**Stanton R. Gallegos, OSB #160091**
StantonGallegos@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR  97201
Telephone: (503) 295-3085

**Neal J. Deckant** *
ndeckant@bursor.com
**Julia K. Venditti** *
jvenditti@bursor.com
BURSOR & FISHER, P.A.
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455

*Attorneys for Plaintiffs and the Putative Class*
*Additional Counsel on Signature Page*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| THEA MACQUAID and SARAH RENFROW, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE NEW YORK TIMES COMPANY, d/b/a *The New York Times*,<br><br>Defendant. | Case No.    3:22-cv-955<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF OREGON'S UNLAWFUL TRADE PRACTICES ACT ("UTPA"), ORS 646.608(1)(ttt)**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Thea MacQuaid and Sarah Renfrow (collectively, "Plaintiffs") bring this action individually and on behalf of all others similarly situated against Defendant The New York Times Company, d/b/a *The New York Times* ("NYT" or "Defendant").  Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a putative class action lawsuit against Defendant for engaging in an illegal "automatic renewal" scheme with respect to its subscription plans for *The New York Times* (collectively, the "NYT Subscriptions, enumerated below") through its website at https://www.nytimes.com (the "NYT Website") and/or its mobile application(s) and/or set-top device(s) (collectively, the "NYT Apps") (together with NYT Website, the "NYT Platform"). Defendant is an international media company that, among other activities, publishes and distributes *The New York Times*, including both its print and online editions.  Relevant to Plaintiffs' allegations, when consumers sign up for *The New York Times* at the NYT Platform, Defendant actually enrolls consumers in a program that automatically renews customers' NYT Subscriptions from month-to-month or year-to-year and results in monthly or annual charges to the consumer's credit card, debit card, or third party payment account (collectively, "Payment Method").  In doing so, Defendant fails to provide the requisite disclosures and authorizations required to be made to and obtained from Oregon consumers under Oregon's Automatic Renewal Law ("ARL"), ORS 646A.295, in direct violation of Oregon's Unlawful Trade Practices Act ("UTPA"), ORS 646.608(1)(ttt).

2.      Through the NYT Platform, Defendant markets, advertises, and sells to

consumers in Oregon and throughout the United States paid memberships to the NYT

Subscriptions, which include, without limitation, the following automatic renewal programs:

Basic Digital Access[1]; All Digital Access[2]; Games[3]; Cooking[4]; and Home Delivery[5]

(collectively, the "NYT Subscriptions").  To sign up for one of Defendant's NYT Subscriptions

through the NYT Platform, customers must provide Defendant with their billing information and

Defendant then automatically charges customers' Payment Method as payments are due,

typically on a monthly or annual basis.  Defendant is able to unilaterally charge its customers

renewal fees without their consent, as Defendant is in possession of its customers' billing

information.  Thus, Defendant has made the deliberate decision to charge Plaintiffs and other

---

[1] "Basic Digital Access subscribers receive access to unlimited articles, podcasts, videos and more on NYTimes.com and the NYTimes news app. You can also download the NYTimes news app for both iOS and Android."  NY Times Help, *Digital Access Subscriptions*, *available at* https://help.nytimes.com/hc/en-us/articles/115015852367-Digital-Access-Subscriptions (last accessed Jun. 27, 2022).  Currently, the Basic Digital Access subscription automatically renews at a standard rate of $17 every four weeks.

[2] "All Digital Access is included with all Home Delivery subscriptions" and is also offered as a standalone subscription.  *Id*.  "All Digital Access subscribers receive unlimited access to New York Times journalism on all your devices and discounts to the Times store."  *Id*.  Additionally, paid subscribers "can download the NYTimes apps for iOS and Android and get access to: … New York Times Games[,] including The Crossword, The Mini Crossword, Spelling Bee, Tiles, and more"; "New York Times Cooking[,] including thousands of recipes, guides for all skill levels, and a digital Recipe Box"; and "Wirecutter[,] including research, reviews and recommendations for thousands of products."  *Id*.  As a standalone subscription, the All Digital Access subscription automatically renews at a standard rate of $25 every four weeks.  *See* https://www.nytimes.com/subscription.

[3] "With a New York Times Games subscription, [consumers] have access to all of The New York Times Word Games and Logic Puzzles[,]" among other things.  NY Times Help, *New York Times Games Subscription*, *available at* https://help.nytimes.com/hc/en-us/articles/360052272251-New-York-Times-Games-Subscription (last accessed Jun. 27, 2022).  The games and puzzles available to paid subscribers "can be played on [a] computer or on [a] phone or tablet with The Crossword app (for iOS and Android)."  *Id*.  NYT Games "is included with Home Delivery and All Digital Access subscriptions" (*id*.), and it is also available for purchase as a standalone subscription for a monthly renewal term at the recurring rate of $1.25 per week (billed every four weeks), or for an annual renewal term at the recurring rate of $40 per year.  *See* https://www.nytimes.com/subscription/games.

[4] The NYT Cooking subscription "[i]ncludes thousands of recipes, a personal Recipe Box, [and] video guides[,]" among other things, and is currently available for purchase as a standalone subscription for a monthly renewal term at the recurring rate of $5 per month (billed every four weeks), or for an annual renewal term at the recurring rate of $40 per year.  *See* https://www.nytimes.com/subscription/cooking.html.

[5] "Home Delivery subscribers receive delivery of the newspaper and All Digital Access."  NY Times Help, *Home Delivery Subscriptions*, *available at* https://help.nytimes.com/hc/en-us/articles/4415714735892-Home-Delivery-Subscriptions- (last accessed Jun. 27, 2022).  Currently, Home Digital subscriptions are available for monthly renewal terms at rates ranging from $10 to $20 per week, billed as $20 to $40 every 4 months, depending on the particular plan the consumer selects.  *See* https://www.nytimes.com/subscription/home-delivery.

similarly situated customers on a monthly or yearly basis, absent their consent under the ARL,

relying on consumer confusion and inertia to retain customers, combat consumer churn, and

bolster its revenues.

3.      Pursuant to the ARL, online retailers who offer automatically renewing

subscriptions to Oregon consumers must: (i) provide the complete automatic renewal offer terms

in a clear and conspicuous manner and in visual proximity to the request for consent prior to the

purchase, *see* ORS 646A.295(1)(a); *see also* ORS 646A.293(5)(a)-(e) (setting forth definition of

"offer terms" as used in ORS 646A.295); (ii) obtain consumers' affirmative consent to the

purchase prior to charging their Payment Methods in connection with the subscriptions, *see* ORS

646A.295(1)(b); and (iii) provide an acknowledgment that includes the automatic renewal offer

terms and identifies a cost-effective, timely, and easy-to-use mechanism for consumers to cancel

their subscriptions, *see* ORS 646A.295(1)(c), ORS 646A.295(2).

4.      Consumers purchasing the NYT Subscriptions do so either by choosing a free trial

that automatically renews with a paid subscription at the end of the trial period, or a paid

monthly or annual subscription (at either the full standard recurring rate that Defendant

ordinarily charges, or at a promotional or discounted rate that remains static for a limited period

of time, after which period the subscription then automatically renews at the full standard rate).

As will be discussed below, the enrollment process for the NYT Subscriptions through the NYT

Platform uniformly violates each of the core requirements of the ARL.

5.      Specifically, Defendant systematically violates the ARL by: (i) failing to present

the automatic renewal offer terms in a clear and conspicuous manner and in visual proximity to

the request for consent to the offer before the subscription or purchasing agreement is fulfilled, in

direct violation of Section 646A.295(1)(a) of the ARL; (ii) charging consumers' Payment

Method without first obtaining their affirmative consent to the agreement containing the automatic renewal offer terms, in direct violation of Section 646A.295(1)(b) of the ARL; and (iii) failing to provide an acknowledgment that includes the automatic renewal offer terms and information regarding how to cancel in a manner that is capable of being retained by the consumer, in direct violation of Section 646A.295(1)(c) of the ARL.  The acknowledgment also fails to disclose a toll-free telephone number or describe another cost-effective, timely, and easy-to-use mechanism for cancellation, and in fact Defendant makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their NYT Subscriptions, in violation of Section 646A.295(2) of the ARL.

6.     As a result, all goods, wares, merchandise, or products sent to Plaintiffs and the Class under the automatic renewal or continuous service agreements are deemed to be "unconditional gifts" under the ARL.  ORS 646A.295(5).

7.     For the foregoing reasons, Plaintiffs bring this action individually and on behalf of all Oregon purchasers of any of Defendant's NYT Subscription offerings who, within the applicable statute of limitations period up to and including the date of judgment in this action, incurred unauthorized fees for the renewal of their NYT Subscriptions.  Based on Defendant's unlawful conduct, Plaintiffs seek damages, restitution, declaratory relief, injunctive relief, reasonable attorneys' fees and costs, and any other relief as the Court may deem proper, for violations of Oregon's Unlawful Trade Practices Act (the "UTPA"), ORS 646.608(1)(ttt).

## THE PARTIES

8.     Plaintiff Thea MacQuaid is a citizen of Oregon, residing in Portland, Oregon.  In or around August 3, 2020, Ms. MacQuaid purchased an annual digital NYT Subscription from Defendant's website while in Oregon.  During the enrollment process, but before finally

consenting to Defendant's subscription offering, Ms. MacQuaid provided her Payment Method information directly to Defendant. At the time Ms. MacQuaid enrolled in her NYT Subscription program, Defendant did not disclose to Ms. MacQuaid all required automatic renewal offer terms associated with the subscription program or obtain Ms. MacQuaid's affirmative consent to those terms. Further, after Ms. MacQuaid completed her initial order, Defendant sent Ms. MacQuaid an email confirmation and receipt for her purchase of and enrollment in a NYT Subscription (the "Acknowledgment Email"). However, the Acknowledgment Email, too, failed to provide Ms. MacQuaid with the complete automatic renewal terms that applied to Defendant's offer, a description of Defendant's full cancellation policy, or information regarding how to cancel Ms. MacQuaid's NYT Subscription in a manner capable of being retained by her. Ms. MacQuaid did not receive any other acknowledgement that contained the required information. As a result, Ms. MacQuaid was not placed on notice of several material terms associated with her NYT Subscription. In particular, Ms. MacQuaid was not made aware of the recurring price to be charged upon renewal, the length of the renewal term or when the first charge would occur, or the complete cancellation policy associated with her NYT Subscription, the most crucial aspects of which were missing from the Checkout Page and Acknowledgment Email. Nevertheless, on Saturday, July 31, 2021, less than one year after Ms. MacQuaid signed up for her NYT Subscription, Defendant automatically renewed Ms. MacQuaid's NYT Subscription and charged Ms. MacQuaid's Payment Method approximately $200, which is a rate more than double the rate charged to her Payment Method upon initial enrollment in or around August 2020. Promptly after learning of this July 2021 subscription charge, on or around Monday, August 2, 2021[6], Ms.

---

[6] Ms. MacQuaid learned of this surprise charge to her Payment Method later the same day that Defendant posted the subscription fees to her associated bank account on July 31, 2021. Although Ms. MacQuaid wanted to cancel her NYT Subscription that same Saturday evening, she quickly discovered she was unable to do at that time. That is

MacQuaid attempted to cancel her NYT Subscription via phone call in order to avoid incurring any additional future charges.  During the same call, Ms. MacQuaid also requested a refund for the unexpected renewal charge she had incurred during the previous week.  Ultimately, however, Ms. MacQuaid's cancellation attempt was unsuccessful, and she was unable to terminate her subscription due to Defendant's confusing cancellation policy, the most crucial aspects of which were missing from the Checkout Page and Acknowledgment Email.  Defendant also denied Ms. MacQuaid's refund request.  Defendant's missing and/or incomplete disclosures on the Checkout Page and in the Acknowledgment Email for the NYT Subscription, its failure to obtain Ms. MacQuaid's affirmative consent to the offer terms associated with the NYT Subscriptions before charging her Payment Method on a recurring basis, and its subsequent failure to issue a refund of the unauthorized charge she incurred in or around July 2021, are contrary to the ARL, which deems products provided in violation of the statute to be a gift to consumers.  *See* ORS 646A.295.  Had Defendant complied with the ARL, Ms. MacQuaid would have been able to read and review the pertinent automatic renewal offer terms prior to purchase, and she would have not subscribed to the *New York Times* at all or on the same terms, or she would have cancelled her NYT Subscription earlier, *i.e.*, prior to the expiration of the initial subscription period.  As a direct result of Defendant's violations of the ARL, Ms. MacQuaid suffered, and continues to suffer, economic injury.

---

because, as discussed below, although Defendant's online policies assure that subscribers "can change or cancel [their] digital subscription at any time by calling Customer Care at (866)-273-3612[,]" in reality cancellation by phone is only possible for subscribers in the U.S. during NYT's customer service hours of operation, which are "7 a.m. to 3 p.m. E.T. on weekends[.]"  NYT Help, *Terms of Sale* (last updated Sep. 1, 2021), https://help.nytimes.com/hc/en-us/articles/115014893968-Terms-of-sale#cancellation.  Additionally, at that time Ms. MacQuaid was unaware that cancellation is also available via Defendant's "chat" facility because, contrary to the ARL, this aspect of NYT's cancellation policy was not adequately disclosed on the pre-purchase Checkout Page or in the post-purchase Acknowledgment Email.  In any case, "most of the time and days, their chat facility is unavailable due to excessive chat from customers[.]"  *NYT shady unSubscription dark pattern explained & steps to exit* (May 1, 2020), https://thedigitalhacker.com/nyt-found-to-be-using-dark-patterns/.  Thus, as Plaintiff MacQuaid discovered, NYT's claim that consumers can cancel their subscriptions "at any time" is demonstrably false.

9.      Plaintiff Sarah Renfrow is a citizen of Oregon, residing in Milwaukie, Oregon.  In or around December 2020, Ms. Renfrow purchased a monthly digital subscription to *The New York Times* from Defendant's website while in Oregon.  During the enrollment process, but before finally consenting to Defendant's subscription offering, Ms. Renfrow provided her Payment Method information directly to Defendant.  At the time Ms. Renfrow enrolled in her NYT Subscription, Defendant did not disclose to Ms. Renfrow all required automatic renewal offer terms associated with the subscription program or obtain Ms. Renfrow's affirmative consent to those terms.  Further, after Ms. Renfrow completed her initial order, Defendant sent Ms. Renfrow an Acknowledgment Email that also failed to provide Ms. Renfrow with the complete automatic renewal terms that applied to Defendant's offer, a description of Defendant's full cancellation policy, or information regarding how to cancel Ms. Renfrow's NYT Subscription in a manner capable of being retained by her.  Ms. Renfrow did not receive any other acknowledgement that contained the required information.  As a result, Ms. Renfrow was not placed on notice of several material terms associated with her NYT Subscription.  Nevertheless, approximately one month after she first signed up for her NYT Subscription, Defendant automatically renewed Ms. Renfrow's NYT Subscription and charged Ms. Renfrow's Payment Method approximately $1.00 per month, the promotional renewal rate associated with Ms. Renfrow's discounted NYT Subscription.  Thereafter, Defendant continued to automatically renew Ms. Renfrow's NYT Subscription at the promotional $1.00 monthly renewal rate until approximately November 2021.  Then, in or around November 2021, less than one full year after Ms. Renfrow's initial enrollment, Defendant began charging approximately $17 per month to Ms. Renfrow's Payment Method in connection with her NYT Subscription, a renewal rate 17 times higher than the initial rate she was charged upon initial enrollment in or around December

2020 and again every month for nearly a year after that. Ms. Renfrow was not aware of the increase in price to the $17 monthly renewal rate until she reviewed her bank statement in or around November 2021. Thereafter, Defendant continued to automatically renew Ms. Renfrow's NYT Subscription on a monthly basis at the renewal rate of $17 per month, thus charging additional unauthorized fees to Ms. Renfrow's Payment Method. Ms. Renfrow was not aware of the increase in price to the $17 monthly renewal rate until she reviewed her bank statement in November 2021. Promptly after learning of these subscription charges, Ms. Renfrow attempted to cancel her NYT Subscription. Specifically, in or around November 2021, Ms. Renfrow called Defendant's customer service line to notify Defendant that she did not authorize the monthly charges she incurred at the unexpected renewal rate of $17 per month, and to request cancellation of her NYT Subscription so as to avoid incurring any additional future charges. During that phone call, Defendant refused to issue any refund but confirmed that it would cancel Ms. Renfrow's NYT Subscription. Thus, Ms. Renfrow believed that her November 2021 cancellation attempt was effective and that she would incur no further automatic monthly charges in connection with her NYT Subscription. However, to Ms. Renfrow's surprise, in December 2021, Defendant again automatically renewed Ms. Renfrow's NYT Subscription and charged her Payment Method another $17 for the subsequent month. Thus, despite being told by Defendant that it would cancel her NYT Subscription in November 2021, the subscription was not cancelled. Then, in or around December 2021, Ms. Renfrow attempted to cancel again by phone, but was told she could not do so. Ultimately, Ms. Renfrow's cancellation attempts were unsuccessful, and she was unable to terminate her subscription due to Defendant's confusing and time-consuming cancellation policy, the most crucial aspects of which were missing or obscured from the Checkout Page and Acknowledgment Email. As a result, Ms. Renfrow remains

enrolled in, and continues to receive monthly renewal charges for, her NYT Subscription to this day, despite the fact that she does not want to remain subscribed or pay further renewal fees. Defendant's missing and/or incomplete disclosures on the Checkout Page and in the Acknowledgment Email for the NYT Subscription, its failure to obtain Ms. Renfrow's affirmative consent to the offer terms associated with the NYT Subscriptions before charging her Payment Method on a recurring basis, and its subsequent failure to issue a refund of the unauthorized charges she incurred, are contrary to the ARL, which deems products provided in violation of the statute to be a gift to consumers.  *See* ORS 646A.295.  Had Defendant complied with the ARL, Ms. Renfrow would have been able to read and review the pertinent automatic renewal offer terms prior to purchase, and she would have not subscribed to *The New York Times* at all or on the same terms, or she would have cancelled her NYT Subscription earlier, *i.e.*, prior to the expiration of the initial subscription period and/or any subsequent renewal term.  As a direct result of Defendant's violations of the ARL, Ms. Renfrow suffered, and continues to suffer, economic injury.

10.     Defendant The New York Times Company ("NYT" or "Defendant") is a New York corporation with its principal place of business at 620 Eighth Avenue, New York, New York 10018.  Defendant is an international media company that publishes *The New York Times*, including both its print and online editions, which it markets to consumers through the NYT Website and App.  Defendant is also responsible for the promotion, advertisement, and/or marketing of the automatically renewing subscription plans for *The New York Times*, and it owns and operates the NYT Website and App, where it markets and sells its NYT Subscriptions. Defendant sells NYT Subscriptions in Oregon and has done business throughout Oregon, and throughout the United States, at all times during the Class Period.  Defendant also made

automatic renewal or continuous service offers to consumers in California and New York, and

throughout the United States, via the NYT Website and/or App during the Class Period.

11.     Plaintiffs reserve the right to amend this Complaint to add different or additional

defendants, including without limitation any officer, director, employee, supplier, or distributor

of Defendant who has knowingly and willfully aided, abetted, or conspired in the false and

deceptive conduct alleged herein.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A),

as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class

action where the aggregate claims of all members of the proposed class are in excess of

$5,000,000.00, exclusive of interest and costs, there are over 100 members of the putative class,

and Plaintiff, as well as most members of the proposed class, is a citizen of a state different from

Defendant.

13.     This Court has personal jurisdiction over the parties because Plaintiffs reside in

Oregon and submit to the jurisdiction of the Court, and because Defendant has, at all times

relevant hereto, systematically and continually conducted business in Oregon, including within

this District, and/or intentionally availed itself of the benefits and privileges of the Oregon

consumer market through the promotion, marketing, and sale of its products and/or services to

residents within this District and throughout Oregon.  Additionally, Plaintiffs purchased their

NYT Subscriptions from Defendant while in Oregon.

14.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action

because a substantial part of the events, omissions, and acts giving rise to the claims herein

occurred in this District.  Also, Plaintiffs reside in this District and purchased Defendant's NYT

Subscription in this District.  Moreover, Defendant systematically conducts business in this

District and throughout the State of Oregon, and it distributed, advertised, and sold the NYT

Subscriptions to Plaintiffs and Class Members in this State and District.  The Portland Division is

the appropriate venue because, as explained below, a substantial part of the events giving rise to

the claims occurred in this division.

<strong><u>FACTUAL ALLEGATIONS</u></strong>

A.    **Background On The Subscription e-Commerce Market**

15.    The e-commerce subscription model is a business model in which retailers

provide ongoing goods or services "in exchange for regular payments from the customer."[7]

Subscription e-commerce services target a wide range of customers and cater to a variety of

specific interests.  Given the prevalence of online and e-commerce retailers, subscription e-

commerce has grown rapidly in popularity in recent years.  Indeed, the "subscription economy

has grown more than 400% over the last 8.5 years as consumers have demonstrated a growing

preference for access to subscription services[.]"[8]  Analysts at UBS predict that the subscription

economy will expand into a $1.5 trillion market by 2025, up from $650 billion in 2020.[9]  That

constitutes an average annual growth rate of 18%, which makes the subscription economy "one

---

[7] *See* https://www.coredna.com/blogs/ecommerce-subscription-services.

[8] Business Insider, *Taco Bell's taco subscription is rolling out nationwide — here's how to get it* (Jan. 6, 2022), https://www.businessinsider.com/taco-bell-subscription-launching-across-the-country-2022-1 (internal quotation marks omitted).

[9] *See* UBS, *Investing in digital subscriptions* (Mar. 10, 2021), https://www.ubs.com/global/en/wealth-management/our-approach/marketnews/article.1525238.html ("[A]t close to USD 650 billion in 2020, we expect the subscription economy to expand into a USD 1.5 trillion market by 2025, implying an average annual growth rate of 18%.").  *See also* Subscribed, *UBS Declares: It's Worth Investing in the Subscription Economy* (Apr. 17, 2021), https://www.subscribed.com/read/news-and-editorial/ubs-declares-its-worth-investing-in-the-subscription-economy; Business 2 Community, *The Subscription Economy Is Booming Right Now. But Are You Reaping the Full Benefits?* (Oct. 7, 2021), https://www.business2community.com/ecommerce/the-subscription-economy-is-booming-right-now-but-are-you-reaping-the-full-benefits-02434851.

of the fastest-growing industries globally."[10]

16.    Defendant "launched the subscription model in March 2011, becoming one of the first American news organizations that put its content behind a paywall after allowing unrestricted access."[11]  Since then, Defendant has been "seeing positive results at a time when newspapers nationwide have been suffering."[12]

17.    As noted above, the production, sale, and distribution of subscription-based products and services is a booming industry that has exploded in popularity over the past few years.  According to Forbes, "[t]he subscription e-commerce market has grown by more than 100% percent a year over the past five years, with the largest retailers generating more than $2.6B in sales in 2016, up from $57.0M in 2011."[13]  Following 2016, market growth within the industry increased exponentially, reaching $650 billion in 2020.[14]  "As such, the financials of companies with subscription business models[] … improved dramatically in 2020 thanks to limited revenue volatility and strong cash flow generation."[15]  Thus, "[t]he share prices of most subscription companies have performed well in recent years."[16]

---

[10] UBS, *Investing in digital subscriptions* (Mar. 10, 2021), *supra* ("[Growth] was seen across many areas, including e-commerce, video streaming, gaming, cloud-based applications, etc."); *see also* Juniper Research, *Subscriptions For Physical Goods To Overtake Digital Subscriptions By 2025; Growing To Over $263bn Globally* (Oct. 12, 2020), https://www.juniperresearch.com/press/subscriptions-for-physical-goods-to-overtake (acknowledging "the significant lead the digital sector has had in th[e] area[ of digital service subscriptions]").

[11] *The New York Times increases digital subscription price for the first time*, CNN Business (Feb. 4, 2020), https://www.cnn.com/2020/02/04/media/newyorktimes-raises-subscription-price/index.html.

[12] *New York Times Company Continues to Add Online Subscribers as Digital Advertising Grows*, NYTimes (May 8, 2019), https://www.nytimes.com/2019/05/08/business/media/new-york-times-company-earnings.html.

[13] *The State Of The Subscription Economy, 2018*, Forbes (Mar. 4, 2018), https://www.forbes.com/sites/louiscolumbus/2018/03/04/the-state-of-the-subscription-economy-2018/#6ad8251a53ef.

[14] *See* UBS, *Investing in digital subscriptions* (Mar. 10, 2021), *available at* https://www.ubs.com/global/en/wealth-management/our-approach/marketnews/article.1525238.html.

[15] *Id.*

[16] *Id.*

18.    The expansion of the subscription e-commerce market shows no signs of slowing. "We're now in the subscriptions era, and the pandemic is accelerating its takeover.  During the COVID-19 lockdowns, many digital-based subscription business models fared well due to their promise of convenience and strong business continuity."[17]  According to *The Washington Post*, "[s]ubscriptions boomed during the coronavirus pandemic as Americans largely stuck in shutdown mode flocked to digital entertainment[.] … The subscription economy was on the rise before the pandemic, but its wider and deeper reach in nearly every industry is expected to last, even after the pandemic subsides in the United States."[18]

19.    However, as *The Washington Post* has noted, there are downsides associated with the subscription-based business model.  While the subscription e-commerce market has low barriers and is thus easy to enter, it is considerably more difficult for retailers to dominate the market due to the "highly competitive prices and broad similarities among the leading players."[19] In particular, retailers struggle with the fact that "[c]hurn rates are high, [] and consumers quickly cancel services that don't deliver superior end-to-end experiences."[20]  Yet, retailers have also recognized that, where the recurring nature of the service, billing practices, or cancellation process is unclear or complicated, "consumers may lose interest but be too harried to take the

---

[17] UBS, *Investing in digital subscriptions* (Mar. 10, 2021), https://www.ubs.com/global/en/wealth-management/our-approach/marketnews/article.1525238.html.

[18] The Washington Post, *Everything's becoming a subscription, and the pandemic is partly to blame* (June 1, 2021), https://www.washingtonpost.com/business/2021/06/01/subscription-boom-pandemic/ (noting that "e-commerce and entertainment subscriptions to sites such as Netflix, Hulu and Disney Plus made headlines during the pandemic for soaring growth").

[19] *Thinking inside the subscription box: New research on e-commerce consumers*, McKinsey & Company (Feb. 2018), https://www.mckinsey.com/industries/technology-media-and-telecommunications/our-insights/thinking-inside-the-subscription-box-new-research-on-ecommerce-consumers#0.

[20] *Id.*

Page 14 - COMPLAINT

extra step of canceling their membership[s]."[21]  As these companies have realized, "[t]he real money is in the inertia."[22]  As a result, "[m]any e-commerce sites work with third-party vendors to implement more manipulative designs."[23]  That is, to facilitate consumer inertia, a number of subscription e-commerce companies, including Defendant, "are now taking advantage of subscriptions in order to trick users into signing up for expensive and recurring plans.  They do this by intentionally confusing users with their app's design and flow, … and other misleading tactics[,]" such as failure to fully disclose the terms of its automatic-renewal programs.[24]

20.     To make matters worse, once enrolled in the subscription, "[o]ne of the biggest complaints consumers have about brand/retailers is that it's often difficult to discontinue a subscription marketing plan."[25]  Moreover, "the rapid growth of subscriptions has created a host of challenges for the economy, far outpacing the government's ability to scrutinize aggressive marketing practices and ensure that consumers are being treated fairly, consumer advocates say."[26]  Thus, although "Federal Trade Commission regulators are looking at ways to make it harder for companies to trap consumers into monthly subscriptions that drain their bank accounts[ and] attempting to respond to a proliferation of abuses by some companies over the

---

[21] *Little-box retailing: Subscription services offer new possibilities to consumers, major outlets*, Washington Post (Apr. 7, 2014), https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3-8d62-419db477a0e6_story.html.

[22] *Id.*

[23] Business Insider, *A new study from Princeton reveals how shopping websites use 'dark patterns' to trick you into buying things you didn't actually want* (Jun. 25, 2019), https://www.businessinsider.com/dark-patterns-online-shopping-princeton-2019-6.

[24] TechCrunch, *Sneaky subscriptions are plaguing the App Store* (Oct. 15, 2018), https://techcrunch.com/2018/10/15/sneaky-subscriptions-are-plaguing-the-app-store/.

[25] The Washington Post, *Everything's becoming a subscription, and the pandemic is partly to blame* (June 1, 2021), https://www.washingtonpost.com/business/2021/06/01/subscription-boom-pandemic/ ("'Subscription services are a sneaky wallet drain,' said Angela Myers, 29, of Pittsburgh. 'You keep signing up for things and they make it really hard to cancel.'"); *see also* New Media and Marketing, *The problem with subscription marketing* (Mar. 17, 2019), https://www.newmediaandmarketing.com/the-problem-with-subscription-marketing/.

[26] *Id.*

past few years[,]"[27] widespread utilization of these misleading dark patterns and deliberate omissions persist.

21.     Defendant has successfully implemented this tactic.  "From 2017 to 2018, revenues from the Times' digital-only subscription packages increased 18% year-over-year to $401 million[.]"[28]  By the end of 2019, Defendant "passed $800 million in annual digital revenue for the first time[.] … Most of that $800.8 million — more than $420 million — came from news subscribers."[29]  According to Mark Thompson, NYT's president and CEO, the fiscal year of 2019 was "'a record-setting year for [Defendant's] digital subscription business, the best since the company launched digital subscriptions [in 2011].'"[30]

### B.   Defendant's Dark Patterns And Online Consumer Complaints About The NYT Subscriptions

22.     Defendant's recent growth in revenues and subscriber count with respect to its digital NYT Subscriptions coincides with a sharp decline in subscriber satisfaction as the NYT Platform have become riddled with "dark patterns."  A dark pattern is "a process design that requires several complex procedures to do simple things."  One consumer complaint indicates that Defendant has been "using dark patterns to prevent user unsubscription from [its] site" by adopting "complex procedures to increase the friction in the subscription cancellation process and keep the user subscriber."  For instance, although one page of the NYT Platform states that consumers can cancel their NYT Subscription via chat, "[t]he chat facility is only available in-office hours (07:00 AM-10:00 PM) on weekdays and 07:00 AM-03:00 PM on weekends[, and]

---

[27] *Id.*

[28] *The New York Times increases digital subscription price for the first time*, CNN Business (Feb. 4, 2020), https://www.cnn.com/2020/02/04/media/newyorktimes-raises-subscription-price/index.html.

[29] *The New York Times Tops 5 Million Subscriptions as Ads Decline* (Feb. 6, 2020), https://www.nytimes.com/2020/02/06/business/new-york-times-earning.html.

[30] *Id.*

most of the time and days, their chat facility is unavailable due to excessive chat from customers[.]"[31]

23.    In fact, Defendant's conduct has drawn the attention and ire of customers across the country, with countless angry customers taking to the Internet to voice their discontent over Defendant's broken promises.  For instance, numerous subscribers have left scathing reviews on the Better Business Bureau website, complaining of the unclear billing practices and confusing cancellation policy associated with the NYT Subscriptions:[32]

 05/20/2022

I signed up for a New York Times Digital Subscription with Sunday delivery on May 5, 2022. I called to cancel my subscription on May 10, 2022. I was advised that I would lose immediate access and be credited a refund of *****, which is the amount I was billed and the amount I was told would be credited. I called back several days later, due to not receiving an email reflecting my cancellation as well as a pending credit. I was advised to give it several more days after speaking with several representatives and a supervisor. Upon still not receiving a cancellation confirmation email or credit to my account, I called again on May 20, 2022 and was advised by a representative that for some reason the system rejected my refund and it will have to start processing once again. I was advised that my refund of ***** for a service cancelled on May 10, 2022 may not be credited to my account until May, 30, 2022. I believe this to be questionable and deceptive business practices by the New York Times and I have yet to receive an email confirming my cancellation and pending refund,

**Complaint Type:** Billing/Collection Issues    **Status:** Answered 🔶

 05/18/2022

I called to cancel my subscription to NYTimes and the customer service representative on the chat agreed to refund the amount of $17 back on my card. But this has never happened and I still did not receive the refund. The customer service is dismal and condescending and often hang up on the chat when I tried to ask for refund. This has happened 3 times now.This is the worst customer service I have experienced in modern times. They just want to get your money and never respond to your concerns of cancellations. Please refund me back the $17 charged to my card.

 04/28/2022

I subscribed to a $4.00 a month trial for the New York Times online newspaper. although I have cancelled the subscription, I continue to get charged monthly for the subscription which the Times customer service says its cancelled. The total amount that I have been overcharged is $64.19. I demand that the Times stop charging my bank account immediately, and refund me a total of $64.19 for the amount that I have been overcharged. I have made several calls to customer service to resolve this issue, but all they tell me is its already cancelled and I am not getting charged.

---

[31] *NYT shady unSubscription dark pattern explained & steps to exit* (May 1, 2020), https://thedigitalhacker.com/nyt-found-to-be-using-dark-patterns/.

[32] *See* https://www.bbb.org/us/ny/new-york/profile/publishers-periodical/the-new-york-times-company-0121-229/complaints; https://www.bbb.org/us/ny/new-york/profile/publishers-periodical/the-new-york-times-company-0121-229/complaints.

Page 17 - COMPLAINT

**Complaint Type:** Problems with Product/Service    **Status:** Answered 

05/03/2022



I have never subscribed to the NYTimes, but there have been $1 charges to credit card for the last 6 months. $1 charge on 4/16/22, 3/19/22, 2/19/22, 1/19/22, 12/25/21 and 11/30/2021. I called NY times, the phone attendant was very helpful. She found no accounts under my name/email addresses of phone number. She forwarded information up the chain to find the status of the card and I was supposed to hear back via email in a couple days, but I have heard nothing in a week. Feels like a scam, getting a dollar a week from unknowing customers.It is NOT coming out through Apple. I would like $6 refunded and deductions to stop coming out of my account.

04/27/2022



I subscribed to NYTimes last year at a rate of $6/month. The subscription automatically renewed and jumped from $6/month to $25/per month. I called to cancel and was talked into continuing my subscription at what I thought was a rate of $19.50/4 months when it was in fact $19.50/4 weeks. To go from $6 to $25 is a huge difference and it is an insult that they thought $19.50 was such a great deal. I called today to cancel my subscription and express my displeasure and had to repeat myself 4 times to finally reach cancellation bc the customer service representative kept insisting on telling me about another special promotion It seems they dont count on people checking their accounts or doing the math. I paid a total of $72 for my subscription last year. In just 4 months I was charged over $100 for the exact same subscription. If they were truly interested in keeping a customer they would have offered at least a partial refund or a legitimately reasonable monthly price. I will never again sign up for another subscription with NYTimes and I look forward to sharing my experience with anyone who will listen.

03/24/2022



I have had a digital subscription to New York Times since October of 2020.In Aug of 2021, I decided to cancel my subscription. I was only using their content sparingly and needed to reduce spending. I accessed my account online and proceeded to cancel. I was offered a reduced monthly cost. I declined. This month (3/22), I found that my cc payment was declined (I have been unable to work due to a loss of affordable child care). When I looked into it, I found that NY Times had been charging me since Oct! I contacted them thru online chat. They informed me that I had only paused the account (untrue), and it had reactivated in October. They refused to issue a refund. When I argued the matter, they refused any consideration. I was only asking for a refund for services that I had not approved, that had been reoccurring since October 2021. I wasnt even addressing the fact that the money they took from me, WITHOUT CONSENT, had effectively lowered my credit. Or the fact that I would have to scramble to find a way to pay for my credit card ****. Even if they issued a refund, it wouldnt come in time, nor would it cover the declined payment charge. Those werent their responsibilities. I asked them to access the account themselves, they can see that I have not logged in ONE SINGLE TIME since August, when I deactivated the account. When I started the service, I linked it to my ********* feed. It was never reconnected because it shouldve been CANCELLED!! Oct 2020 - account opened Aug9th- cancelled account 8/10- $4.24 11/1 - $3.94 11/29 - $4.24 12/27 - $18.02 1/24 - $18.02 3/9 - $18.02 3/21 - $18.02 NONE OF THESE CHARGES WERE AUTHORIZED. This is stealing.When asked about the price increase, they told me my account was opened in 1/22/21; that I had a reduced pricing offer for one years time. My account was opened 3 mo prior. Even with the obvious confusion, they refused any help.



03/14/2022

I had a one-year subscription with the New York Times ($1/week),I received an email yesterday letting me know my account would be charged on the 14th if I did not cancel.I cancelled today. They charged my account $12 and refused to refund the charge. Im currently (temporarily) unemployed; with gas prices and inflation, I NEED that money to use it to buy food for my kids. I am absolutely shocked, and disappointed by their customer service,

**Complaint Type:** Billing/Collection Issues    **Status:** Answered ⓘ



04/07/2020

To retain me as a customer, the NYT agreed to freeze my monthly subscription rate at $15.00 for as long as I continued to subscribe.The NYT continued to abide by this agreement for several years. Then, in the last bill(and without notice) the NYT raised my subscription price to $18.06 per month. I immediately complained to the NYT by phone about the unilateral price increase. I was channeled through 3 separate customer service representatives. All of whom admitted that their notes stated that the NYT had, in fact, made such an agreement with me. But they emphasized that the paper would not live by the agreement, essentially repudiating it, now indicating,in a spirit of buyer's remorse. that NYT should not have been made such an agreement

**Complaint Type:** Billing/Collection Issues    **Status:** Answered ⓘ



02/28/2020

I was subscribed to the New York Times and cancelled 3 times over the course of 3 months. Every month I continue to be billed the $5. They refuse to offer a refund. When you call, text or chat to cancel the subscription, there is always a "longer than usual wait time". Sometimes I do not hear back and other times it takes hours.

**Complaint Type:** Billing/Collection Issues    **Status:** Resolved ⓘ



01/29/2020

I have been attempting to cancel my digital subscription with this company for the past 24 hours. I first attempted to do so through their online chat. Eventually the technician stopped replying and was taking an inordinate amount of time to reply when they were replying (asking basic elections like "why do I want to cancel", "what is my name". So once they hadn't replied for 10 minutes I switched to their text message cancellation service. I was only ever answered by the automatic reply system. I was finally connected with a representative almost 12 hours later at 4 AM. I was unable to reply since I was asleep. Instead of canceling my subscription like I requested, they offered me a new deal. When I replied at 6 AM after waking up, I got another automated message stating that I would be reconnected with a representative but that I would have to wait again.

24.    Other subscribers to *The New York Times* left similar complaints on Yelp.com:[33]



25.     Yet more unhappy subscribers left negative reviews on the "New York Times

Customer Service" webpage at CustomerServiceScoreboard.com:[34]

---

**30 Dec**   **Posted by Unhappy** 🚩

*12/30/19 6:07PM*

I have wasted a total of three hours today trying to connect with NYT customer service. This is in addition to the two hours I spent on Dec. 17 on the phone and also chatting with a customer service agent.

This is the very WORST customer service I have ever experienced!

You need more staff, more knowledgeable staff, a system that allows customer service to address/make changes to gift subscriptions. This is a long, painful story, too long at this point to retell. I am most dissatisfied!

---

**13 Nov**   **Posted by Harley, Summer** 🚩

*11/13/19 1:05PM*

Honestly worst customer service I have ever come across. They always take half an hour to solve your problem. They offered me a four month free subscription then sneakily charged money on my account. When I requested refund it took them ages to set up a new account. Now I am quite prepared that my money will just be snatched up.

---

**20 Aug**   **Posted by Anonymous** 🚩

*8/20/19 1:25PM*

All I want to do is change the credit card number you charge for my monthly subscription. I don't in Understand what you are telling me to do. Could I please talk to a real person?

---

**27 Jul**   **Posted by Kwikoff** 🚩

*7/27/19 9:28AM*

Why do you make it so damn hard to cancel a subscription? I have spent almost 30 minutes trying to do so. Your digital newspaper is too difficult to use. Your newspaper has changed since I first subscribed and I do not find it interesting. You don't need my phone number or anything else.

---

**27 Dec**   **Posted by Anonymous** 🚩

*12/27/19 8:04AM*

I keep getting charged each month. I wanted to cancel. have been texting for OVER an hour waiting for a response besides someone will be with you shortly. It should not be this difficult to cancel a 6$ a month subscription. They are doing this so you go screw it and keep charing you. even if it is 6$ a month , imagine the millions of people they are doing this too. I will resort to canceling my credit card if this crap continues

---

[34] *See* https://www.customerservicescoreboard.com/New+York+Times.

26.     The above reviews are just a sampling of numerous negative reviews consumers have left about Defendant's NYT Subscriptions and the unclear cancellations policy and confusing billing associated with its subscription offerings.  As discussed below, the above online consumer complaints reveal a widespread pattern of uniform unlawful conduct by Defendant, underscoring the artifice devised and employed by Defendant to lure and deceive millions of consumers into enrolling, and remaining enrolled, in the paid NYT Subscription programs.

**C.    Oregon's Automatic Renewal Law**

27.     In 2011, with the passage of Oregon's Senate Bill 487, the Oregon Legislature enacted the Automatic Renewal Law ("ARL"), ORS 646A.292-646A.295, with the intent to "end the practice of ongoing charging of consumer credit or debit cards or third party payment accounts without the consumers' explicit consent for ongoing shipments of a product or ongoing deliveries of service."  ORS 646A.292 (statement of legislative intent).

28.     The ARL makes it "unlawful for a person that makes an automatic renewal or continuous service offer to a consumer in this state to do any of the following:"

> (a)  Fail to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before a subscription or purchasing agreement is fulfilled and in visual proximity, or in the case of an offer conveyed by voice, in temporal proximity, to the request for consent to the offer.
>
> (b)  Charge the consumer's credit or debit card or payment account with a third party for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms.
>
> (c)  Fail to provide an acknowledgment that includes the automatic renewal offer terms or continuous service offer terms and information regarding how to cancel in a manner that is capable of being retained by the consumer.  If the offer includes a free trial,

the person shall also disclose in the acknowledgment how to cancel
and allow the consumer to cancel before the consumer pays for the
goods or services.

ORS 646A.295(1)(a)-(c).  The requirements of 646A.295(1)(a)-(b) "must be met prior to the

completion of the initial order for the automatic renewal or continuous service[,]" but the

requirements of 646A.295(1)(c) "may be fulfilled after completion of the initial order."

646A.295(4).

29.    Additionally, Section 646A.295(2) of the ARL further provides:

A person making automatic renewal or continuous service offers
shall provide a toll-free telephone number, electronic mail address,
a post-office address only when the person directly bills the
consumer, or another cost-effective, timely and easy-to-use
mechanism for cancellation that must be described in the
acknowledgment required by subsection (1)(c) of this section.

ORS 646A.295(2).

30.    The term "Person" as used in ORS 646A.295 means "natural persons,

corporations, trusts, partnerships, incorporated or unincorporated associations and any other legal

entity except bodies or officers acting under statutory authority of this state or the United States."

ORS 646.605; *see also* ORS 646A.293(4) ("'Person' has the meaning given that term in ORS

646.605[.]").  Defendant is a "person" under this definition.

31.    Section 646A.293(1) of the ARL defines the term "Automatic renewal" as a "plan

or arrangement in which a paid subscription or purchasing agreement is automatically renewed at

the end of a definite term for a subsequent term."  Section 646A.293(3) similarly defines

"Continuous service" as "a plan or arrangement in which a paid subscription or purchasing

agreement continues until the consumer cancels the service."  The NYT Subscriptions constitute

"automatic renewal" and/or "continuous service" plans under these definitions.

32.    Pursuant to Section 646A.293(5) of the ARL, "Offer terms" means "the following

clear and conspicuous disclosures: (a) That the subscription or purchasing agreement will continue until the consumer cancels. (b) The description of the cancellation policy that applies to the offer. (c) The recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal or continuous service plan or arrangement, and, if the amount of the charge will change, the amount to which the charge will change, if known. (d) The length of the automatic renewal term or that the service is continuous, unless the length of the term is chosen by the consumer. (e) The minimum purchase obligation, if any." ORS 646A.293(5)(a)-(e).

33.    Section 646A.293(2) of the ARL defines the term "Clear and conspicuous," in relevant part, as "in larger type than the surrounding text, or in contrasting type, font or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language."

34.    Finally, the ARL provides that where "a person sends goods, wares, merchandise or products to a consumer under a continuous service agreement or pursuant to an automatic renewal of a purchase without first obtaining the consumer's affirmative consent as required in [ORS 646A.295(1)], the goods, wares, merchandise or products shall for all purposes be deemed an unconditional gift to the consumer who may use or dispose of them in any manner the consumer sees fit without any obligation to the person including, but not limited to, requiring the consumer to ship, or bear the cost of shipping, any goods, wares, merchandise or products to the person." ORS 646A.295(5).

35.    As alleged below, Defendant's practices systematically violate Sections 646A.295(1)(a), 646A.295(1)(b), 646A.295(1)(c), and 646A.295(2) of the ARL.

**D.    Defendant's Business: The Subscription Enrollment Process**

36.     At all relevant times, Defendant offered, via the NYT Platform, various NYT Subscriptions to *The New York Times*, a publication available in digital and print formats, and/or NYT's Games or Cooking subscriptions (collectively, the "NYT Subscriptions").  These paid subscriptions are offered on a recurring basis for monthly and/or yearly renewal terms, and all plans automatically renew at the end of the defined renewal term unless the subscriber cancels. For example, customers that sign up for a monthly NYT Subscription are, at the end of the initial one-month period, automatically renewed and typically charged the full amount for the next month, and every month thereafter if they do not cancel.  Similarly, customers enrolled in an annual NYT Subscription are, at the end of the initial one-year period, automatically renewed and typically charged the full amount for the next year, and every year thereafter if they do not cancel.  Defendant's NYT Subscriptions constitute automatic renewal and/or continuous service plans or arrangements as those terms are defined under ORS 646A.293(1) and ORS 646A.293(3).

37.     To sign up for one of Defendant's NYT Subscriptions, the consumer must first select a program.  From the NYT Platform, prospective subscribers can review features of – and find links to the individual enrollment webpages for – each of Defendant's subscription offerings, including the NYT Subscriptions at issue.

38.     Consumers can sign up for one of Defendant's subscription plans through the NYT Website, on either its mobile or desktop format, or the NYT App(s).  Defendant automatically enrolls customers who purchase a paid NYT Subscription via the NYT Platform in their chosen NYT Subscription program going forward, by default.

39.     The enrollment process for the NYT Subscriptions is substantially the same, regardless of the medium used.  After selecting a subscription option, consumers navigating the

enrollment process on the NYT Platform are directed to subsequent webpages where they are prompted to create a membership account and input their billing information.  After these steps, consumers are directed to another, final webpage (the "Checkout Page"), where prospective subscribers are invited to complete their purchase.  For the purposes of the ARL and this Complaint, the "relevant portion of the Checkout Page" refers to the text of that portion of the Checkout Page that appears "in visual proximity … to the request for consent to the offer" (ORS 646A.295(1)(a)), which in this case pertains to the latter block of text located immediately above the final black "Purchase Subscription" button that customers must press in order to complete the checkout process.

     40.    By way of example, at least as June 2022, when a consumer signed up for a Basic Digital Access NYT Subscription via his or her computer web browser, the "relevant portion of the Checkout Page" refers to the disclosures in the block of text above the black "Purchase Subscription" button (*i.e.*, the "request for consent"), which contains the following language and appearance (red box added for emphasis):



41.     Regardless of how the consumer subscribes (via the NYT Website on its mobile or desktop format, or through Defendant's mobile application(s)), and irrespective of which particular NYT Subscription plan the consumer selects, Defendant fails to disclose the full terms of its auto-renewal program either before or after checkout, and it never requires the individual to read or affirmatively agree to any terms of service, *i.e.*, by requiring consumers to click a checkbox next to the automatic renewal offer terms before consumers complete the checkout process and submit their orders for NYT Subscriptions.  Consequently, Defendant uniformly fails to obtain any form of consent from – or even provide effective notice to – its subscribers before charging consumers' Payment Methods on a recurring basis.

**E.     Defendant Violates Oregon's Automatic Renewal Law**

42.     At all relevant times, Defendant failed to comply with the ARL in three ways: (i)

Defendant failed to present the automatic renewal offer terms in a clear and conspicuous manner and in visual proximity to the request for consent to the offer before the subscription or purchasing agreement was fulfilled, in violation of ORS 646A.295(1)(a); (ii) Defendant charged Plaintiffs' and Class members' Payment Methods without first obtaining their affirmative consent to the agreement containing the automatic renewal offer terms, in violation of ORS 646A.295(1)(b); and (iii) Defendant failed to provide an acknowledgment that included the automatic renewal offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, in violation of ORS 646A.295(1)(c). The acknowledgment also fails to disclose a toll-free telephone number or describe another cost-effective, timely and easy-to-use mechanism for cancellation, and in fact Defendant makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their NYT Subscriptions, in violation of ORS 646A.295(2).

> **i.     Defendant Fails To Clearly And Conspicuously Present The NYT Subscription Terms Before The Subscription Agreement Is Fulfilled And In Visual Proximity To The Request For Consent To The Offer.**

43.     First, the relevant portion of the Checkout Page does not present the complete "offer terms[,]" as defined by ORS 646A.293(5), in violation of Section 646A.295(1)(a) of the ARL.  For instance, with respect to cancellation, the relevant portion of the Checkout Page states: "You can notify us of your intent to cancel at any time <u>by contacting Customer Care</u>.  The cancellation goes into effect at the start of your following billing cycle." (Underlining denotes hyperlink).  However, the Checkout Page contains no explanation of *how* to cancel.  For instance, the Checkout Page does not mention that, in order to cancel their NYT Subscriptions through Customer Care by phone, consumers can call a toll-free number during particular hours or by utilizing the chat function on the NYT Website, as is set forth in other pages of the NYT

Website.[35]  The Checkout Page also fails to mention that cancellation or modification of one's

NYT Subscription via phone call to Defendant's Customer Care line may not be permitted "in

the case of certain promotions"[36]  Nor does the Checkout Page disclose that, "[t]o cancel and

avoid being charged[ in connection with a promotional NYT Subscription offer], [the consumer]

must notify [Defendant] <u>before</u> the promotion ends[,]" or, paradoxically, that "[c]ertain

promotions may not permit cancellation during the promotional period."[37]  And, to the extent

that cancellation is required before the end of the promotional period, the Checkout Page does

not specify how long before the end of that period cancellation must be affected, or precisely by

when the consumer must request cancellation in order to avoid being charged for the subsequent

billing period.  The Checkout Page also fails to adequately explain that consumers who cancel in

the beginning or middle of a given billing cycle "will not receive a [partial or full] refund for the

current billing cycle[,]" even if the consumer does not want to have or use the benefits of the

NYT Subscription until the end of that billing cycle.[38]  These undisclosed terms constitute

material aspects of Defendant's cancellation policy.  However, Plaintiffs were not previously

aware of the above aspects of Defendant's cancellation policy.  At no point during the life of

their NYT Subscriptions were Plaintiffs required or even prompted to navigate to or otherwise

examine any of the terms disclosed on the on any other page of the NYT Platform aside from the

---

[35] *See* NYT Help, *Terms of Sale* (last updated Sep. 1, 2021), https://help.nytimes.com/hc/en-us/articles/115014893968-Terms-of-sale#cancellation ("<u>Except in the case of certain promotions</u>, you can change or cancel your digital subscription at any time by calling Customer Care at (866)-273-3612.  If you are in the U.S. our hours are 7 a.m. to 10 p.m. E.T. Monday to Friday, and 7 a.m. to 3 p.m. E.T. on weekends and holidays.") (emphasis added); *see also* NYT Help, *Cancel Your Subscription*, https://help.nytimes.com/hc/en-us/articles/360003499613-Cancel-your-subscription ("Cancel Your Subscription … Call us at 866-273-3612 if you are in the U.S.  Our hours are 7 a.m. to 10 p.m. E.T. Monday to Friday, and 7 a.m. to 3 p.m. E.T. on weekends and holidays. … Select the 'Chat' button to the right or bottom of this page to chat with a Care Advocate and cancel your subscription.").

[36] NYT Help, *Cancel Your Subscription*, *supra* (emphasis added).

[37] *Id.*

[38] *Id.*

Page 29 - COMPLAINT

Checkout Page.  Yet, prior to checkout, Defendant was obligated by law to place consumers on notice of these aspects of Defendant's cancellation policy in accordance with the ARL, which requires that companies provide such information "in visual proximity … to the request for consent to the [automatic renewal] offer."  ORS 646A.295(1)(a).  Accordingly, because the Checkout Page does not present a complete "description of the cancellation policy that applies to the offer[,]" *see* ORS 646A.293(5)(b), Defendant failed, and continues to fail, to satisfy that requirement, in violation of Section 646A.295(1)(a) of the ARL.

44.    The Checkout Page also fails to adequately disclose the length of the automatic renewal term associated with the NYT Subscriptions, *see* ORS 646A.293(5)(d).  In particular, although the Checkout Page shown above states that the consumers' payment method "will be automatically charged … every 4 weeks[,]" based on that statement, the precise date of a given month or billing period that the consumer will be charged in connection with the NYT Subscription is unclear.  Thus, the exact length of each renewal term is ambiguous in terms of start and end date from month-to-month or year-to-year.  And this information is also necessary for consumers to successfully affect cancellation, because consumers must cancel before the end of a given billing period.  If consumers are not on notice of the precise calendar date that their NYT Subscriptions will renew and their Payment Methods will be charged each month or billing period, they cannot, as a practical matter, affect cancellation before that date.  As such, Defendant fails to disclose "[t]he length of the automatic renewal term or that the service is continuous" in the manner required by statute.  ORS 646A.293(5)(c); ORS 646A.295(1)(a).s

45.    Additionally, the relevant portion of the Checkout Page for the NYT Subscription does not adequately disclose the recurring amount to be charged to the subscriber's Payment Method each billing period, *see* ORS 646A.293(5)(c).  To the extent this information appears on

the Checkout Page, the disclosure was presented in such a way that it could be, and was, easily

overlooked, and is therefore not "clear and conspicuous" as defined by Cal. Bus. & Prof. Code §

17601(c).  Given such inconspicuousness, Defendant fails to disclose "[t]he recurring charges

that will be charged to the consumer's [Payment Method] as part of the automatic renewal or

continuous service plan or arrangement, and, if the amount of the charge will change, the amount

to which the charge will change, if known[,]" *see* ORS 646A.293(5)(c), in violation of ORS

646A.295(1)(a).

46.     As a result of Defendant's missing and otherwise deficient pre-purchase

disclosures, when Plaintiffs selected and enrolled in their NYT Subscriptions, they were unaware

that Defendant had enrolled them in "automatic renewal" programs under which their

subscription would renew each month or year and result in continuous monthly or annual

automatic renewal charges to their Payment Methods unless and until they effectively canceled

the subscription.

        **ii.**       **Defendant Fails To Obtain Consumers' Affirmative Consent To The Automatic Renewal Offer Terms Associated With The NYT Subscriptions.**

47.     Second, at no point during the checkout process does Defendant require

consumers to read or affirmatively agree to any terms of service associated with the NYT

Subscription, *i.e.*, by requiring consumers to select or click a "checkbox" next to the automatic

renewal offer terms or other similar mechanism to complete the checkout process.  Accordingly,

when Defendant automatically renews customers' NYT Subscriptions, Defendant charges

consumers' Payment Methods without first obtaining their affirmative consent to the agreement

containing the automatic renewal offer terms, in violation of ORS 646A.295(1)(b).

      **iii.**    **<u>Defendant Fails To Provide A Post-Checkout<br>Acknowledgment That Clearly And Conspicuously<br>Discloses The Required NYT Subscription Offer Terms.</u>**

48.     Finally, after Plaintiffs and the members of the Class subscribed to one of Defendant's NYT Subscription plans, Defendant sent to Plaintiffs and the Class email follow-ups regarding their purchases (the "Acknowledgment Emails").

49.     By way of example, as of 2020, the subject line of the email stated: "NYTimes Digital Subscription Order Confirmation." The body of the email contained, in relevant part, the following text and images:

50.    The Acknowledgment Email contains even less of the required information than is featured on the relevant portion of the Checkout Page, discussed above.  Namely, the purchase confirmation does not provide:  that the subscription "will continue until the consumer cancels[,]" ORS 646A.293(5)(a); a "description of the cancellation policy that applies to the offer[,]" ORS 646A.293(5)(b); a statement of "[t]he recurring charges that will be charged to the consumer's [Payment Method] as part of the automatic renewal plan or arrangement, and that the amount of the charge may change[, and,] if that is the case, and the amount to which the charge will change," ORS 646A.293(5)(c); or "[t]he length of the automatic renewal term or that the service is continuous, unless the length of the term is chosen by the consumer[,]" ORS 646A.293(5)(d).  As such, the Acknowledgment Email fails to "include[] the automatic renewal offer terms … and information regarding how to cancel in a manner that is capable of being retained by the consumer[,]" in violation of Section 646A.295(1)(c) of the ARL.

51.    Additionally, the Acknowledgment Emails fails to provide a toll-free telephone number or describe another cost-effective, timely, and easy-to-use mechanism for cancellation, and in fact Defendant makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their NYT Subscriptions, which further violates the ARL under ORS 646A.295(2).

* * *

52.    In sum, Defendant's pre- and post-purchase disclosures and lack of affirmative consent fail to comply with the ARL.  Specifically, the Checkout Page and Acknowledgment Email for the NYT Subscriptions do not adequately describe the complete cancellation policy associated with a consumer's given NYT Subscription, the recurring price to be charged in connection with the NYT Subscriptions or that the initial amount may change during the course of a subscription agreement (and the amount to which it will change and when), or the precise

length of the automatic renewal term applicable to the NYT Subscriptions.  In addition, the Acknowledgment Email further fails to clearly and conspicuously disclose the continuous nature of the subscription or purchasing agreement.  Thus, the Checkout Page and Acknowledgment Email do not adequately disclose the associated "Offer term[s]" as defined by Section 646A.293(5) of the ARL, in violation of Section 646A.295(1)(c) of the ARL.  Disclosures of required offer terms are either missing altogether, are deceptively incomplete, objectively inaccurate, and/or are inconspicuously buried in text outside of the area that is in "visual proximity … to the request for consent" on the Checkout Page or in the fine print at the bottom of the Acknowledgment Email.  In other words, to the extent any of the required information does, in fact, appear on the Checkout Page and/or Acknowledgment Email, such disclosures are presented in such a way that they could be, and – at least by Plaintiffs – were, easily overlooked. Such disclosures are therefore not "clear and conspicuous" as defined by ORS 646A.293(2). Further, as noted above, Plaintiffs struggled to cancel their NYT Subscriptions due to Defendant's obscure, confusing, and time-consuming cancellation policy, the terms related to which were either entirely missing or obscured from the Checkout Page and Acknowledgment Email.

53.    Because Defendant failed to disclose this material information in the manner required by statute, Plaintiffs were unable at the point of sale to accept or provide affirmative consent to Defendant's offer or knowingly enter into to the purchase agreements.  Thus, as a direct result of Defendant's missing, incomplete, and otherwise deficient disclosures on the Checkout Page and in the Acknowledgment Email, Plaintiffs were induced to sign up for, unable to terminate, and automatically charged for their NYT Subscriptions.

54.    By and through these actions, Defendant has charged Plaintiffs' and Class

members' Payment Methods in direct violation of the ARL.  As a result, pursuant to ORS 646A.295(5), all goods, wares, merchandise, and/or products sent to Plaintiffs and the Class in violation of the statute are deemed to be "unconditional gift[s] to the consumer who may use or dispose of them in any manner the consumer sees fit without[.]"  ORS 646A.295(5).

55.    As a direct result of Defendant's unlawful conduct described above, Plaintiffs suffered ascertainable loss in the form of economic injury equal to all monies withdrawn from Plaintiffs' Payment Methods in connection with the NYT Subscriptions without first fully and adequately disclosing the offer terms associated with the subscription or purchasing agreement and obtaining their affirmative consent to those terms.  That is because Defendant "failed to disclose the legally required information and assessed a . . . fee in violation of the UTPA." *Scharfstein v. BP W. Coast Prod., LLC*, 292 Or. App. 69, 90 (2018).  "In doing so, [Defendant] illegally charged [Plaintiffs and its other Oregon] customers [recurring subscription fees], thereby causing the ascertainable loss." *Id.*; *see also id.* at 89 ("In an illegal charge case such as this one, whether a customer relied on the nondisclosure of a fee does not matter; what matters is whether the fee is disclosed in the particular way that the law requires. The UTPA prohibits businesses from charging customers other types of fees when they are not disclosed in the particular way that the law requires. … If any of those businesses were to violate any of the terms under which they may assess those fees, the assessment would result in an illegal charge. The customer's actual awareness or knowledge of the illegality would be irrelevant.").[39]

---

[39] *See also Miller v. WinCo Foods, LLC*, 2020 WL 6693149, at *7 (D. Or. Sept. 3, 2020), *report and recommendation adopted*, 2020 WL 6685697 (D. Or. Nov. 12, 2020) ("[Defendant] was required to accurately advertise the price it intended to charge Plaintiffs for the non-grocery goods.  Plaintiffs effectively assert that once WinCo made the decision to recoup the Surcharge from the customer, its failure to include the Surcharge in the advertised price of the items was a violation of the Act and, consequently, its collection of the Surcharge was improper, or 'illegal.'  The court finds, viewing the allegations of the Complaint in a light most favorable to Plaintiffs, Plaintiffs adequately allege an ascertainable loss under the 'illegal charge' theory."); *Stewart v. Albertson's, Inc.*, 308 Or. App. 464, 492 n.17, *review denied*, 368 Or. 138 (2021); *Russell v. Ray Klein, Inc.*, 2019

56.     In the alternative, Defendant's ARL violations caused Plaintiffs' ascertainable

loss in the form of financial injury because Plaintiffs reasonably relied on Defendant's

conspicuous disclosures of the Checkout Page and the Acknowledgment Email – and, as a

natural corollary, on the omissions and/or the inconspicuousness of the disclosures contained

therein – in deciding whether to purchase their NYT Subscriptions in the first place and whether

to continue paying for them after that (*i.e.*, by not cancelling the auto-renewal prior to incurring

renewal charges for the subsequent billing period).  Had Defendant complied with the ARL by

adequately disclosing – and obtaining Plaintiffs' affirmative consent to – the requisite NYT

Subscription offer terms on the Checkout Page at the point of Plaintiffs' initial purchases,

Plaintiffs twould have been able to read and review the auto renewal terms prior to purchase and

they would have not enrolled in NYT's paid automatic renewal programs in the first place, or

would have subscribed to the NYT Subscriptions on materially different terms, thereby avoiding

financial injury of any kind as a result of Defendant's ARL violations.  Similarly, had Defendant

complied with the ARL by adequately disclosing the terms associated with Plaintiffs' NYT

Subscriptions in the post-checkout Acknowledgment Email (*i.e.*, after initial enrollment in their

NYT Subscriptions, but before any subsequent automatic renewal charge of Plaintiffs' Payment

---

WL 6137455, at *4 (D. Or. Nov. 19, 2019) ("Defendants final argument is that even if they are subject to and violated the UTPA, [plaintiff's] claim still fails because he never suffered an ascertainable loss of money or property because of the alleged violations. … Defendants['] argu[ment] … misses the mark.  Here, Mr. Russell's loss is the improper collection of the $45 fee. [Thus, plaintiff] and putative class members suffered an ascertainable loss of money in the form of the unlawful fees collected from them by defendants, which they otherwise would not have had to pay if defendants had not engaged in conduct violating the UTPA.") (internal citations and quotation marks omitted); *Tri-W. Const. Co. v. Hernandez*, 43 Or. App. 961, 972 (1979) ("[P]roof that a party justifiably relied on a representation is not necessary when the representation involves a matter about which the party making it is legally required to inform the other."); *Sanders v. Francis*, 277 Or. 593, 598-99 (1977) ("Defendants' chief argument[] … is that irrespective of any unlawful practice committed by defendants, plaintiff must have acted in reliance on that practice in order to have a civil action under ORS 646.638. … But an examination of the possible forms of unlawful practices shows that this cannot invariably be the case. Especially when the representation takes the form of a 'failure to disclose' … , as in this case, it would be artificial to require a pleading that plaintiff had 'relied' on that non-disclosure. …Whether ORS 646.638(1) requires reliance as an element of causation necessarily depends on the particular unlawful practice alleged. … We hold that the demurrer should have been overruled.  Reversed and remanded."); *see also Rollins v. Wink Labs, Inc.*, 2021 WL 1976082, at *5-6 (D. Or. Feb. 22, 2021).

Methods in connection with same), Plaintiffs would have been able to read and review the

applicable offer terms prior to further automatic renewal(s) for the subsequent billing period(s),

and they would have successfully cancelled their NYT Subscriptions prior to the expiration of

the subscription period in which they learned such information, thereby avoiding all or part of

the aggregate automatic renewal charges Plaintiffs incurred in connection with their NYT

Subscriptions following initial enrollment.  But Defendant did not adequately disclose the

required automatic renewal and free offer terms in either the Checkout Page or the

Acknowledgment Email, thereby depriving Plaintiffs of the opportunity to make informed

decisions as to the recurring transactions, in violation of the ARL.

57.     At all relevant times, Defendant has been well aware that its NYT Subscriptions

fail to comply with Oregon's ARL.  Indeed, Defendant is currently defending a substantially

similar putative class action lawsuit pursuant to California's Automatic Renewal Law, Cal. Bus.

& Prof. Code §§ 17600, *et seq*.  *See generally*, *Moses v. The New York Times Company*, No.

1:20-cv-04658 (S.D.N.Y.) (the *Moses* Action).[40]  Notably, the California Automatic Renewal

Law was enacted in 2010, one year prior to the enactment of Oregon's ARL in 2011, and

features the identical language as Oregon's ARL with respect to legislative intent.  *Compare*

ORS 646A.292 *with* Cal. Bus. & Prof. Code § 17600 (statement of legislative intent).

Additionally, Oregon's five-part statutory definition of "offer terms" under ORS

646A.293(5)(a)-(e) mirrors California's definition of "Automatic renewal offer terms" under Cal.

Bus. & Prof. Code § 17601(b)(1)-(5).  *Compare also* ORS 646A.293(2) *with* Cal. Bus. & Prof.

Code § 17601(c) (definition of "clear and conspicuous").  And, most importantly, the

---

[40] Defendant is also currently defending a substantially similar putative class action lawsuit pursuant to North
Carolina's Automatic Renewal Law, N.C.G.S. § 75-41(1), *et seq*.  *See generally*, *Perkins v. The New York Times
Company*, No. 1:22-cv-05202 (S.D.N.Y.) (the *Perkins* Action).

requirements and prohibitions of the operative provisions of Oregon's ARL are substantively the same as the California version. *Compare* ORS 646A.295(1)(a)-(c) *with* Cal. Bus. & Prof. Code § 17602(a)(1)-(3). *Compare also* ORS 646A.295(2) *with* Cal. Bus. & Prof. Code § 17602(b) (requiring a "cost-effective, timely, and easy-to-use mechanism for cancellation that shall be described in the acknowledgment"); *compare* ORS 646A.295(5) *with* Cal. Bus. & Prof. Code § 17603 (unconditional gift provision). Thus, by virtue of, among other things, the earlier enactment of California's substantially identical ARL, the *Moses* Action asserting violations of California's ARL, and the large volume of online consumer complaints discussed above regarding Defendant's billing practices with respect to the NYT Subscriptions, Defendant knew or should have known that its conduct constitutes violations of the ARL (and, thus, the UTPA).

58. The facts giving rise to Plaintiffs' claims are materially the same as the Class they seek to represent.

59. Accordingly, Plaintiffs bring this action individually and on behalf of similarly situated individuals against Defendant for violations of Section 646.608 of Oregon's Unlawful Trade Practices Act ("UTPA"). As set forth in detail below, Plaintiffs' UTPA claims – which are based on, *inter alia*, Defendant's failure to adequately provide the requisite disclosures and authorizations required to be made to Oregon consumers under ORS 646A.295 – arise under ORS 646.608(1)(ttt).

## CLASS ACTION ALLEGATIONS

60. **Class Definition**: Plaintiffs bring this action pursuant to Rule 23(a) of the Federal Rules of Civil Procedure on behalf of a class of similarly situated individuals, defined as follows (the "Class"):

> All persons in Oregon who, within the applicable statute of limitations period, up to and including the date of final judgment in

this action, incurred fee(s) in connection with any of Defendant's
NYT Subscription offerings.

61.    Specifically excluded from the Class are Defendant and any entities in which

Defendant has a controlling interest, Defendant's agents and employees, the judge to whom this

action is assigned, members of the judge's staff, and the judge's immediate family.

62.    Plaintiffs reserve the right to amend the definitions of this Class if discovery or

further investigation reveals that the Class should be expanded or otherwise modified.

63.    ***Numerosity.***  Members of the Class are so numerous that their individual joinder

herein is impracticable.  On information and belief, the Class comprises at least thousands of

consumers throughout California.  The precise number of Class members and their identities are

unknown to Plaintiffs at this time but may be determined through discovery.  Class members

may be notified of the pendency of this action by mail and/or publication through the distribution

records of Defendant.

64.    ***Commonality and Predominance***.  Common questions of law and fact exist as to

all Class members and predominate over questions affecting only individual Class members.

Common legal and factual questions include, but are not limited to:  (i) whether Defendant's

NYT Subscriptions constitute "Automatic renewal[s]" and/or "Continuous service[s]" within the

meaning of ORS 646A.293(1) and (4); (ii) whether Defendant failed to present the automatic

renewal offer terms, or continuous service offer terms, in a clear and conspicuous manner before

the subscription or purchasing agreement was fulfilled and in visual proximity to the request for

consent to the offer, in violation of ORS 646A.295(1)(a); (iii) whether Defendant charged

Plaintiffs' and Class members' Payment Method for an automatic renewal or continuous service

without first obtaining their affirmative consent to the automatic renewal offer terms or

continuous service offer terms in violation of ORS 646A.295(1)(b); (iv) whether Defendant

failed to provide an acknowledgment that included the automatic renewal or continuous service offer terms and information on how to cancel in a manner that is capable of being retained by Plaintiffs and the Class, in violation of ORS 646A.295(1)(c); (v) whether the goods and services provided by Defendant are deemed "unconditional gifts" in accordance with ORS 646A.295(5); (vi) whether Defendant's conduct alleged herein violated the UTPA's prohibitions of engaging in unlawful practices in the course of its business, vocation, or occupation under ORS 646.608(1); (vii) whether Plaintiffs and the Class are entitled to damages and/or restitution; (viii) whether Defendant should be enjoined from further engaging in the misconduct alleged herein; (ix) whether Defendant's use or employment of the unlawful practice(s) alleged herein was willful and/or reckless or knowing; (x) whether Plaintiffs and the Class suffered ascertainable loss of money or property as a result of Defendant's conduct; (xi) whether Plaintiffs and the Class members are entitled to recover statutory damages of $200 per violation pursuant to ORS 646.638(1) and ORS 646.638(8); and (xii) whether Plaintiffs and Class members are entitled to recover punitive damages and/or equitable relief under ORS 646.638(1); and (xiii) whether Plaintiffs and the Class are entitled to attorneys' fees and costs under ORS 646.638(3).

65.    *Typicality.*  The claims of Plaintiffs are typical of the claims of the Class in that Plaintiffs and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's failure to obtain Plaintiffs' and the Class's affirmative consent to the automatic renewal offer terms or continuous service offer terms associated with the NYT Subscriptions before charging their Payment Methods.

66.    *Adequacy*.  Plaintiffs will fairly and adequately protect Class members' interests. Plaintiffs have no interests antagonistic to Class members' interests, and Plaintiffs have retained counsel that have considerable experience and success in prosecuting complex class-actions and

consumer-protection cases.

67.    *Superiority*.  A class action is superior to all other available methods for the fair

and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions

of individual actions are economically impractical for members of the Class; the Class is readily

definable; prosecution as a class action avoids repetitious litigation and duplicative litigation

costs, conserves judicial resources, and ensures uniformity of decisions; and prosecution as a

class action permits claims to be handled in an orderly and expeditious manner.

68.    Defendant has acted or failed to act on grounds generally applicable to the Class,

thereby making appropriate final injunctive relief with respect to the Class as a whole.

69.    Without a class action, Defendant will continue a course of action that will result

in further damages to Plaintiffs and the Class and will likely retain the benefits of its

wrongdoing.

70.    Based on the foregoing allegations, Plaintiffs' claims for relief include those set

forth below.

**COUNT I**
**Violations of Oregon's Unlawful Trade Practices Act ("UTPA"),**
**ORS §§ 646.608(1)(ttt)**

71.    Plaintiffs re-allege and incorporate by reference every allegation set forth in the

preceding paragraphs as though alleged in this Count.

72.    Plaintiffs bring this claim individually and on behalf of the members of the

proposed Class against Defendant.

73.    The Oregon Unlawful Trade Practices Act ("UTPA"), which was enacted in 1971

and is codified at ORS 646.605-646.656, is remedial statutory scheme enacted as a

comprehensive statute for the protection of consumers from unlawful trade practices.  The UTPA

prohibits unlawful practices in the course of the person's business, vocation, or occupation with respect to both general and specific conduct. Specifically proscribed conduct is set forth under Section 646.608(1), which has 79 subsections and many of which refer to other provisions of the Oregon Revised Statutes. *See* O.R.S. 646.608(1)(a)–(aaaa).

74.    The UTPA authorizes private civil actions. Pursuant to Section 646.638(8)(a) of the UTPA, "a person that suffers an ascertainable loss of money or property, real or personal, as a result of another person's willful use or employment of a method, act or practice declared unlawful under ORS 646.608 … may bring an individual action in an appropriate court to recover actual damages or statutory damages of $200, whichever is greater." ORS 646.638(1); *see also* ORS 646.638(8). In a class action, plaintiffs may recover statutory damages only if they suffered an ascertainable loss "as a result of a reckless or knowing use or employment" of an unlawful trade practice. ORS 646.638(8)(a).

75.    Defendant is a "Person" as defined in ORS 646.605(4).

76.    The NYT Subscriptions are goods as defined by ORS 646.605(6)(a), because the constitute products that may be obtained primarily for personal, family, or household uses.

77.    "The UTPA prohibits businesses from charging customers other types of fees when they are not disclosed in the particular way that the law requires." *Stewart v. Albertson's, Inc.*, 308 Or. App. 464, 492 n.17, *review denied*, 368 Or. 138 (2021); *Scharfstein v. BP West Coast Products, LLC*, 292 Or. App. 69, 89, *review denied*, 363 Or. 815 (2018) (same). As explained below, at all relevant times, Defendant violated, and continues to violate, the UTPA's proscription against engaging in unlawful conduct by charging customers certain types of fees when they are not disclosed in the particular way that the law requires.

78.    Specifically, Defendant's actions are "unlawful" within the meaning of the UTPA

because they violated the Oregon's Automatic Renewal Law ("ARL"), ORS §§ 646A.292-646A.295, in direct violation of Section 646.608(1)(ttt) of the UTPA.  In particular, following consumers' (including Plaintiffs' and Class members') initial enrollments in the NYT Subscriptions, Defendant automatically charges subscription fees to consumers' Payment Methods notwithstanding Defendant's uniform and systematic failure to provide legally required information at the point of purchase.  As is explained in the above paragraphs of this complaint, which are incorporated herein by reference, by doing so, Defendant violated multiple provisions of Oregon's ARL.  *See supra* (alleging violations of specific provisions of ORS 646A.295).

79.    Defendant's noncompliance with the ARL is a direct violation of UTPA.  *See* ORS 646.608(1)(ttt) ("(1) A person engages in an unlawful practice if in the course of the person's business, vocation or occupation the person does any of the following: … (ttt) Violates a provision of ORS 646A.295 (Prohibited actions).").

80.    Specifically, Defendant violates the ARL because, at all relevant times, it failed, and continue to fail, to:  (a) provide the auto-renewal terms associated with the NYT Subscriptions in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity to the request for consent to the offer, in violation of ORS 646A.295(1)(a); (b) obtain the affirmative consent of Plaintiffs and the Class to those terms before charging their Payment Methods, in violation of ORS 646A.295(1)(b); and (c) provide an acknowledgment that includes the automatic renewal or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, in violation of ORS 646A.295(1)(c).  Defendant also makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their NYT Subscriptions, in violation of ORS 646A.295(2).

81.     Each of these acts and practices constitutes an independent violation of the ARL, and thus an independent violation of the Section 646.608(1) of the UTPA.

82.     Defendant was prohibited from making the automatic renewal charges to Plaintiffs' and Class members' Payment Methods as discussed above, thereby taking Plaintiffs' and Class members' money without the required affirmative consent.  *See* ORS 646A.295(1)(b), (5).  Yet, Defendant nevertheless did so in violation of the ARL.

83.     Thus, Defendant "failed to disclose the legally required information and assessed a . . . fee in violation of the UTPA."  *Scharfstein v. BP W. Coast Prod., LLC*, 292 Or. App. 69, 90 (2018).  "In doing so, [Defendant] illegally charged [their] customers [recurring subscription fees], thereby causing the ascertainable loss."  *Id.*; *see also Rollins v. Wink Labs, Inc.*, 2021 WL 1976082, at *5 (D. Or. Feb. 22, 2021); *Stewart v. Albertson's, Inc.*, 308 Or. App. 464, 492 n.17, *review denied*, 368 Or. 138 (2021); *Solano v. Kroger Co.*, 2020 WL 7028473, at *3–4 (D. Or. Nov. 30, 2020); *Miller v. WinCo Foods, LLC*, 2020 WL 6693149, at *6–7 (D. Or. Sept. 3, 2020); *report and recommendation adopted*, 2020 WL 6685697 (D. Or. Nov. 12, 2020); *Russell v. Ray Klein, Inc.*, 2019 WL 6137455, at *4 (D. Or. Nov. 19, 2019).

84.     Moreover, pursuant to the ARL, all products received from Defendant in violation of the ARL constitute "unconditional gifts."  *See* ORS 646A.295(5).  In other words, once Defendant tendered, and Plaintiffs and Class members were provided access to, the "goods, wares, merchandise or products" of the NYT Subscriptions (*i.e.*, their benefits) vis-à-vis their activation, Plaintiffs and Class members assumed title and ownership over such goods as their property, and when Plaintiffs and Class members with the right to "use or dispose of them in any manner the consumer sees fit without any obligation to the person[.]"  *Id.*

85.     Thus, Plaintiffs have sustained an ascertainable loss of money *and* property as a

result of Defendant's use or employment of methods, acts, or practices declared unlawful by

ORS 646.608(ttt) (*i.e.*, Defendant's conduct in violation of Oregon's ARL, ORS 646A.295).

86.    Because Defendant illegally charged Plaintiffs and the Class unlawful fees in

connection with the NYT Subscriptions, Plaintiffs and Class members are entitled to recover

statutory damages of $200 per UTPA violation.  *See* ORS 646.638(1) and (8)(a) (class members

can recover "actual damages or statutory damages of $200, whichever is greater").

87.    Moreover, Defendant's unlawful conduct as described above caused Plaintiffs'

and Class members' ascertainable loss because Defendant's acts and practices were intended to

deceive Plaintiffs and the Class, and – as a result of Plaintiffs' and Class members' reasonable

reliance on Defendant's omissions of material offer terms required to be disclosed by the ARL –

have resulted, and will result, in damages to Plaintiffs and the Class in the form of loss on money

and property.

88.    As a direct and proximate result of Defendant's unlawful practices described

herein, Defendant has received, and continue to hold, unlawfully obtained property and money

belonging to Plaintiffs and the Class in the form of payments made by Plaintiffs and Class

members in connection with their NYT Subscriptions.  Defendant has profited from its unlawful

acts and practices in the amount of those business expenses and interest accrued thereon.  If

Defendant had complied with the ARL, Defendant would not have made the unlawful charges,

and would not have obtained these monies from Plaintiffs and the Class.

89.    Defendant's violations of the UTPA under ORS 646.608(1)(ttt) as described

above were willful, as well as reckless and/or knowing, because, at the time Defendant

committed the violations at issue, Defendant knew or should have known that its actions violated

the Oregon UTPA.

90.     Accordingly, Plaintiffs, individually and on behalf of similarly situated Oregon consumers, seek all monetary and non-monetary relief permitted by law under ORS 646.605 *et seq.*, including ORS 646.636 and ORS 646.638(1) and (8), including equitable relief, actual damages or statutory damages of $200 per violation (whichever is greater), and pre- and-post judgment interest, along with any other appropriate equitable relief deemed necessary or proper.

91.     Further, Plaintiffs and the Class seek recovery of punitive damages from Defendant because Defendant's conduct was reprehensible.  Defendant inflicted economic injury upon Plaintiffs and the proposed Class in an intentional manner.  Defendant utilized its singular control over the NYT Subscriptions to induce Plaintiffs and the Class to purchase the NYT Subscriptions over alternative automatic renewal programs for services offered by competitors that feature similar benefits and content and are sold at similar and/or lesser price points.

92.     Under ORS 646.638(3), Plaintiffs and Class members are also entitled to recover their reasonable attorney fees from Defendant for Defendant's violations of Oregon law as detailed herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

(a)     For an order certifying the proposed Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiffs as representatives of the Class, and naming Plaintiffs' attorneys as Class Counsel to represent the Class;

(b)     For an order declaring the Defendant's conduct violates the statutes and common laws referenced herein;

(c)     For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

(d)     For actual, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury;

(e)     For prejudgment interest on all amounts awarded;

(f)     For an order of restitution and all other forms of equitable monetary relief;

(g)     For injunctive relief as pleaded or as the Court may deem proper; and

(h)     For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Dated: July 1, 2022                    Respectfully submitted,

MARKOWITZ HERBOLD PC

By:     *s/ Stanton R. Gallegos*
Stanton R. Gallegos, OSB #160091
StantonGallegos@MarkowitzHerbold.com
*Of Attorneys for Plaintiffs and the
Putative Class*

**BURSOR & FISHER, P.A.**

Neal J. Deckant *
ndeckant@bursor.com
Julia K. Venditti *
jvenditti@bursor.com
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone:  (925) 300-4455

Philip L. Fraietta *
pfraietta@bursor.com
Frederick J. Klorczyk III *
fklorczyk@bursor.com
888 Seventh Avenue
New York, NY  10019
Telephone:  (646) 837-7150

*\* Pro Hac Vice Application Forthcoming
Attorneys for Plaintiffs and the Putative Class*