**Eryn Karpinski Hoerster, OSB #106126**
E-Mail: eryn.hoerster@foster.com
FOSTER GARVEY PC
Eleventh Floor
121 SW Morrison Street
Portland, Oregon 97204-3141
Telephone: (503) 228-3939
Facsimile: (503) 226-0259

**Kristen C. Rodriguez,** *Pro Hac Vice*
E-Mail: kristen.rodriguez@dentons.com
DENTONS US LLP
1900 K Street, NW
Washington, DC 20006
Telephone: (202) 496-7188

*Attorneys for Defendant*
*The New York Times Company*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| THEA MACQUAID and SARAH RENFROW, on behalf of themselves and all others similarly situated, | Case No. 3:22-cv-00955-MO |
| Plaintiffs, | DEFENDANT THE NEW YORK TIMES COMPANY'S MOTIONS TO DISMISS AND STRIKE AND MEMORANDUM OF LAW IN SUPPORT |
| v. | |
| THE NEW YORK TIMES COMPANY, d/b/a The New York Times, | Pursuant to Fed. R. Civ. P. 12(b), (f) |
| Defendant. | ORAL ARGUMENT REQUESTED |

DEFENDANT THE NEW YORK TIMES COMPANY'S MOTIONS TO DISMISS AND STRIKE
AND MEMORANDUM OF LAW IN SUPPORT

FG: 100603708.1

# TABLE OF CONTENTS

Page

LR 7-1 CERTIFICATION ........................................................................................ 1

MOTION ................................................................................................................... 1

MEMORANDUM OF LAW ..................................................................................... 2

PRELIMINARY STATEMENT ............................................................................... 2

FACTUAL BACKGROUND .................................................................................... 4

    A.    The Times Clearly and Conspicuously Discloses All Automatic
           Renewal Terms During Its Subscription Process ...................................... 4

    B.    Plaintiffs' Counsel Files Litigation Against The Times Based on
           California's ARL. ...................................................................................... 6

    C.    Plaintiff Thea MacQuaid Purchases a Subscription to The Times
           and Agrees to Its Automatic Renewal Terms. .......................................... 8

    D.    Plaintiff Sarah Renfrow Purchases a Subscription to The Times
           and Agrees to Its Automatic Renewal Terms. ........................................ 10

    E.    Plaintiffs File This Lawsuit And Amend Their Complaint. ................... 11

LEGAL STANDARDS ........................................................................................... 12

ARGUMENT ......................................................................................................... 15

I.     PLAINTIFFS' UTPA CLAIMS MUST BE DISMISSED BECAUSE THEY WERE
       FILED BEYOND UTPA'S ONE-YEAR STATUTE OF LIMITATIONS. ................... 15

    A.    Plaintiffs' Claims Are Time-Barred Because Any Purported
           Deficiencies in The Times's Disclosures Were Readily Apparent at
           the Time of Sale. .................................................................................... 16

    B.    In the Alternative, Renfrow's Claim is Time-Barred Because Her
           Subscription Renewed More Than One Year Before the Filing of
           the Complaint. ........................................................................................ 19

II.    PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE AN ARL VIOLATION. .................... 21

    A.    The Times's Presentation of the Automatic Renewal Terms Was
           Clear and Conspicuous. ......................................................................... 22

DEFENDANT THE NEW YORK TIMES COMPANY'S MOTIONS TO DISMISS AND STRIKE
AND MEMORANDUM OF LAW IN SUPPORT

B.      The Times Obtained Subscribers' Consent to Automatic Renewal.......................26

C.      Plaintiffs Fail to Adequately Allege a Violation of the ARL's Acknowledgement Requirement............................................................................28

III.     PLAINTIFFS DO NOT STATE A CLAIM FOR UNJUST ENRICHMENT. ................ 30

IV.     THE FAC'S NATIONWIDE CLASS ALLEGATIONS SHOULD BE STRICKEN. .... 33

CONCLUSION.................................................................................................................. 37

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*Arnett v. Bank of Am., N.A.*,
   874 F. Supp. 2d 1021 (D. Or. 2012) ...................................................................31

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..........................................................................................12

*Bates v. Bankers Life & Cas. Co.*,
   993 F. Supp. 2d 1318 (D. Or. 2014) ...................................................................34

*Brooks v. BC Custom Constr., Inc.*,
   No. 3:18-cv-00717-YY, 2019 WL 3763769 (D. Or. May 21, 2019).................15, 17

*Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*,
   637 F.3d 1047 (9th Cir. 2011) ...........................................................................21

*Ciuffitelli v. Deloitte & Touche LLP*,
   No. 3:16-cv-580-AC, 2017 WL 2927481 (D. Or. Apr. 10, 2017) ..........................12

*Dearmey v. Hawaiian Isles Kona Coffee Co.*, LTD,
   No. SACV 19-432 JVS, 2019 WL 6723413 (C.D. Cal. July 22, 2019) .................34

*DeLoe v. Dep't Stores Nat'l Bank*,
   No. 3:17-CV-00022-SB, 2017 WL 4052185 (D. Or. Aug. 18, 2017), *report*
   *and rec. adopted*, 2017 WL 4051557 (D. Or. Sept. 13, 2017) ................................21

*In re: Dollar Gen. Corp. Motor Oil Mktg. & Sales Pracs. Litig.*,
   No. 16-02709-MD-W-GAF, 2019 WL 1418292 (W.D. Mo. Mar. 21, 2019) .................35, 36

*Egbukichi v. Wells Fargo Bank*,
   184 F. Supp. 3d 971 (D. Or. 2016) .....................................................................15

*Fantasy, Inc. v. Fogerty*,
   984 F.2d 1524 (9th Cir. 1993) ...........................................................................34

*Forest Grove Brick Works, Inc. v. Strickland*,
   277 Or. 81, 559 P.2d 502 (1977) .......................................................................18

*Fteja v. Facebook, Inc.*,
   841 F. Supp. 2d 829 (S.D.N.Y. 2012)..................................................................17

*In re Google Assistant Privacy Litig.*,
   457 F. Supp. 3d 797 (N.D. Ca. 2020) ...................................................................12

*Gross v. Symantec Corp.*,
   No. C 12-00154 CRB, 2012 WL 3116158 (N.D. Cal. July 31, 2012)....................................29

*Hall v. Time, Inc.*,
   No. 20-55354, 2021 WL 2071991 (9th Cir. May 24, 2021).............................................23, 28

*Hall v. Time, Inc.*,
   No. SACV 19-01153-CJC(ADSx), 2020 WL 2303088 (C.D. Cal. Mar. 13,
   2020), *aff'd*, 857 F. App'x 385 (9th Cir.) .........................................................23, 26

*Huynh v. Chase Manhattan Bank*,
   465 F.3d 992 (9th Cir. 2006) ...............................................................................15

*Indoor Billboard Northwest Inc.*,
   No. 3:12-CV-01338-BR, 2013 WL 3146850 (D. Or. Jun. 18, 2013) ...............................34, 35

*In re Intel Corp. CPU Mktg., Sales Pracs. & Prod. Liab. Litig.*,
   No. 3:18-md-2828-SI, 2021 WL 1198299 (D. Or. Mar. 29, 2021) .........................................31

*Ivie v. Mission Rock Residential LLC*,
   No. 3:21-cv-01122-SB, 2022 WL 2612215 (D. Or. May 27, 2022) ................................13, 14

*Kearns v. Ford Motor Co.*,
   567 F.3d 1120 (9th Cir. 2009) ...............................................................................13

*Kinyon v. Cardon*,
   69 Or. App. 546, 686 P.2d 1048 (1984)................................................................15, 18

*Lazy Y Ranch, Ltd., v. Behrens*,
   546 F.3d 580 (9th Cir. 2008) ............................................................................12, 33

*Lundbom v. Schwan's Home Serv., Inc.*,
   No. 3:18-cv-02187-IM, 2020 WL 2736419 (D. Or. May 26, 2020) ....................24, 27, 28, 32

*Martell v. Gen. Motors LLC*,
   492 F. Supp. 3d 1131 (D. Or. 2020) ..................................................................13, 14

*Mazza v. Am. Honda Motor Co., Inc.*,
   666 F.3d 581 (9th Cir. 2012) .......................................................................33, 34, 35, 36

*Meyer v. Uber Techs., Inc.*,
   868 F.3d 66 (2d Cir. 2017)..........................................................................17, 26, 27

DEFENDANT THE NEW YORK TIMES COMPANY'S MOTIONS TO DISMISS AND STRIKE
AND MEMORANDUM OF LAW IN SUPPORT

*Minskoff v. Am. Express Travel Related Servs. Co., Inc.,*
   98 F.3d 703 (2d. Cir. 1996)...................................................................................20

*Naharaja v. Wray,*
   No. 3:13-CV-01261-HZ, 2014 WL 3891754 (D. Or. Aug. 6, 2014)......................14

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC,*
   31 F.4th 651 (9th Cir. 2022) .............................................................................33, 34

*Osborne v. Nottley,*
   206 Or. App. 201, 136 P.3d 81 (2006)..................................................................31

*Peter v. Doordash, Inc.,*
   445 F. Supp. 3d 580 (N.D. Cal. 2020) .............................................................26, 27

*Phillips v. Lithia Motors, Inc.,*
   No. 03-3109-HO, 2006 WL 113608 (D. Or. Apr. 27, 2006)..................................15

*Pincetich v. Jeanfreau,*
   699 F. Supp. 1469 (D. Or. 1988) ..........................................................................21

*Rutter v. Apple Inc.,*
   No. 21-CV-04077-HSG, 2022 WL 1443336 (N.D. Cal. May 6, 2022)............24, 29

*Scharfstein v. BP West Coast Products, LLC,*
   292 Or. App. 69, 423 P.3d 757 (2018)..................................................................18

*In re Sears, Roebuck & Co. Tools Mktg. & Sales Pracs. Litig.,*
   Nos. 05 C 4742, 05 C 2623, 2006 WL 3754823 (N.D. Ill. Dec. 18, 2006) ...........35

*Smith v. U.S. Bank, N.A.,*
   Civ. No. 10-3077-CL, 2011 WL 2470100 (D. Or. Apr. 22, 2011), *report and*
   *rec. adopted*, 2011 WL 2469729 (D. Or. Jun. 20, 2011) ..................................32, 33

*Snow v. Eventbrite, Inc.,*
   No. 3:20-cv-03698-WHO, 2020 WL 6135990 (N.D. Cal. Oct. 19, 2020) .............27

*Sonner v. Premier Nutrition Corp.,*
   971 F.3d 834 (9th Cir. 2020) ................................................................................31

*Sound Found. v. SCI Fund II, LLC,*
   No. 3:20-cv-01190-HZ, 2022 WL 225089 (D. Or. Jan. 25, 2022) .........................31

*Strawn v. Farmers Ins. Co. of Or.,*
   350 Or. 336, 258 P.3d 1199 (2011) ......................................................................13

DEFENDANT THE NEW YORK TIMES COMPANY'S MOTIONS TO DISMISS AND STRIKE
AND MEMORANDUM OF LAW IN SUPPORT

*In re Trilegiant Corp.*,
    11 F. Supp. 3d 82 (D. Conn. 2014) ...................................................................19, 20

*United States v. MyLife.Com, Inc.*,
    567 F. Supp. 3d 1152 (C.D. Cal. 2021) ...................................................................19

*Walters v. Vitamin Shoppe Indus.*,
    No. 3:14-cv-1173-PK, 2018 WL 2424132 (D. Or. May 8, 2018), *report and*
    *rec. adopted,* 2018 WL 2418544 (D. Or. May 29, 2018) ...........................................14, 34, 36

*Wiseley v. Amazon.com, Inc.*,
    709 F.App'x 862 (9th Cir. 2017) ...................................................................32

*Zafarana v. Pfizer, Inc.*,
    724 F. Supp. 2d 545 (E.D.Pa. 2010) ...................................................................36

*In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*,
    No. LAML1902905JAKFFMX, 2022 WL 522484 (C.D.Cal. Feb. 9, 2022) ...................30, 31

### STATUTES

15 U.S.C. §57b ...................................................................19

ORS 646.608(1)(ttt) ...................................................................1

ORS 646.638(6) ...................................................................1, 15

ORS 646A.293 ...................................................................4, 5, 22, 25

ORS 646A.295 ................................................................... *passim*

### OTHER AUTHORITIES

Fed. R. Civ. P. 9(b) ...................................................................12, 14, 21

Fed. R. Civ. P. 12(b)(6) ...................................................................1

Fed. R. Civ. P. 12(f) ...................................................................1, 14, 34

Restatement (Second) Conflict of Laws ...................................................................35

## LR 7-1 CERTIFICATION

In compliance with LR 7-1, the parties made a good faith effort to resolve the dispute raised in this motion and have been unable to do so.  Specifically, counsel for Defendant and Plaintiffs conferred by telephone on August 25, 2022 and September 22, 2022, regarding the sufficiency of Plaintiffs' pleading, the timeliness of Plaintiffs' claims, and the preclusion of a nationwide class on state law claims.

## MOTION

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendant The New York Times Company ("The Times") moves to dismiss the claims brought against it as follows:

1.  Plaintiffs fail to state a claim under ORS 646A.295 and ORS 646.608(1)(ttt);

2.  Plaintiffs' claims under ORS 646A.295 and ORS 646.608(1)(ttt) are barred by the one-year statute of limitations set forth in ORS 646.638(6);

3.  Plaintiffs fail to state a claim for unjust enrichment.

The Times also moves to strike Plaintiffs' nationwide class claims for unjust enrichment pursuant to Federal Rule of Civil Procedure 12(f) on the ground that material variations in state law preclude the certification of a nationwide class as a matter of law.

In support of its Motion to Dismiss and Strike (the "Motion"), Defendant relies on the following Memorandum of Law, the Declaration of Karen Ann Chesley ("Chesley Decl.") and documents attached thereto which this Court has held are subject to incorporation by reference and/or judicial notice (Dkt. 15), and the Amended Complaint.

DEFENDANT THE NEW YORK TIMES COMPANY'S MOTION TO DISMISS AND STRIKE
AND MEMORANDUM OF LAW IN SUPPORT

Page 1

FG: 100603708.1

# MEMORANDUM OF LAW

## PRELIMINARY STATEMENT

This lawsuit is one of many that Plaintiffs' counsel has filed against The Times and other publishers alleging purported violations of various state automatic renewal laws.  In this version, Plaintiffs Thea MacQuaid and Sarah Renfrow claim that The Times enrolled them in subscription plans without making the necessary disclosures or obtaining their affirmative consent, in violation of Oregon's Automatic Renewal Law ("ARL") and Unlawful Trade Practices Act ("UTPA"). After The Times moved to dismiss the initial Complaint, Plaintiffs filed their First Amended Class Action Complaint (the "Amended Complaint" or "FAC") (Dkt. 14), which largely does not address the numerous deficiencies that The Times identified in its initial motion.  Instead, Plaintiffs add an ill-conceived nationwide claim for "unjust enrichment" without identifying which state's law applies.  The Amended Complaint is equally as deficient as the first and should be dismissed.

***First,*** Plaintiffs' UTPA claims stem from conduct that was readily apparent to Plaintiffs when they signed up for their Times subscriptions in 2020 – yet they waited until July 2022 to file their Complaint.  Because they knew or should have known about these claims more than 18 months ago, their statutory claims are barred by UTPA's one-year statute of limitations.

***Second,*** Plaintiffs' UTPA claims fail on their merits.  Although Plaintiffs were required to plead their fraud-based claims with particularity, despite repleading they still never allege what disclosures The Times made ***to them*** during the subscription process and immediately thereafter. Instead, they rely solely on hypothetical "example" disclosures from various time periods, including an email from a prior lawsuit brought by Plaintiffs' counsel several months before these Plaintiffs began their subscriptions.  FAC ¶¶40, 49.   These omissions are particularly glaring because the Amended Complaint shows that certain of these disclosures are available in the

Plaintiffs' own email inboxes, *id.* ¶48, yet Plaintiffs failed to use their recent amendment to correct this obvious deficiency after The Times identified it in its initial motion.

Moreover, the sample screenshot of The Times's billing page included in the Amended Complaint (the "Checkout Page") clearly and conspicuously discloses each of the supposedly "missing" offer terms in a shaded box under the bolded, all-caps heading "**AUTOMATIC RENEWAL TERMS**." *Id.* ¶40.  This is a not a case where the required terms were buried in fine print or on a cluttered page.  The Checkout Page also shows that, by signing up for a subscription, a user must consent to these terms and other Times policies by clicking "Purchase Subscription." *Id.*  Thus, Plaintiffs have no basis to allege that they failed to agree to these terms or lacked knowledge of them.  And to the extent that Plaintiffs' claims rest on the lack of additional confirmatory disclosures after they subscribed, they do not describe what those disclosures were or explain why the information on The Times's website fails to qualify as a proper ARL disclosure.

***Third*,** Plaintiffs' unjust enrichment claim fails because it (i) does not identify a source of law; (ii) fails to allege that legal remedies are inadequate, despite seeking equitable relief; (iii) derives from a contractual relationship; and (iv) is based solely on purported "omissions" that are clearly disclosed on the Checkout Page and the documents linked thereto.

***Fourth*,** to the extent it is not otherwise dismissed, Plaintiffs' nationwide class claim for unjust enrichment should be stricken because it would require a court to apply 50 different states' disparate laws in violation of controlling Ninth Circuit law.

DEFENDANT THE NEW YORK TIMES COMPANY'S MOTIONS TO DISMISS AND STRIKE
AND MEMORANDUM OF LAW IN SUPPORT

FG: 100603708.1

## FACTUAL BACKGROUND[1]

### A.    THE TIMES CLEARLY AND CONSPICUOUSLY DISCLOSES ALL AUTOMATIC RENEWAL TERMS DURING ITS SUBSCRIPTION PROCESS.

The Times publishes *The New York Times* in print and online editions.  FAC (Dkt. 14) ¶1. A customer who wishes to purchase one or more of the subscriptions offered by The Times may do so via its website at www.nytimes.com.[2]  *Id.* ¶¶1-2.  Subscriptions to The Times's products "are offered on a recurring basis for monthly and/or yearly renewal terms."  *Id.* ¶36.

Plaintiffs allege that, after selecting a subscription plan, new users "are directed to subsequent webpages on the NYT Website and/or App where they are prompted to create a membership account and input their billing information."  *Id.* ¶39.  The Amended Complaint does not include these additional webpages.  Instead, it contains only a minimized screenshot of a portion of an exemplar "Checkout Page" from June 2022.  *Id.* ¶40.  As the heading on that screenshot shows, the Checkout Page is the second step in a three-part sign-up process, with the various steps titled "Account," "Payment," and "Confirmation."  *Id.*  Plaintiffs make no allegations about the disclosures on the missing two pages, or what terms subscribers agreed to when they created an account with The Times.

Nonetheless, the excerpt of the Checkout Page, standing alone, shows that The Times clearly and conspicuously disclosed the automatic renewal terms required by ORS 646A.295(1) and ORS 646A.293(5):  (i) a statement that the subscription will continue until cancelled; (ii) a

---

[1] Plaintiffs' well-pled factual allegations are taken as true for this Motion only.

[2] Although Plaintiffs allege that The Times offers subscription plans through "its mobile applications(s) or set-top device(s)" (FAC ¶¶1, 38), such subscriptions are typically only available through third-party providers such as Google.  Chesley Decl., Exs. B, C §1.9.

DEFENDANT THE NEW YORK TIMES COMPANY'S MOTIONS TO DISMISS AND STRIKE AND MEMORANDUM OF LAW IN SUPPORT

FG: 100603708.1

description of the applicable cancellation policy; (iii) any recurring charges and how they will change over time; (iv) the length of the renewal term; and (v) any minimum purchase obligation (the "Automatic Renewal Terms"):



*Id.* ¶40.  The Automatic Renewal Terms, which are in bold set off from the surrounding text in a shaded box under the heading "**AUTOMATIC RENEWAL TERMS**," explain that "[y]our subscription will continue until you cancel"; set forth the subscriber's billing frequency, cost, and how that cost will change over time; and describe The Times's cancellation policy. *Id.* ¶40.  They also include instructions on how to cancel – by "**contacting Customer Care**" – with a bolded, blue hyperlink directing users to a webpage explaining the various ways to contact The Times to cancel a subscription.  *Id.*; Chesley Decl., Ex. A.

DEFENDANT THE NEW YORK TIMES COMPANY'S MOTIONS TO DISMISS AND STRIKE AND MEMORANDUM OF LAW IN SUPPORT

FG: 100603708.1

This screenshot also shows that The Times tells users, prior to their purchasing a subscription, that "By subscribing, you agree to the Automatic Renewal Terms on this page, our Terms of Sale and Terms of Service."  FAC ¶40.  This language appears in normal-size font directly above the "Purchase Subscription" button, and the hyperlinks to The Times's Terms of Sale and Terms of Service are both underlined and rendered in blue.  *Id.*

At all times relevant to this Complaint, The Times's Terms of Sale stated, "All NYTimes digital subscriptions are renewed automatically.  When we renew your subscription, we will use the payment method currently associated with your account."[3]  Chesley Decl., Exs. B, C §1.5.1. The Terms of Sale also included the company's full Cancellation and Refund Policy (the "Cancellation Policy"), which—consistent with the description in the Automatic Renewal Terms—stated that subscribers "may notify us of your intent to cancel at any time, but the cancellation will become effective at the end of your current billing period.  *Id.* §2.1.  The Cancellation Policy also provided information about various ways to contact Customer Care to cancel a subscription.  *Id.*

**B.    PLAINTIFFS' COUNSEL FILES LITIGATION AGAINST THE TIMES BASED ON CALIFORNIA'S ARL.**

On June 17, 2020, Plaintiffs' counsel filed a "substantially similar" putative class complaint against The Times on behalf of California subscribers, alleging that The Times violated

---

[3] On September 13, 2022, the Court granted The Times's Request for Judicial Notice and Recognition of Documents Incorporated by Reference (Dkt. 10, the "RJN"), which asked the Court to notice the "Cancel Your Subscription" webpage linked to the Checkout Page (Chesley Decl. Ex. A), the Terms of Sale in effect when each of the Plaintiffs allegedly purchased her subscription (*id.* Exs. B-C), and filings in the *Moses* Action.  Dkt. 15.  Nothing in the Amended Complaint impacts the Court's ruling or any of the arguments in the RJN, and The Times therefore relies on these judicially noticed documents.

California's "substantively" identical ARL law.[4]  FAC ¶57; *Moses v. The New York Times Co.*, No. 1:20-cv-04658-RA (S.D.N.Y.) (the "*Moses* Action"), Dkt. 1.  Each of the ARL violations alleged in the Amended Complaint were also alleged in the *Moses* Action.  *Moses* Compl. ¶34.

On November 13, 2020, the parties informed the court that they had reached a mediated settlement of the *Moses* Action in which, among other things, The Times agreed to modify its disclosures during the subscription process – an initiative that was then already in progress.  *Moses* Action, Dkt. 41, §2.3 (stating that The Times "is revising the presentation and wording of the automatic renewal terms on the checkout pages in its mobile and desktop platforms and in its direct mail offers" and "agrees to provide consumers who submit an order for a new automatically renewing subscription with an e-mail or paper acknowledgment (appropriate to the method of subscription) that includes the automatic renewal terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer").  The parties notified the court of this settlement on November 13, 2020.  *Id.* Dkt. 33.  The *Moses* court granted preliminary approval of the settlement on May 12, 2021, and final approval on September 13, 2021.  *Id.* Dkts. 43, 60.

As promised, The Times made several changes to its Checkout Page to enhance its ARL disclosures, as can be seen by comparing the screenshot in the instant Complaint to the version used in the *Moses* Complaint.  *Compare Moses* Compl. ¶31 (screenshot of Checkout Page allegedly taken on April 4, 2020) *with* FAC ¶40 (screenshot of Checkout Page allegedly taken in

---

[4] Not only is the Complaint "substantially similar" to that in the *Moses* Action, a large portion of its allegations are copied verbatim—as demonstrated in Plaintiffs' initial Complaint, which mistakenly asked to certify a class "throughout California." Compl. (Dkt. 1) ¶60.  Plaintiffs' FAC replaced references to "California" and "New York" with "Oregon," but largely did not alter the substance of the allegations. *Compare* Compl. ¶¶10, 63 *with* FAC ¶¶10, 63.

June 2022).  However, despite Plaintiffs' counsel's knowledge that The Times was revising its ARL disclosures in Fall 2020 and the fact that emails Plaintiffs received from The Times are within their possession—***and despite knowing that The Times has sought dismissal on this very issue***— the Amended Complaint does not include any emails sent to Plaintiffs (both of which would have arrived after the filing of *Moses*).    Instead, Plaintiffs inexplicably copy the same "Acknowledgement Email" that appeared in the *Moses* Complaint.  *Compare Moses* Compl. ¶41 (containing a screenshot of an "email follow-up" that The Times "sent to [Moses] and the Class") *with* FAC ¶49 (containing the same screenshot from the *Moses* Complaint, but merely noting it is an "example" of a follow-up email from sometime in 2020).

## C.  PLAINTIFF THEA MACQUAID PURCHASES A SUBSCRIPTION TO THE TIMES AND AGREES TO ITS AUTOMATIC RENEWAL TERMS.

Plaintiff Thea MacQuaid allegedly purchased an annual subscription to The Times on August 3, 2020.  FAC ¶8.  During the sign-up process, MacQuaid provided her payment information and was charged an amount that the Amended Complaint does not specify, other than to say that it was less than $100.  *Id.*

As The Times pointed out in its initial Motion to Dismiss, the Complaint also did not specify what disclosures were presented to MacQuaid, either during the subscription sign-up process or via a follow-up "Acknowledgement Email."  Plaintiffs' amendments have done nothing to fix this problem.  Instead, like the initial Complaint, the Amended Complaint merely alleges that The Times's disclosures were insufficient to comply with Oregon's ARL because they did not inform MacQuaid of "the complete automatic renewal terms that applied to Defendant's offer, a description of Defendant's full cancellation policy, or information regarding how to cancel Ms. MacQuaid's NYT Subscription in a manner capable of being retained by her."  *Id.*  MacQuaid

alleges that she was therefore unaware of "the recurring price to be charged upon renewal, the length of the renewal term or when the first charge would occur, or the complete cancellation policy associated with her NYT Subscription," *id.*, even though the pricing and renewal terms are set forth in the sample Checkout Page, and the "complete cancellation policy" is available through the Terms of Sale to which MacQuaid agreed.  FAC ¶40; Chesley Decl., Exs. B, C §2.

MacQuaid alleges that despite not knowing her subscription would renew, she was charged approximately $200 on July 31, 2021, to subscribe for another year.  FAC ¶8.  MacQuaid vaguely alleges that when she attempted to cancel her subscription and seek a refund on August 2, 2021, she was "unsuccessful" and "was unable to terminate her subscription due to Defendant's confusing cancellation policy."  *Id.*  She does not explain what was "confusing" about the policy, other than noting in a footnote that she was unaware that The Times "only" permits subscribers to cancel via phone from 7 a.m. to 3 p.m. E.T. on weekends and holidays, and via chat (*id.* ¶8, n.6) – facts that appear in on The Times's website and would have been made available to MacQuaid when she subscribed through a blue, bolded link on the Checkout Page titled "contacting Customer Care," which led to the Help page titled "Cancel Your Subscription."[5]  FAC ¶¶40, 43 n.38; Chesley Decl., Ex. A.

___

[5] When MacQuaid subscribed, the Terms of Sale stated that a subscriber could cancel via telephone and chat, but did not provide the hours for each.  Chesley Decl., Ex. B §2.1.  However, the Checkout Page clearly provides a link with specific information about how to cancel, including the hours of availability.  *Id.* Ex. A.  Moreover, by the time MacQuaid attempted to cancel in August 2021, she could access this information on both the Terms of Sale and Cancel Your Subscription pages.  *Id.* & Ex. C §2.1.  These hours are extensive:  Customer Care is available via telephone for 15 hours each business day, and 8 hours each weekend day and holiday.  *Id.* Ex. A.  Chat is available 24 hours per day, seven days per week.  *Id.*

MacQuaid alleges that had she "been able to read and review the pertinent automatic renewal offer terms prior to purchase, she would have not subscribed to the New York Times at all or on the same terms, or she would have cancelled her NYT Subscription earlier, i.e., prior to the expiration of the initial subscription period." FAC ¶8. She does not allege whether she read the Automatic Renewal Terms or Terms of Sale to which she agreed, nor does she allege that The Times failed to provide her access to its website or any other services included in her subscription.

### D.   PLAINTIFF SARAH RENFROW PURCHASES A SUBSCRIPTION TO THE TIMES AND AGREES TO ITS AUTOMATIC RENEWAL TERMS.

Plaintiff Sarah Renfrow allegedly purchased a monthly subscription to The Times sometime in December 2020. FAC ¶9. During the sign-up process, Renfrow provided her payment information and was charged an unspecified amount upfront. *Id.*

As with MacQuaid, the Amended Complaint (still) does not identify what disclosures were presented to Renfrow, either during the subscription sign-up process or via a follow-up "Acknowledgement Email." Instead, it again states the disclosures were deficient under Oregon's ARL for the same reasons alleged by MacQuaid.[6]

Renfrow alleges that even though she did not give "affirmative consent" to her subscription's renewal terms, it nonetheless renewed at a cost of "approximately $1.00 per month" through November 2021. FAC ¶9. That month, Renfrow alleges, her monthly subscription price was increased from $1 per month to $17.[7] *Id.* Renfrow claims that she called The Times to cancel

---

[6] Because the Amended Complaint does not describe the disclosures sent to these Plaintiffs, it is impossible to know whether they were identical or not.

[7] Although not relevant for this Motion, The Times does not generally offer a promotional rate of $1 per month. Like the plaintiff in the *Moses* Action and the hypothetical user reflected in the

her subscription in both November and December 2021 but was unable to do so.  *Id.*  Like MacQuaid, she alleges that The Times's "confusing" cancellation policy prevented her from cancelling her subscription but does not specify what she did not understand about the policy.  *Id.*

Renfrow claims that if she had known all the autorenewal terms, "she would have not subscribed to *The New York Times* at all or on the same terms, or she would have cancelled her NYT Subscription earlier, *i.e.*, prior to the expiration of the initial subscription period and/or any subsequent renewal term."  *Id.*  Like MacQuaid, she does not allege whether she read the Automatic Renewal Terms or Terms of Sale to which she agreed, nor does she allege that The Times failed to provide her access to its website or any other services.

## E.    PLAINTIFFS FILE THIS LAWSUIT AND AMEND THEIR COMPLAINT.

On July 1, 2022, Plaintiffs filed their initial Complaint, alleging that The Times "failed to comply with the ARL in three ways" by:  (i) "fail[ing] to present the automatic renewal offer terms in a clear and conspicuous manner and in visual proximity to the request for consent to the offer before the subscription or purchasing agreement was fulfilled, in violation of ORS 646A.295(1)(a);" (ii)  "charg[ing] Plaintiffs' and Class members' Payment Methods without first obtaining their affirmative consent to the agreement containing the automatic renewal offer terms, in violation of ORS 646A.295(1)(b)"; and (iii) "fail[ing] to provide an acknowledgment that included the automatic renewal offer terms, cancellation policy, and information regarding how to cancel," along with a "toll-free telephone number" or "another cost-effective, timely and easy-to-

---

FAC's sample Checkout Page, Renfrow likely paid $4 per month, or $1 per week.  FAC ¶40; *Moses* Compl. ¶44.

DEFENDANT THE NEW YORK TIMES COMPANY'S MOTIONS TO DISMISS AND STRIKE AND MEMORANDUM OF LAW IN SUPPORT

use mechanism for cancellation," in a manner that is capable of being retained by the consumer, in violation of ORS 646A.295(1)(c) and ORS 646A.295(2).  FAC ¶42.

The Times moved to dismiss on August 26, 2022.  Plaintiffs did not respond to that motion, instead electing to file the Amended Complaint to add a claim for unjust enrichment on behalf of a nationwide class of Times subscribers.  The Amended Complaint, however, does little to address the deficiencies identified in The Times's initial motion, and its addition of a new meritless claim does not save it.  Because Plaintiffs do not – and cannot – adequately allege UTPA and unjust enrichment claims, The Times moves to dismiss these claims with prejudice or, in the alternative, to strike Plaintiffs' nationwide class claims.

## <u>LEGAL STANDARDS</u>

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  While the Court "must accept as true all of the [factual] allegations contained in a complaint," it need not accept "legal conclusions."  *Id.*  In addition to the complaint itself, a court may also consider judicially noticeable documents such as public filings and documents incorporated by reference.  *In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 813-14 (N.D. Ca. 2020) (incorporating the Terms of Service and Privacy Policy containing the relevant contract terms); *Ciuffitelli v. Deloitte & Touche LLP,* No. 3:16-cv-580-AC, 2017 WL 2927481, *17 (D. Or. Apr. 10, 2017).  Courts "need not accept as true allegations contradicting documents that are referenced in the complaint or that are properly subject to judicial notice."  *Lazy Y Ranch, Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

Because Plaintiffs' claims sound in fraud, they are subject to Federal Rule of Civil Procedure 9(b)'s heightened pleading standard.  Rule 9(b) applies to UTPA claims – like this one

DEFENDANT THE NEW YORK TIMES COMPANY'S MOTIONS TO DISMISS AND STRIKE
AND MEMORANDUM OF LAW IN SUPPORT

FG: 100603708.1

– which are "grounded in fraud" even if "fraud is not an element of the claim." *Martell v. Gen. Motors LLC*, 492 F. Supp. 3d 1131, 1145 (D. Or. 2020); *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009). To determine whether a complaint "sounds in fraud," a court must compare a plaintiff's allegations to the elements of fraud under Oregon law. *Ivie v. Mission Rock Residential LLC*, No. 3:21-cv-01122-SB, 2022 WL 2612215, *9-10 (D. Or. May 27, 2022). The elements of common-law fraud in Oregon are: "the defendant made a material misrepresentation that was false," (2) "the defendant did so knowing that the representation was false," (3) "the defendant intended the plaintiff to rely on the misrepresentation," (4) "the plaintiff justifiably relied on the [defendant's] misrepresentation," and (5) "the plaintiff was damaged as a result of that reliance."[8] *Strawn v. Farmers Ins. Co. of Or.*, 350 Or. 336, 258 P.3d 1199, 1209 (2011).

Here, Plaintiffs' UTPA claim alleges a unified course of fraudulent conduct. Plaintiffs allege that The Times engaged in "false and deceptive conduct" by using its subscription process "to trick users into signing up for expensive and recurring plans." FAC ¶¶11, 19 (citation omitted). This "widespread pattern of uniform unlawful conduct" was purportedly based on "artifice devised and employed by Defendant to lure and deceive millions of consumers into enrolling, and remaining enrolled, in the paid NYT Subscription programs." *Id.* ¶26. According to Plaintiffs, The Times's wrongful conduct included subscriber communications in which "[d]isclosures of required offer terms are either missing altogether, are deceptively incomplete, objectively inaccurate, and/or are inconspicuously buried." *Id.* ¶52. Plaintiffs allege that this "unlawful

---

[8] Oregon recognizes "four theories of fraud: (1) affirmative misrepresentation; (2) omission of a material fact when there is an independent duty to disclose; (3) omission of a material fact needed to make a 'half-truth' not misleading; and (4) actual or active concealment." *Martell*, 492 F. Supp. 3d at 1142 (citation omitted)).

DEFENDANT THE NEW YORK TIMES COMPANY'S MOTIONS TO DISMISS AND STRIKE AND MEMORANDUM OF LAW IN SUPPORT

conduct" was "intended to deceive Plaintiffs and the Class, and – as a result of Plaintiffs' and Class members' reasonable reliance on Defendant's omissions of material offer terms required to be disclosed by the ARL – has resulted, and will result, in damages to Plaintiffs and the Class in the form of loss on money and property." *Id.* ¶87.  Thus, Plaintiffs' allegations make clear that their UTPA claims sound in fraud.  *See Ivie*, 2022 WL 2612215, *12 (applying Rule 9(b) to a UTPA claim based on defendant's alleged use of misrepresentations and omissions to "induce" plaintiffs to sign lease agreements); *Martell*, 492 F. Supp. 3d at 1139-46 (applying Rule 9(b) to a UTPA claim based on defendant's misleading advertisements and concealment of unfavorable facts). Plaintiffs therefore must "state with particularity the circumstances constituting fraud or mistake," meaning their allegations "must be accompanied by the 'who, what, when, where, and how' of the misconduct charged."  *Martell*, 492 F. Supp. 3d at 1142 (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)).

Separately, a court has "broad discretion" to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent or scandalous matter."  Fed. R. Civ. P. 12(f); *Naharaja v. Wray*, No. 3:13-CV-01261-HZ, 2014 WL 3891754, *4 (D. Or. Aug. 6, 2014).  A court may strike class allegations at the pleading stage if it is clear from the face of the complaint that variations in state law will preclude class certification.  *Walters v. Vitamin Shoppe Indus*., No. 3:14-cv-1173-PK, 2018 WL 2424132, *4 (D. Or. May 8, 2018), *report and rec. adopted*, 2018 WL 2418544 (D. Or. May 29, 2018) (striking nationwide class claims for unjust enrichment due to disparate state law).

## ARGUMENT

**I.    PLAINTIFFS' UTPA CLAIMS MUST BE DISMISSED BECAUSE THEY WERE FILED BEYOND UTPA'S ONE-YEAR STATUTE OF LIMITATIONS.**

A private UTPA claim "must be commenced within one year after the discovery of the unlawful method, act or practice." ORS 646.638(6). This time period "begins to run when the plaintiff knew or should have known of the alleged misrepresentation." *Brooks v. BC Custom Constr., Inc.*, No. 3:18-cv-00717-YY, 2019 WL 3763769, *19 (D. Or. May 21, 2019) (citation and internal punctuation omitted). This is an objective inquiry and may be decided on a motion to dismiss where "only one conclusion reasonably can be drawn" from the allegations. *Kinyon v. Cardon*, 69 Or. App. 546, 550-52, 686 P.2d 1048, 1051-52 (1984) (citation omitted); *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006) (holding that dismissal was appropriate on statute of limitations grounds because "the running of the statute [wa]s apparent on the face of the complaint").

Courts use "a two-step process to determine whether a plaintiff 'should have known' of the existence of a claim: 'First, it must appear that plaintiff had sufficient knowledge to excite attention and put a party upon his guard or call for an inquiry. Second[,] if plaintiff had such knowledge, it must also appear that a reasonably diligent inquiry would disclose the fraud.'" *Brooks*, 2019 WL 3763769, *19 (quoting *McCulloch v. Price Waterhouse LLP*, 157 Or. App. 237, 248, 971 P.2d 414, 420 (1998)). Where the purported fraud occurred more than a year before the filing of a complaint, a plaintiff must specifically "allege facts sufficient to support application of the discovery rule." *Egbukichi v. Wells Fargo Bank*, 184 F. Supp. 3d 971, 977-78 (D. Or. 2016) (dismissing UTPA claim as time-barred where plaintiff failed to plead "that they reasonably could not have known about the allegedly improper fees and costs"); *Phillips v. Lithia Motors, Inc.*, No.

03-3109-HO, 2006 WL 113608, *15 (D. Or. Apr. 27, 2006) (citation omitted) ("A complaint filed after the period provided by statute for the bringing of the action must negative lack of diligence in the discovery of the fraud.").

Here, the face of the Amended Complaint shows Plaintiffs' UTPA claims are time-barred.

## A.    PLAINTIFFS' CLAIMS ARE TIME-BARRED BECAUSE ANY PURPORTED DEFICIENCIES IN THE TIMES'S DISCLOSURES WERE READILY APPARENT AT THE TIME OF SALE.

According to Plaintiffs, The Times violated Oregon's ARL by failing to make appropriate ARL disclosures during the sign-up process and by charging Plaintiffs' "Payment Method" (presumably, their credit cards) without obtaining appropriate consent. FAC ¶¶42, 59 (stating that Plaintiffs' UTPA claims "are based on, *inter alia*, Defendant's failure to adequately provide the requisite disclosures and authorizations required to be made to Oregon consumers under ORS 646A.295"). Each of these alleged wrongs occurred at the point of sale or immediately following it. *Id.* ¶53 (alleging that because of The Times's "missing, incomplete, and otherwise deficient disclosures" made "at the point of sale," Plaintiffs were "induced to sign up for" and "automatically charged" for their subscriptions); *id.* ¶¶55-56 (alleging Plaintiffs suffered an "ascertainable loss" consisting of all their payments to The Times, including their initial payments); *id.* ¶60 (seeking to certify a class consisting of Oregon residents who "incurred fee(s) in connection with any of Defendant's NYT Subscription offerings"). For MacQuaid and Renfrow, those sales allegedly occurred on August 3, 2020 and in "December 2020," respectively (*id.* ¶¶8-9) – yet the initial Complaint was not filed until July 1, 2022, at least 18 months later.

The question, then, is whether Plaintiffs could have "discovered" The Times's alleged misstatements or omissions when they purchased their subscriptions or shortly thereafter. According to the Amended Complaint, the information that was allegedly "missing, incomplete,

DEFENDANT THE NEW YORK TIMES COMPANY'S MOTIONS TO DISMISS AND STRIKE AND MEMORANDUM OF LAW IN SUPPORT

and otherwise deficient" during The Times's subscription process was (i) the Automatic Renewal Terms; (ii) a clickable checkbox to indicate acceptance of those terms; and (iii) the existence of a toll-free telephone number or other "timely and easy-to-use mechanism for cancellation." *Id.* ¶¶41-42.

The Checkout Page clearly and conspicuously discloses the Automatic Renewal Terms. FAC ¶40. To the extent any information was not directly stated on the page, the Checkout Page provides hyperlinks sufficient to draw the attention of an objective subscriber to additional information (including The Times's toll-free telephone number). *See Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 840 (S.D.N.Y. 2012) (citation omitted) ("[A] person using a computer quickly learns that more information is available by clicking on a blue hyperlink"); *see also* pp. 23-24, *infra*. For example, users are told that they can cancel by "contacting Customer Care," with a hyperlink on how to do just that (along with a second blue hyperlink to "Contact Customer Care" following the prompt, "Need help?"). They are also told that, "[b]y subscribing," they agree to the Automatic Renewal Terms and The Times's Terms of Sale and Terms of Service – both of which prompt the user to review them via an underlined, blue hyperlink. *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 79 (2d Cir. 2017) ("[T]he language '[b]y creating an Uber account, you agree' is a clear prompt directing users to read the Terms and Conditions."). And the absence of a checkbox is readily apparent to any user of the site. Given the information on the Checkout Page and its prompts to obtain more information, Plaintiffs had sufficient information to inquire further. *See Brooks*, 2019 WL 3763769, *19 (citation omitted) (finding that the date on which a plaintiff signed a contract "provided actual notice of the transaction and the obligations that plaintiffs owed under the agreement," and therefore "[t]he facts alleged in the complaint show that plaintiff had 'sufficient knowledge to excite attention and put a party upon his guard or call for an inquiry'").

DEFENDANT THE NEW YORK TIMES COMPANY'S MOTIONS TO DISMISS AND STRIKE AND MEMORANDUM OF LAW IN SUPPORT

FG: 100603708.1

Had Plaintiffs chose to inquire here, the Amended Complaint makes clear that any additional information about their subscription was readily available on The Times's website. FAC ¶43, n.38 (alleging that both The Times's Terms of Sale and help page explaining how to "Cancel Your Subscription" contain detailed instructions on how subscribers can contact The Times to cancel their subscriptions); Chesley Decl., Exs. B, C §1.5.1 (providing notice that subscriptions automatically renew and a hyperlink "[t]o view information about your billing cycle"), *id.* §2.1 (providing information about cancellation).  Moreover, if Plaintiffs had wanted to know more about complaints regarding The Times's subscription practices, a simple Google search would have revealed these – as well as the then-pending *Moses* Action.[9]  *See* FAC ¶¶23-26; *Moses* Action (Dkt. 1).  "This is not a situation where the alleged fraud was, or indeed could have been, concealed from its victim so as to justify its delayed discovery."  *Kinyon*, 686 P.2d at 1051; *cf. Forest Grove Brick Works, Inc. v. Strickland*, 277 Or. 81, 86, 559 P.2d 502, 505 (1977) (a party may be expected to immediately inquire about a "fraud which is flagrant and widely publicized," but not one that is "artfully concealed" or arises from a fiduciary relationship).

The fact that the statute of limitations for a UTPA claim begins to accrue at the time of a purportedly deficient disclosure is supported by both state and federal law.  For example, in *Scharfstein v. BP West Coast Products, LLC*, 292 Or. App. 69, 423 P.3d 757 (2018) – a case relied on by Plaintiffs (FAC ¶¶55, 77, 83) – the Oregon Court of Appeals affirmed a judgment in favor of a class of consumers who did not receive a legally required disclosure at the time they were charged a "fee in violation of the UTPA" during the year before the complaint was filed (and thereafter).  *Id.* at 90*; see also id.* at 72-73 (noting that the complaint was filed on December 29,

---

[9] The *Moses* allegations were widely publicized when the complaint was filed in June 2020.

2011, and the class period began on January 1, 2011). Similarly, in a lawsuit in which the defendant's phone calls did not "disclose all material terms and conditions of the automatic renewal feature of the subscriptions" in violation of the federal unfair trade practices act (15 U.S.C. §57b), the court held that relief under that statute was time-barred for any call made prior to the act's three-year statute of limitations. *United States v. MyLife.Com, Inc.*, 567 F. Supp. 3d 1152, 1165-66 (C.D. Cal. 2021). And in connection with California's automatic renewal law, which as Plaintiffs acknowledge mirrors that of Oregon (FAC ¶57), at least one court has explained that a violation occurs before "'completion of the initial order'" because "to violate the statute, companies must fail to disclose the automatic renewal practice *before the first order is completed*." *In re Trilegiant Corp.*, 11 F. Supp. 3d 82, 127 (D. Conn. 2014) (quoting Cal. Bus. & Policy Code §17602(d)) (emphasis added); *compare* ORS 646A.295(4) (with certain enumerated exceptions, "[t]he requirements of this section must be met prior to the completion of the initial order for the automatic renewal or continuous service").

As in these cases, any failure to make the required disclosures during the sign-up process was obvious at the time of the sale and could have been discovered using information readily available through hyperlinks on the Checkout Page. Thus, Plaintiffs' claims are time-barred.

**B.      IN THE ALTERNATIVE, RENFROW'S CLAIM IS TIME-BARRED BECAUSE HER SUBSCRIPTION RENEWED MORE THAN ONE YEAR BEFORE THE FILING OF THE COMPLAINT.**

To the extent that Plaintiffs argue the sign-up process alone was insufficient notice to trigger the statute of limitations, they undoubtedly had sufficient notice to "inquire further" once their subscriptions renewed – an event that, according to Plaintiffs, was neither authorized nor expected. *See* FAC ¶2 (The Times "made the deliberate decision to charge Plaintiffs and other similarly situated customers on a monthly or yearly basis, absent their consent"); *id.* ¶46 (alleging

DEFENDANT THE NEW YORK TIMES COMPANY'S MOTIONS TO DISMISS AND STRIKE
AND MEMORANDUM OF LAW IN SUPPORT

that Plaintiffs "were unaware that Defendant had enrolled them in 'automatic renewal' programs under which their subscription would renew each month or year and result in continuous monthly or annual automatic renewal charges to their Payment Methods"). These "unexpected renewal charge[s]" appeared on the bank statements of Plaintiffs' Payment Methods, and thus were clearly disclosed to Plaintiffs at the time they occurred. *Id.* ¶¶8-9 & n.6. Even if Plaintiffs could successfully argue that they lacked sufficient inquiry notice that they had agreed to an autorenewal agreement during the subscription process (which they cannot), their own allegations make clear that they obtained such notice once they began incurring monthly subscription fees. *Id.*; *see Minskoff v. Am. Express Travel Related Servs. Co., Inc.*, 98 F.3d 703, 710 (2d. Cir. 1996) ("[O]nce a cardholder receives a statement that reasonably puts him on notice that one or more fraudulent charges have been made, he cannot thereafter claim lack of knowledge.").

Renfrow alleges that she began her monthly Times subscription in approximately December 2020. FAC ¶9. Starting one month later, in January 2021, The Times began charging her Payment Method $1.00 each month until November 2021. *Id.* It appears that Renfrow – like any objectively reasonable person – looked at the statements associated with her Payment Method, because she alleges that she learned that her subscription had increased in price when "she reviewed her bank statement in November 2021." *Id.* Given these facts, Renfrow has had inquiry notice that she was enrolled in an automatic renewal program since at least January 2021. *See In re Trilegiant*, 11 F. Supp. 3d at 107 (holding that plaintiffs should have known that they had been enrolled in an autorenewal plan once they received the charges on their credit card statements).

As explained above, even the slightest inquiry would have (again) revealed the renewing nature of her subscription and its relevant terms – for example, review of the Checkout Page's link to the Terms of Sale, a visit to her Account page on the Times's website (as prompted in the Terms

of Sale), a simple Google search, or a visit to the public-facing webpages cited in the Amended Complaint. *See* FAC ¶43, n.38. Thus, because Renfrow's claim was filed more than one year after she began incurring renewal fees, it is barred by the UTPA's one-year statute of limitations.

## II.    PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE AN ARL VIOLATION.

At the outset, the Amended Complaint is deficient because—like its predecessor pleading—it fails to allege what disclosures were actually presented to Plaintiffs during the subscription process. Instead, they cite examples of disclosures that The Times made to other people at various points in time, without alleging whether those disclosures are identical to what the Plaintiffs here saw and received. These vague allegations simply do not meet Plaintiffs' requirement to plead their claims with particularity. *See Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (Rule 9(b) obligates a plaintiff to allege the "who, what, when, where, and how" of the fraudulent activity) (citation omitted); *DeLoe v. Dep't Stores Nat'l Bank*, No. 3:17-CV-00022-SB, 2017 WL 4052185, *5 (D. Or. Aug. 18, 2017), *report and rec. adopted*, 2017 WL 4051557 (dismissing UTPA claim because defendants failed to plead "with sufficient particularity"); *Pincetich v. Jeanfreau*, 699 F. Supp. 1469, 1474-75 (D. Or. 1988) (a complaint that relied on general allegations of misrepresentations by defendants was not pled with particularity).

While the Amended Complaint may be dismissed on this ground alone, it is also subject to dismissal with prejudice for the additional reasons set forth below.

**A.    THE TIMES'S PRESENTATION OF THE AUTOMATIC RENEWAL TERMS WAS CLEAR AND CONSPICUOUS.**

Plaintiffs' claim under ORS 646A.295(1)(a) fails as a matter of law because The Times did just what that section requires: provide the Automatic Renewal Terms in a "clear and conspicuous" manner.

The terms that must be disclosed under the ARL are:

a.    That the subscription or purchasing agreement will continue until the consumer cancels.

b.    The description of the cancellation policy that applies to the offer.

c.    The recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal or continuous service plan or arrangement, and, if the amount of the charge will change, the amount to which the charge will change, if known.

d.    The length of the automatic renewal term or that the service is continuous, unless the length of the term is chosen by the consumer.

e.    The minimum purchase obligation, if any.[10]

ORS 646A.293(5). The ARL defines "clear and conspicuous" to mean "in larger type than the surrounding text, or in contrasting type, font or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language."  ORS 646A.293(2).

The "clear and conspicuous" disclosure of the Automatic Renewal Terms is readily apparent from the screenshot of the Checkout Page in the Amended Complaint.  FAC ¶ 40.  Indeed, the terms are impossible to miss.  They are distinctly highlighted on a minimalist and uncluttered page, commanding attention by being set off from the rest of the Checkout Page in a gray box above the "Purchase Subscription" button.  To further emphasize their importance, they are

---

[10] Plaintiffs have not alleged any "minimum purchase obligation," so this term is not at issue.

DEFENDANT THE NEW YORK TIMES COMPANY'S MOTIONS TO DISMISS AND STRIKE AND MEMORANDUM OF LAW IN SUPPORT

FG: 100603708.1

rendered in bold font under the all-caps heading "**AUTOMATIC RENEWAL TERMS**," and appear in close visual proximity to the "Purchase Subscription" button.  *See Hall v. Time*, *Inc.,* No. 20-55354, 2021 WL 2071991, *1 (9th Cir. May 24, 2021) (holding that terms within 40 words of the button to make a purchase satisfied the California ARL's "visual proximity" requirement).  The text of the Automatic Renewal Terms is unambiguous, informing subscribers that their "payment method will be automatically charged $4.00 every 4 weeks for the first year" and "$17.00 every 4 weeks thereafter," specifying the date on which the price will increase, describing The Times's cancellation policy, and explaining that the "subscription will continue until you cancel."  FAC ¶40; Chesley Decl., Ex. A.  Moreover, immediately above the button a user must click to purchase a subscription, the text states, "By subscribing, you agree to the Automatic Renewal Terms on this page."  *Id.*

Despite these express disclosures, Plaintiffs allege that The Times violated Section 646A.295(1)(a) by failing to include The Times's entire Cancellation Policy on the Checkout Page. FAC ¶43.  Specifically, Plaintiffs complain that the Checkout Page does not detail "*how* to cancel," that there are potential exceptions to the Cancellation Policy for "certain promotions," cancellations must occur before a promotion ends to avoid a charge, and a consumer cannot receive a refund where a cancellation is made in the middle of billing cycle.  *Id.*

But the Automatic Renewal Terms do describe "how to cancel" – by contacting Customer Care, with a hyperlink on how to do just that – and indicate that refunds are unavailable by stating that cancellations "take effect at the end of your current billing period" (so there is nothing to refund).  FAC ¶40; *see Hall v. Time, Inc.,* No. SACV 19-01153-CJC(ADSx), 2020 WL 2303088, *4 (C.D. Cal. Mar. 13, 2020), *aff'd*, 857 F. App'x 385 (9th Cir.) (holding that a checkout notice sufficiently described Time's cancellation policy when it "provided information about how and

DEFENDANT THE NEW YORK TIMES COMPANY'S MOTIONS TO DISMISS AND STRIKE AND MEMORANDUM OF LAW IN SUPPORT

when she could cancel, with hyperlinks to the relevant contact information").  As for variations in the Cancellation Policy that may occur due to certain promotions, the ARL only requires disclosure of the Cancellation Policy "that applies to the offer" – not every possible policy that might apply.[11] Plaintiffs' arguments to the contrary fundamentally misunderstand what the ARL requires, which is simply a ***description*** of the Cancellation Policy – not a complete reproduction.  Indeed, if Plaintiffs' argument were correct, publishers' checkout pages would be bogged down in pages of text that would render them far more difficult to comprehend, thereby defeating the very purpose of the ARL.

Even if the ARL required more than a straightforward description of a company's cancellation policy, the Cancellation Policy is a part of the Terms of Sale to which Plaintiffs affirmatively agreed when they purchased their subscriptions.  FAC ¶40.  This document, which is incorporated into the parties' contract, includes The Times's Cancellation Policy.  Chesley Decl., Exs. B, C; *Lundbom v. Schwan's Home Serv., Inc.*, No. 3:18-cv-02187-IM, 2020 WL 2736419, *6 (D. Or. May 26, 2020) (holding that policies available via hyperlink are incorporated into the parties' agreement where a plaintiff agrees to them by clicking a "Complete Registration" button). By providing links to that policy during the subscription process and notifying subscribers that they were agreeing to its terms, The Times sufficiently described its cancellation policy as required.  *See Rutter v. Apple Inc*., No. 21-CV-04077-HSG, 2022 WL 1443336, *6 (N.D. Cal. May

---

[11] Because Plaintiffs do not allege what disclosures they actually received during the subscription process, there is no way to know whether they viewed terms unique to a specific promotion.  If they had, they would have been notified at the time of purchase because "[t]he specific terms of each promotion are stated at the time the promotion is offered."  Chesley Decl., Exs. B, C §1.7; *id*. §2.2 (for promotions that limit cancellations, a user "agree[s] to the cancellation and refund terms stated at the time of purchase").

6, 2022) (holding that Apple included a "description of the cancellation policy that applies to the offer" by linking to its Terms and Conditions).

Defendants also allege that The Times failed to disclose "the length of the automatic renewal term" because the Amended Complaint's sample Checkout Page describes that term as occurring "every 4 weeks" rather than on specific dates.  FAC ¶44.  But the law simply requires disclosure of the length of the renewal period, not the calculation of specific dates.  If users want to know more, such as "the precise calendar date that their NYT Subscriptions will renew and their Payment Methods will be charged each month or billing period" (*id.*), they can contact The Times using the links on the Checkout Page or, as set forth in the Terms of Sale, visit their Account page on the Times's website.  Chesley Decl. Exs. B, C, §1.5.1 (stating that "[t]o view information about your billing cycle, visit the My Account area of NYTimes.com" and providing a hyperlink to the membership account page).

Plaintiffs also halfheartedly allege that The Times "does not adequately disclose the recurring amount to be charged to the subscriber's Payment Method each billing period."  FAC ¶45.  Although Plaintiffs seem to admit – as they must – that this information appears on the Checkout Page, they absurdly claim that it is "inconspicuous" despite being bolded and in a shaded box set off from the rest of the page.  These assertions are flatly contradicted by the definition of "clear and conspicuous" in the ARL and, frankly, common sense.  *See* ORS 646A.293(2).  Any reader who understands English would know that the hypothetical user reflected in the sample Checkout Page would be "automatically charged $4.00 every 4 weeks for the first year," and "$17.00 every 4 weeks thereafter, starting on June 26, 2023" – exactly as stated in the Automatic Renewal Terms.  FAC ¶40.

DEFENDANT THE NEW YORK TIMES COMPANY'S MOTIONS TO DISMISS AND STRIKE
AND MEMORANDUM OF LAW IN SUPPORT

FG: 100603708.1

**B.    THE TIMES OBTAINED SUBSCRIBERS' CONSENT TO AUTOMATIC RENEWAL.**

Plaintiffs next argue that The Times violated Oregon's ARL by failing to obtain subscribers' consent to the agreement containing the automatic renewal offer terms.  FAC ¶47.  This allegation is again contradicted by the Checkout Page, which clearly states immediately above the "Purchase Subscription" button that "By subscribing, you agree to the Automatic Renewal Terms on this page, our Terms of Sale and Terms of Service."  FAC ¶40.  The "Automatic Renewal Terms" are located directly above this statement, and both the Terms of Sale and Terms of Service are accessible via blue, underlined hyperlinks.  As Times subscribers, both Plaintiffs necessarily would have had to agree to all these terms when clicking the "Purchase Subscription" button.

Plaintiffs' main contention appears to be that any method of indicating consent is invalid without the use of a "checkbox."  *Id.*  That is simply not the law.  *See Hall*, 2020 WL 2303088, *4 (dismissing plaintiffs' claims under California's ARL where the plaintiff did not click a checkbox but instead "affirmatively consented to the agreement containing [the ARL] terms by entering her payment information and submitting her order after receiving notice of those terms").  Instead, numerous courts have recognized that "sign-in wrap agreements" like the one here – "in which a website 'notif[ies] the user of the existence of the website's terms of use and, instead of providing an 'I agree' button, advise[s] the user that he or she is agreeing to the terms of service when registering or signing up'" – show a party's consent to the underlying terms "where the existence of the terms was reasonably communicated to the user."  *Peter v. Doordash, Inc*., 445 F. Supp. 3d 580, 585 (N.D. Cal. 2020) (quoting *Meyer*, 868 F.3d at 75-76 (collecting cases)).

The question of whether terms were "reasonably communicated" must be addressed from the position of a "reasonably prudent" Internet user.  *Meyer*, 868 F.3d at 77.  With respect to

DEFENDANT THE NEW YORK TIMES COMPANY'S MOTIONS TO DISMISS AND STRIKE
AND MEMORANDUM OF LAW IN SUPPORT

FG: 100603708.1

hyperlinks, "a reasonably prudent smartphone user knows that text that is highlighted in blue and underlined is hyperlinked to another webpage where additional information will be found." *Id.* at 77-78. Thus, where a user was prompted to review additional terms either directly or via a "reasonably conspicuous" hyperlink and "signal[ed] . . . their acceptance of the benefit of registration" by clicking a button to create an account, the user consented to those terms. *Id.* at 78-79; *id.* at 80 (holding a plaintiff agreed to Uber's Terms of Service that were hyperlinked on a sign-up page stating that "by creating an Uber account, you agree to the Terms of Service"); *Peter*, 445 F. Supp. 3d at 586 (holding that plaintiffs agreed to DoorDash's terms of service where they appeared in blue on an "uncluttered" page, were "wholly visible," and were in close proximity to the sign-up button); *Snow v. Eventbrite, Inc.*, No. 3:20-cv-03698-WHO, 2020 WL 6135990, *7 (N.D. Cal. Oct. 19, 2020) (holding that a user consented to a sign-in wrap agreement when the "I accept the terms of service" statement was directly above the "pay now" button and the terms were available through a blue hyperlink).

In *Lundbom v. Schwan's Home Service*, a court in this District applied this law in the context of a Telephone Consumer Protection Act claim that required a user to give affirmative consent to receive text messages after being shown certain "clear and conspicuous" disclosures. 2020 WL 2736419, *5. Consumers could create an account on defendant's website by clicking a "Complete Registration" button that appeared below a pre-checked box indicating agreement to receive calls and text messages, which included links to defendant's Mobile Policy and Privacy Policy. *Id.* The court deemed this design equivalent to a "sign-in wrap" agreement like the one at issue here and noted that the agreement terms "will be given effect if an offeree has inquiry notice of the terms and assents to the terms through conduct, such as creating an account, that a reasonable person would understand to constitute consent." *Id.* (citations omitted). The court ultimately

found that the plaintiffs' consent to each of the above policies was effective because the disclosures and links above the "Complete Registration" button "reasonably prompts users to be aware" that their account was subject to the hyperlinked policies; "the user must manifest assent by taking the affirmative action of registering for an account with the check-box for phone communications selected"; and "the hyperlinks in this case are not buried in distracting content." *Id.* *6-7.

Plaintiffs' lack-of-consent claim is particularly inapt here because The Times's requirement that users give consent to the "Automatic Renewal Terms" goes beyond what is required by law. As the Ninth Circuit has explained in the context of analyzing California's identical "affirmative consent" requirement, the statute only requires consent "to the agreement containing the automatic renewal offer terms" – not agreement to the terms themselves. *Hall*, 2021 WL 2071991, *2 ("Had the legislature intended to require a consumer's affirmative consent to the automatic renewal terms specifically, it could have omitted the words 'the agreement containing' from the provision. It did not, and we decline to rewrite the statute and impose a requirement that is absent from the text.") (citation omitted). Therefore, Plaintiffs' act of purchasing a subscription after having the opportunity to view the Automatic Renewal Terms and the Terms of Sale was independently sufficient to indicate consent.

## C.    PLAINTIFFS FAIL TO ADEQUATELY ALLEGE A VIOLATION OF THE ARL'S ACKNOWLEDGEMENT REQUIREMENT.

Finally, Plaintiffs allege that The Times sent them an "Acknowledgement Email" after they subscribed that did not contain all the relevant Automatic Renewal Terms and cancellation information. FAC ¶48. However, even after filing an Amended Complaint, Plaintiffs allege nothing about what was in the Acknowledgement Emails that were sent ***to them***. Instead, they

include a screenshot of an "example" email from 2020, and then assert that the email is deficient – without alleging whether their emails were identical, or even substantially similar. *Id.* ¶¶49-51.

This is insufficient to allege that these Plaintiffs failed to receive an "acknowledgement" within the meaning of Section 646A.295(1)(c), particularly given Plaintiffs' obligation to plead the "who, what, when, and how" of The Times's alleged omissions and misrepresentations to them. *Gross v. Symantec Corp.*, No. C 12-00154 CRB, 2012 WL 3116158, *5 (N.D. Cal. July 31, 2012) (dismissing fraud claims that lacked "direct quotations from [defendant's] website or other marketing materials" because plaintiff's claims depended on the defendant's representations). And Plaintiffs' missing allegations in this regard are particularly striking given that both Plaintiffs alleged they received emails from The Times (FAC ¶48), so the content of those emails should be known to them and easy to obtain.[12]

In any event, Plaintiffs' allegations of inadequate "acknowledgement" are deficient because they presuppose that the Acknowledgement Email is the only way in which The Times could comply with ORS 646A.295(1)(c)(2). The ARL contains no such restrictions on the form in which acknowledgement must be provided, other than that it be "capable of being retained by the consumer." ORS 646A.295(1)(c). Thus, in *Rutter v. Apple*, a California court dismissed a claim based on the defendant's alleged failure to send an acknowledgement email because the relevant information was contained in its terms of service. 2022 WL 1443336, *7. Here, as in *Rutter*, the Amended Complaint does not allege anything about whether The Times gave Plaintiffs notice of the Automatic Renewal Terms and cancellation information through other means. The

---

[12] Plaintiffs offer no explanation for failing to provide this easily accessible information and instead citing an "example" from *Moses*, an especially strange decision given counsel's knowledge of The Times's agreement to modify these confirmation emails. *See* pp. 6-7, *supra*.

documents incorporated by reference, however, show that all the necessary disclosures were made via hyperlinks on the Checkout Page.  For example, the Terms of Sale provided the full Cancellation Policy, which explained how to cancel and provided a toll-free number to do so. Chesley Decl., Exs. B, C §2.  The Terms of Sale also clearly and conspicuously informed subscribers that their subscriptions would renew automatically and they could view information about their billing cycles on the their Account Page. *Id.* §1.5.1.

Because Plaintiffs have not properly pled a violation of ORS 646A.295(1)(c), this claim must be dismissed.

## III.    PLAINTIFFS DO NOT STATE A CLAIM FOR UNJUST ENRICHMENT.

Plaintiffs' primary amendment to their initial Complaint was to add a meritless claim for unjust enrichment of behalf of a nationwide class of people who "incurred fee(s) in connection with Defendant's NYT Subscription Offerings."  FAC ¶60(b).  According to Plaintiffs, The Times was unjustly enriched because it retained revenues from class members who were induced to subscribe based on The Times's purported "failure to disclose material terms of the purchase agreement, in violation of common law."  *Id.* ¶96.  This claim should be dismissed for the following reasons, each of which is independently sufficient.

***First***, a claim for unjust enrichment is a state common law claim—yet Plaintiffs fail to identify which state's law of unjust enrichment they are invoking.  "A group of plaintiffs cannot bring a claim on behalf of a 'nationwide' class without alleging the applicable states' laws." *In re ZF-TRW Airbag Control Units Prods. Liab. Litig*., No. LAML1902905JAKFFMX, 2022 WL 522484, *65 (C.D.Cal. Feb. 9, 2022) (collecting cases).  This is so because courts should "'refrain from guessing what state law or laws Plaintiffs are using as the basis for their claims' when Plaintiffs have failed to specify."  *Id.* (citation omitted).  Given Plaintiffs' failure to identify a

source of law, their unjust enrichment claim must be dismissed. *Id.* ("Because Plaintiffs must identify which State's or States' law they rely upon and have not done so, their 'nationwide' claims for fraud and unjust enrichment fail.") (citation and internal punctuation omitted).[13]

**Second,** unjust enrichment is an equitable claim for which Plaintiffs seek the equitable remedy of restitution.  FAC ¶97; *Osborne v. Nottley*, 206 Or. App. 201, 204-05, 136 P.3d 81 (2006).  Thus, Plaintiffs "must plead the inadequacy of legal remedies before requesting equitable relief."  *In re Intel Corp. CPU Mktg.*, *Sales Pracs. & Prod. Liab. Litig.,* No. 3:18-md-2828-SI, 2021 WL 1198299, *11 (D. Or. Mar. 29, 2021) (citation omitted).  Because Plaintiffs "have not alleged, even in the alternative, that they do not have adequate legal remedies[,]" their unjust enrichment claim must be dismissed.  *Id.*; *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020) (holding that, in order seek the equitable remedy of restitution, a plaintiff "must establish that she lacks an adequate remedy at law").

**Third,** a claim for unjust enrichment is only permitted where no enforceable contract exists. *See Arnett v. Bank of Am., N.A.*, 874 F. Supp. 2d 1021, 1035 (D. Or. 2012) (dismissing an unjust-enrichment claim "because a valid contract—the mortgage—covers the services at issue"); *Sound Found. v. SCI Fund II, LLC*, No. 3:20-cv-01190-HZ, 2022 WL 225089, *9 (D. Or. Jan. 25, 2022) (dismissing unjust enrichment claim "because express contracts govern the loan").

Here, Plaintiffs allege that they entered into subscription agreements with The Times.  FAC ¶¶8-9.  While the Amended Complaint does dispute the contours of these agreements by alleging that they contained material omissions, these allegations are belied by the documents they

---

[13] This analysis is not altered by the choice-of-law analysis set forth in The Times's Motion to Strike, which suggests that Oregon law should apply for the two named Plaintiffs here.  Neither The Times nor this Court are obligated to amend the FAC to create a cognizable claim.

incorporate by reference and thus fail as a matter of law.  Moreover, as explained above (*see* §II.B, *supra*), Plaintiffs' argument that they never agreed to the Terms of Sale because they did not click a separate checkbox is wrong as a matter of law.  *See Wiseley v. Amazon.com, Inc.*, 709 F.App'x 862, 864 (9th Cir. 2017) ("The notices on Amazon's checkout and account registration pages, which alerted [the plaintiff] that clicking the corresponding action button constituted agreement to the hyperlinked COU, were in sufficient proximity to give him a 'reasonable opportunity to understand' that he would be bound by additional terms."); *Lundbom*, 2020 WL 2736419, *6.

**Fourth,** there is nothing "unjust" about The Times keeping the money that Plaintiffs paid for their subscriptions, given the disclosures available on the Checkout Page and the fact that there is no dispute The Times provided Plaintiffs with the services it promised.

An unjust enrichment claim requires that a plaintiff plausibly allege the defendant received a benefit from the plaintiff, and "under the circumstances, it would be unjust to allow retention of the benefit without requiring the recipient to pay for it."  *Smith v. U.S. Bank, N.A.*, Civ. No. 10-3077-CL, 2011 WL 2470100, *16 (D. Or. Apr. 22, 2011), *report and rec. adopted*, 2011 WL 2469729 (D. Or. Jun. 20, 2011) (citation omitted).  Further, a complaint must allege "that the defendant received the benefit under circumstances that in some sense were wrongful or inequitable, e.g., mistake, fraud, coercion, undue influence, duress, taking advantage of weakness, or violation of a duty imposed by a confidential or fiduciary relationship."  *Id.* (citing *Tupper v. Roan*, 349 Or. 211, 223, 243 P.3d 50 (2010)).  It is neither "wrongful" nor "inequitable" for a defendant to retain the profit made from a business transaction where the plaintiffs' allegations merely show that they misunderstood the terms of the transactions.  *Smith*, 2011 WL 2470100, *16 ("Simply put, plaintiffs' failure to understand the terms by which they bound themselves and under which the loan proceedings went forward is insufficient to state a claim for unjust enrichment.").

DEFENDANT THE NEW YORK TIMES COMPANY'S MOTIONS TO DISMISS AND STRIKE AND MEMORANDUM OF LAW IN SUPPORT

The Checkout Page and the documents linked thereto, which control this analysis, refute Plaintiffs' allegations that they were was misled into signing up for a subscription because The Times withheld material information from them.  *Lazy Y Ranch*, 546 F.3d at 588 (a court need not accept allegations contradicted by incorporated or judicially noticeable documents).  Although the Amended Complaint does not specify which supposed "omissions" underlie Plaintiffs' unjust enrichment claim (FAC ¶96), the Checkout Page and incorporated documents make clear that there were none:  they show full, complete disclosure of all relevant terms.  FAC ¶40; Chesley Decl., Exs. A-C.  And there is no allegation that The Times failed to provide Plaintiffs with exactly what they paid for:  access to its vast repository of digital content.  Because Plaintiffs did not and cannot allege that The Times's retention of their subscription fees was "unfair," this claim should be dismissed with prejudice.

## IV.    THE FAC'S NATIONWIDE CLASS ALLEGATIONS SHOULD BE STRICKEN.

To the extent it is not otherwise dismissed, Plaintiffs' nationwide class claim for unjust enrichment should also be stricken because the face of the Amended Complaint shows the class cannot be certified.

In *Mazza v. Am. Honda Motor Co., Inc.*, the Ninth Circuit reversed certification of a nationwide class that sought to bring an unjust enrichment claim against Honda.  666 F.3d 581 (9th Cir. 2012), *overruled on other grounds*, *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022).[14]  As the court explained, a nationwide class action cannot proceed where (i) the "law of multiple jurisdictions" applies to the claims the plaintiff seeks

---

[14] In overruling *Mazza*'s statement that "no class may be certified that contains members lacking Article III standing," the Ninth Circuit expressly stated, "We do not overrule *Mazza* as to any other holding which remain good law."  *Olean*, 31 F.4th at 682 n.32.

to bring; and (ii) variations in that law from state to state are material to the facts alleged in a particular case.

Following *Mazza*, courts in this district and elsewhere have held they may address similar deficient nationwide class allegations at the pleading stage. *See Walters*, 2018 WL 2424132, *11 ("[T]his court may rule on the sufficiency of class action allegations at the pleading stage if no issues of fact must be resolved."). Courts can, and do, strike such class allegations where they do not allege a valid class as a matter of law. *Id.*; *Dearmey v. Hawaiian Isles Kona Coffee Co*., LTD, No. SACV 19-432 JVS (KESx), 2019 WL 6723413, *3 (C.D. Cal. July 22, 2019) ("It is not premature to determine that material variations in state common law render a nationwide class unworkable as to the common law claims."); *Bates v. Bankers Life & Cas. Co*., 993 F. Supp. 2d 1318, 1340 (D. Or. 2014) (granting motion to strike class claims where it was clear from the pleadings that "plaintiffs' claims are not appropriate for class treatment"). Striking meritless class allegations at the pleading stage comports with the "essential function" of Rule 12(f), which is to "avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds*, *sub nom. Fogerty v. Fantasy, Inc*., 510 U.S. 517 (1994).

Both *Mazza* elements are satisfied here. Under Oregon's choice-of-law rules, a court must first determine whether Oregon law differs from the law of other possible fora. *Indoor Billboard Northwest Inc.*, No. 3:12-CV-01338-BR, 2013 WL 3146850, *3 (D. Or. Jun. 18, 2013) (citing *Waller v. Auto-Owners Ins. Co*., 174 Or. App. 471, 475, 126 P.3d 845, 847-48 (2001)). If it does, the court must next "determine whether both [or multiple] states have substantial interests in having their laws applied." *Id.* (citation omitted). If multiple states have a substantial interest the application of their laws, the Court must determine which state, based on the facts of the case, has

the "most significant relationship" as set forth in the Restatement (Second) Conflict of Laws.  *Id.* (citation omitted).

Given the nationwide sweep of the alleged class, all 50 states' law of unjust enrichment is implicated.   As the Ninth Circuit and numerous other courts have found, this law varies significantly among jurisdictions.  *See, e.g.*, *Mazza*, 666 F.3d at 591 ("The elements necessary to establish a claim for unjust enrichment also vary materially from state to state."); *In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Pracs. Litig.*, No. 16-02709-MD-W-GAF, 2019 WL 1418292, *6 (W.D. Mo. Mar. 21, 2019) ("Contrasting aspects of states' unjust enrichment laws, such as the differing lengths of statutes of limitation, the level of misconduct a plaintiff must show, and preclusion of the cause of action if an adequate remedy at law exists, are all examples of states making choices to reflect their respective interests in protecting its consumers or, conversely, the businesses that operate within its borders. As such, a true conflict exists between states' unjust enrichment laws."); *In re Sears, Roebuck & Co. Tools Mktg. & Sales Pracs. Litig.*, Nos. 05 C 4742, 05 C 2623, 2006 WL 3754823, *1 n.3 (N.D. Ill. Dec. 18, 2006) ("[U]njust enrichment is a tricky type of claim that can have varying interpretations even by courts within the same state, let alone amongst the fifty states.").  Moreover, each of these 50 states has an interest in having its law applied to its resident claimants because a key "principle of federalism [is] that 'each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders.'"  *Mazza*, 666 F.3d at 591 (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003)).  For litigation stemming from sales transactions in various states, each state has "a strong interest in the application of their laws to transactions between their citizens and corporations doing business within their state."  *Id.*  at 594.

DEFENDANT THE NEW YORK TIMES COMPANY'S MOTIONS TO DISMISS AND STRIKE AND MEMORANDUM OF LAW IN SUPPORT

FG: 100603708.1

Given the legal differences and competing state interests, the primary question under Oregon's choice-of-law analysis becomes which state has the "most significant interest" in this litigation.  As the Ninth Circuit has made clear, where products are sold to consumers in different states, the state in which the sale occurred has the most signification interest in the litigation. *Mazza*, 666 F.3d at 594; *see also Walters*, 2018 WL 2424132, *5.  Were it otherwise, states could impose their domestic law onto other foreign states, which would violate federalism principles and impair each state's "ability to calibrate liability to foster commerce."  *Mazza*, 666 F.3d at 594. Therefore, Plaintiffs' nationwide class claim is governed by the law of all 50 states.

As for *Mazza*'s second factor, the variations in different states' unjust enrichment law are material to this case.  The substantive differences in states' unjust enrichment laws include "whether a wrongful act is required on the part of the party unjustly enriched, whether the enrichment must have come directly from the plaintiff to the defendant, and whether an unjust enrichment claim can survive if the plaintiff has an adequate remedy at law."  *In re Dollar Gen.*, 2019 WL 1418292, *4 (citation omitted) (collecting cases).  These differences also include whether the defendant must have engaged in misconduct (and if so, what type), statute of limitations periods and accrual dates, and whether "unjust enrichment" exists as a distinct claim. *Id.*; *Zafarana v. Pfizer, Inc.*, 724 F. Supp. 2d 545, 560 (E.D. Pa. 2010) (there is "no separate tort cause of action for unjust enrichment in New Jersey").   Several of these elements of an unjust enrichment claim—including wrongfulness, the impact of a contact, and the viability of a stand-alone claim—are at issue here, as shown by The Times's arguments for dismissal.  *See* §III, *supra.*

Because the Amended Complaint satisfies the two-part test set forth in *Mazza*, Plaintiffs' nationwide class allegations are untenable on their face and should be stricken.  *See Walters*, 2018 WL 2424132, *4-5 (relying on *Mazza* to strike a nationwide class claim for unjust enrichment).

DEFENDANT THE NEW YORK TIMES COMPANY'S MOTIONS TO DISMISS AND STRIKE AND MEMORANDUM OF LAW IN SUPPORT

FG: 100603708.1

## **CONCLUSION**

Because Plaintiffs have not and cannot plausibly allege a violation of Oregon's UTPA or a valid unjust enrichment claim, their claims should be dismissed with prejudice. If Plaintiffs' unjust enrichment claim is not dismissed in its entirety, the Court should strike Plaintiffs' allegations that purport to bring this claim on behalf of a nationwide class.


Respectfully submitted this 23rd day of September, 2022.


FOSTER GARVEY PC

By  s/ Eryn Karpinski Hoerster
    Eryn Karpinski Hoerster, OSB #106126
    Telephone:  (503) 228-3939
    Fax:  (503) 226-0259
    E-Mail:  eryn.hoerster@foster.com

DENTONS US LLP

By  s/ Kristen C. Rodriguez
    Kristen C. Rodriguez, *Pro Hac Vice*
    Telephone: (202) 496-7188
    E-Mail: kristen.rodriguez@dentons.com

*Attorneys for Defendant The New York Times Company*

## CERTIFICATE OF COMPLIANCE

This Memorandum complies with the applicable word-count limitation under LR 7-2(b) because it contains 10,969 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, motion, signature block, exhibits, and any certificates of counsel.

/s/ *Eryn Karpinski Hoerster*
Eryn Karpinski Hoerster, OSB #106126