**Stanton R. Gallegos, OSB #160091**
StantonGallegos@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
**Jermaine F. Brown, OSB #073415**
JermaineBrown@MarkowitzHerbold.com
1455 SW Broadway, Suite 1900
Portland, OR  97201
Telephone: (503) 295-3085

**Neal J. Deckant** *
ndeckant@bursor.com
**Julia K. Venditti** *
jvenditti@bursor.com
BURSOR & FISHER, P.A.
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455

*Attorneys for Plaintiffs and the Putative Class*
*Additional Counsel on Signature Page*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| THEA MACQUAID and SARAH RENFROW, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE NEW YORK TIMES COMPANY, d/b/a *The New York Times*,<br><br>Defendant. | Case No. 3:22-cv-00955-MO<br><br>PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTIONS TO DISMISS AND STRIKE<br><br>ORAL ARGUMENT REQUESTED |

RESPONSE TO MOTIONS TO DISMISS AND STRIKE

**TABLE OF CONTENTS**

PAGE(S)

I.    INTRODUCTION .................................................................................................. 1

II.   FACTUAL BACKGROUND ................................................................................ 2

    A.    Plaintiff Thea MacQuaid................................................................................ 4

    B.    Plaintiff Sarah Renfrow ................................................................................. 5

III.  LEGAL STANDARD ........................................................................................... 7

IV.   ARGUMENT ........................................................................................................ 7

    A.    Plaintiffs' UTPA Claims Are Not Time-Barred ........................................... 7

        i.    Defendant's Unlawful Acts And Practices In Violation Of
            The ARL Were Not Readily Apparent To Plaintiffs At The
            Point Of Sale ...................................................................................... 8

            a.    Defendant's Unlawful Charges (ORS 646A.295(1)(b)) ................ 9

            b.    Defendant's Deficient Disclosures (ORS 646A.295(1)(a),
                 (1)(c)) ......................................................................................... 11

        i.    Defendant's Argument That Deficient Disclosures Trigger
            Accrual Of Plaintiffs' ARL-Based UTPA Claims Defies
            Common Sense And Legislative Intent ........................................... 12

    B.    Plaintiffs Plausibly Allege ARL Violations.................................................. 16

        i.    Plaintiffs Plausibly Allege ARL Violations In Pre-Purchase
            Checkout Page ................................................................................. 18

            a.    Defendant's Disclosures Are Neither Clear And Conspicuous
            Nor Are They Presented In Close Visual Proximity To The
            Request  For Consent .................................................................. 18

            b.    Defendant Failed To Fully Disclose Its Cancellation Policy
            On The Pre-Purchase Checkout Page ......................................... 19

        ii.   Defendant's Internet Agreement Does Not Confer
            Affirmative Consent........................................................................ 25

        iii.  Defendant's Acknowledgment Email Failed To Comply
            With The ARL ................................................................................ 30

    C.    Plaintiffs State A Claim For Unjust Enrichment .................................... 32

    D.    Plaintiffs' Nationwide Class Allegations Should Not Be Struck.................. 34

V.    CONCLUSION ................................................................................................... 35

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...................................................................................................... 7

*B.D. v. Blizzard Ent., Inc.*,
76 Cal. App. 5th 931 (2022) ........................................................................................ 29

*Barber v. Johnson & Johnson Co.*,
2017 WL 2903255 (C.D. Cal. Apr. 4, 2017) .............................................................. 35

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................................................ 7

*Berkson v. Gogo LLC*,
97 F. Supp. 3d 359 (E.D.N.Y. 2015) ........................................................................... 27

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022) .................................................................................. 13, 15

*Brooks v. BC Custom Constr., Inc.*,
2019 WL 3763769 (D. Or. May 21, 2019) ............................................................... 8, 9

*Brown v. Natures Path Foods, Inc.*,
2022 WL 717816 (N.D. Cal. Mar. 10, 2022)............................................................... 32

*Cavka v. SoulCycle Inc.*,
2017 WL 2906034 (C.D. Cal. 2017)........................................................................... 28

*Clancy v. The Bromley Tea Co.*,
308 F.R.D. 564  (N.D. Cal. 2013)................................................................................ 35

*Doe v. American Red Cross*,
322 Or 502 (1996)........................................................................................................ 15

*Dutcher v. Google LLC*,
2021 WL 628347 (Cal. Super. Jan. 27, 2021) ............................................... 22, 25, 31

*Edwards on behalf of J.E. v. Yamhill Cnty.*,
2021 WL 7540367 (D. Or. Sept. 7, 2021) .................................................................... 7

*Eminence Capital, LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) .................................................................................... 35

*Forcellati v. Hyland's, Inc.*,
   876 F. Supp. 2d 1155 (C.D. Cal. 2012) ................................................................. 35

*Gaston v. Parsons*,
   318 Or. 247 (1994) ................................................................................................ 13

*Hall v. Marriott Int'l, Inc.*,
   2020 WL 4727069 (S.D. Cal. Aug. 14, 2020) ...................................................... 19

*Hall v. Time, Inc.*,
   2020 WL 2303088 (C.D. Cal. Mar. 13, 2020) .................................................. 24, 25

*Hopkins v. Genesis FS Card Servs., Inc.*,
   2020 WL 466636 (D. Or. Jan. 9, 2020) ................................................................ 27

*In re Clorox Consumer Litigation*,
   894 F. Supp. 2d 1224 (N.D. Cal. 2012) ........................................................... 32, 35

*In re Seagate Tech. LLC Litig.*,
   2017 WL 3670779 (N.D. Cal. Aug. 25, 2017) ...................................................... 35

*Johnson v. Pluralsight, LLC*,
   728 F. App'x 674 (9th Cir. 2018) ................................................................... 23, 24

*Kay v. Copper Cane, LLC*,
   549 F. Supp. 3d 1014 (N.D. Cal. 2021) ................................................................ 33

*Kissel v. Code 42 Software, Inc.*,
   2016 WL 7647691 (C.D. Cal. Apr. 14, 2016) ...................................................... 17

*L.Q. Dev., Oreg. v. Mallory*,
   98 Or. App. 121 (1989) ......................................................................................... 34

*Lopez v. Stages of Beauty, LLC*,
   307 F. Supp. 3d 1058 (S.D. Cal. 2018) ...................................................... 19, 24, 25

*Lopez v. Terra's Kitchen, LLC*,
   331 F. Supp. 3d 1092 (S.D. Cal. 2018) .................................................... 27, 28, 29

*Lundbom v. Schwan's Home Service*,
   2020 WL 2736419 (D. Or. May 26, 2020) .................................................... 27, 29

*Martell v. Gen. Motors LLC*,
   492 F. Supp. 3d 1131 (D. Or. 2020) ..................................................................... 15

*Mattson v. New Penn Fin., LLC*,
   2018 WL 6735088 (D. Or. Nov. 6, 2018) ....................................................... 34, 35

*Mazza v. American Honda Motor Co., Inc.*,
    666 F.3d 581 (9th Cir. 2012) ................................................................ 35

*McCulloch v. Price Waterhouse LLP*,
    157 Or. App. 237 (1998) ................................................................. 9, 15

*McKee v. Audible, Inc.*,
    2018 WL 11263238 (C.D. Cal. Mar. 12, 2018) ....................................... 17

*Merritt v. Yavone, LLC*,
    2015 WL 9256682 (D. Or. Nov. 5, 2015) ............................................... 17

*Nacarino v. Chobani, LLC*,
    2022 WL 344966 (N.D. Cal.  Feb. 4, 2022) ........................................... 32

*Nguyen v. Barnes & Noble Inc.*,
    763 F.3d 1171 (9th Cir. 2014) ................................................... 16, 27, 28

*Ott v. Mortg. Invs. Corp. of Ohio*,
    65 F. Supp. 3d 1046 (D. Or. 2014) ...................................................... 35

*Price v. Synapse Group, Inc.*,
    2017 WL 3131700 (S.D. Cal. July 24, 2017) ............................... 17, 19, 25

*Rollins v. Wink Labs, Inc.*,
    2021 WL 1976082 (D. Or. Feb. 22, 2021) ............................................... 9

*Russell v. Ray Klein, Inc.*,
    2021 WL 1895238 (D. Or. May 10, 2021) ........................................... 8, 12

*Rutter v. Apple Inc.*,
    2022 WL 1443336 (N.D. Cal. May 6, 2022) ....................................... 29, 31

*Sanders v. Francis*,
    277 Or. 593 (1977) ...................................................................... 13, 15

*Scharfstein v. BP W. Coast Prod., LLC*,
    292 Or. App. 69 (2018) ................................................................. 13, 14

*Sellers v. JustAnswer LLC*,
    73 Cal. App. 5th 444 (2021) ........................................................... 16, 29

*Sonner v. Premier Nutrition Corp.*,
    971 F.3d 834 (9th Cir. 2020) .............................................................. 32

*State v. Clemente-Perez*,
    357 Or. 745 (2015) ......................................................................... 26

*State v. Rodriguez-Barrera*,
    213 Or. App. 56 (2007) ............................................................................. 17

*State ex rel. Rosenblum v. Living Essentials, LLC*,
    313 Or. App. 176 (2021) ........................................................................... 26

*Supermail Cargo, Inc. v. United States*,
    68 F.3d 1204 (9th Cir. 1995) ..................................................................... 8

*T. R. v. Boy Scouts of America*,
    344 Or. 282 (2008) ................................................................................... 15

*Tri-West Const. v. Hernandez*,
    43 Or. App. 961 (Or. App. 1979) .............................................................. 14

*Turnier v. Bed Bath & Beyond Inc.*,
    517 F. Supp. 3d 1132 (S.D. Cal. 2021) .............................................. 23, 28

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
    718 F.3d 1006 (9th Cir. 2013) ................................................................... 7

*Unigestion Holdings, S.A. v. UPM Tech., Inc.*,
    580 F. Supp. 3d 932 (D. Or. 2022) ........................................................... 34

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
    592 F.3d 954 (9th Cir. 2010) ..................................................................... 8

*Williams v. Gerber Products*,
    552 F.3d 934 (9th Cir. 2008) ................................................................... 18

*Wilson v. Hewlett-Packard Co.*,
    668 F.3d 1136 (9th Cir. 2012) ................................................................... 7

**STATUTES**

Cal. Bus. & Prof. Code § 17600 ...................................................................... 17

Cal. Bus. & Prof. Code § 17602 ............................................... 17, 23, 24, 31

Cal. Bus. & Prof. Code § 17603 ...................................................................... 17

**RULES**

Fed. R. Civ. P. 12(b)(6) ............................................................................... 7, 8

Fed. R. Civ. P. 8(d) ........................................................................................ 32

## I.    INTRODUCTION

Plaintiffs Thea MacQuaid and Sarah Renfrow (collectively, "Plaintiffs") submit this memorandum of law in opposition to the Motion to Dismiss filed by Defendant The New York Times Company ("Defendant" or "NYT").

Defendant asks this Court to ignore the will of the Oregon legislature and impose its own will instead.  Oregon's Automatic Renewal Law ("ARL") is clear.  Defendant was required to disclose, in a "clear and conspicuous" manner, per ORS 646A.295(1), five specifically enumerated automatic renewal offer terms.  *See* ORS 646A.293(5); *see also infra*.  Defendant was required to disclose this information "before the subscription or purchasing agreement [wa]s fulfilled," *i.e.*, on the Checkout Page, "in visual proximity … to the request for consent" on that page, and Defendant was further required to disclose this information in "an acknowledgment," *i.e.*, in the Acknowledgement Email.  *See* ORS 646A.295(1)(a) and (1)(b).  Defendant was also required to "obtain[] the consumer's affirmative consent to the agreement containing the automatic renewal offer terms" before "charg[ing] the consumer's [Payment Method] for an automatic renewal or continuous service."  ORS 646A.295(1)(b).  And Defendant was required to "provide a toll-free telephone number, electronic mail address, a post-office address only when the person directly bills the consumer, or another cost-effective, timely and easy-to-use mechanism for cancellation that must be described in the acknowledgment."  ORS 646A.295(2).

But Defendant did not comply with *any* of these requirements.  As alleged in the First Amended Complaint, ECF No. 14 ("FAC") ¶ 2, Defendant failed to: (1) disclose the full terms of the cancellation policy on the Checkout Page; (2) disclose the automatic renewal terms in a clear and conspicuous manner on the Checkout Page; (3) disclose the full terms of the cancellation policy in the Acknowledgment Email; (4) disclose the automatic renewal terms in a clear and

conspicuous manner in the Acknowledgement Email; (5) obtain affirmative consent to the automatic renewal offer terms; and (6) provide a timely or easy-to-use cancellation mechanism. FAC ¶¶ 5, 8-9, 42-51.  Defendant does not deny any of this, let alone deny that Plaintiffs have plausibly alleged these violations.  Rather, Defendant argues that the ARL's textual requirements are too burdensome, so they should be read away or excused.  That is not the law.  As explained herein, and as explained by numerous courts in denying similar motions to dismiss, the ARL represents the will of the Oregon legislature, and it must be enforced as written.  This Court may not substitute its own judgment for that of the Oregon legislature.

In sum, there are a number of ways to violate the ARL.  And while Plaintiffs only need to plausibly allege that Defendant violated the ARL in one of these ways, Plaintiffs plausibly allege that Defendant violated the ARL in every way possible.  Plaintiffs' FAC thus states a claim for relief, and the Court should deny Defendant's motion to dismiss accordingly.

## II.    FACTUAL BACKGROUND

On July 1, 2022, Plaintiffs filed this action alleging that NYT violated the ARL's requirements by failing to provide the automatic renewal "offer terms" associated with the NYT Subscriptions in a "clear and conspicuous" manner in the pre-purchase Checkout Page, as well as the post-purchase Acknowledgment Email, and by failing to obtain Plaintiffs' affirmative consent to the purchase prior to charging their Payment Methods in connection with the subscriptions.  *See* Class Action Complaint, ECF No. 1 ¶¶ 1, 3; *accord* FAC ¶¶ 1, 3.  Plaintiffs allege that, in doing so, Defendant fails to provide the requisite disclosures and authorizations required to be made to and obtained from Oregon consumers, including Plaintiffs, under Oregon's Automatic Renewal Law ("ARL"), ORS 646A.295, in direct violation of Oregon's Unlawful Trade Practices Act ("UTPA"), ORS 646.608(1)(ttt).  *See* FAC ¶ 1.

At all relevant times, Defendant offered, via the NYT Website and App, various NYT Subscriptions for *The New York Times*, a publication available in digital and print formats. *See id*. ¶¶ 1-2, 4. These paid subscriptions are offered on a recurring basis for monthly and/or yearly renewal terms, and all plans automatically renew at the end of the defined monthly or annual renewal term unless the subscriber cancels. *See id.* Defendant's NYT Subscriptions constitute automatic renewal and/or continuous service plans or arrangements for the purposes of Oregon's ARL. *See id.*

Consumers can sign up for one of Defendant's subscription plans through the NYT Website, on either its mobile or desktop format, or Defendant's mobile application. *See id*. ¶ 38. After signing up for a subscription, consumers are directed to a final webpage where prospective subscribers are invited to complete their purchase (the "Checkout Page"). *See id*. ¶ 39. On the Checkout Page, there is a distinct area of the webpage that contains relevant information regarding the automatic renewal offer terms associated with the NYT Subscriptions—specifically, the block of text located immediately above the final black "Purchase Subscription" button (*i.e.*, the "request for consent," *see* ORS 646A.295(1)(a)) that customers must click in order to complete the checkout process. *See id*. ¶ 40. As the exemplar Checkout Page shown at Paragraph 40 of the FAC depicts, the automatic renewal terms are presented on the Checkout Page in the same size, color, and font as that of the surrounding block of text, and they are placed alongside other, unrelated disclosures without distinction from the surrounding text of the same size in any manner that calls attention to the language. *Id*. Further, there is no checkbox on the Checkout Page that the consumer must select before they complete the checkout process and submit their orders for NYT Subscriptions. *Id*. ¶¶ 41, 47.

Finally, after Plaintiffs and the members of the Class subscribed to one of Defendant's

NYT Subscription plans, Defendant sent to Plaintiffs and the Class a follow-up email regarding their purchases (the "Acknowledgment Emails").  *See id*. ¶ 48.  However, the Acknowledgment Email contains even less of the required information than is featured on the relevant portion of the Checkout Page, as discussed below.  *See id*. ¶ 50.

### A.    Plaintiff Thea MacQuaid

Plaintiff Thea MacQuaid alleges that she signed up for an annual digital New York Times subscription on "August 3, 2020, … from Defendant's website while in Oregon." FAC ¶ 8. During the enrollment process, but before finally consenting to Defendant's subscription offering, Ms. MacQuaid provided her Payment Method information directly to Defendant.  *See id*.  "At the time Ms. MacQuaid enrolled in her NYT Subscription program, Defendant did not disclose to Ms. MacQuaid all required automatic renewal offer terms associated with the subscription program or obtain Ms. MacQuaid's affirmative consent to those terms."  *Id*. "Further, after Ms. MacQuaid completed her initial order, Defendant sent Ms. MacQuaid an email confirmation and receipt for her purchase of and enrollment in a NYT Subscription (the 'Acknowledgment Email')."  *Id*.  However, the Acknowledgment Email, too, failed to comply with the disclosure requirements of the ARL.  *See id*.   "As a result, Ms. MacQuaid was not placed on notice of several material terms associated with her NYT Subscription."  *Id*.

"Nevertheless, on Saturday, July 31, 2021, less than one year after Ms. MacQuaid signed up for her NYT Subscription, Defendant automatically renewed Ms. MacQuaid's NYT Subscription and charged Ms. MacQuaid's Payment Method approximately $200, which is a rate more than double the rate charged to her Payment Method upon initial enrollment in or around August 2020."  *Id*.  "Ms. MacQuaid learned of this surprise charge to her Payment Method later th[at] same day[.]"  *Id*. ¶ 8 n.6.

"Promptly after learning of this July 2021 subscription charge, on or around Monday, August 2, 2021, Ms. MacQuaid attempted to cancel her NYT Subscription via phone call in order to avoid incurring any additional future charges." *Id*. ¶ 8 (internal footnote omitted). During that call, "Ms. MacQuaid also requested a refund for the unexpected renewal charge she had incurred during the previous week. Ultimately, however, Ms. MacQuaid's cancellation attempt was unsuccessful, and she was unable to terminate her subscription due to Defendant's confusing cancellation policy, the most crucial aspects of which were missing from the Checkout Page and Acknowledgment Email. Defendant also denied Ms. MacQuaid's refund request." *Id.*

### B.    Plaintiff Sarah Renfrow

Plaintiff Sarah Renfrow alleges that she signed up for a monthly digital New York Times subscription on "[i]n or around December 2020, … from Defendant's website while in Oregon," at a promotional or discounted rate or $1.00 per month. FAC ¶ 9. During the enrollment process, but before finally consenting to Defendant's subscription offering, Ms. Renfrow provided her Payment Method information directly to Defendant. *See id*. Before Ms. Renfrow purchased her monthly NYT subscription, Defendant did not disclose to her all of the required automatic renewal "offer terms" associated with the subscription program, and it never obtained Ms. Renfrow's affirmative consent to those terms. *See id*. After Ms. Renfrow completed her initial order, Defendant sent Ms. Renfrow an Acknowledgement Email that failed to include all required offer terms or a description of how to cancel in a manner capable of being retained by her. *See id*. "As a result, Ms. Renfrow was not placed on notice of several material terms associated with her NYT Subscription." *Id*. "Nevertheless, approximately one month after she first signed up for her NYT Subscription, Defendant automatically renewed Ms. Renfrow's NYT Subscription and charged Ms. Renfrow's Payment Method approximately $1.00 per month, the

promotional renewal rate associated with Ms. Renfrow's discounted NYT Subscription." *Id*. "Thereafter, Defendant continued to automatically renew Ms. Renfrow's NYT Subscription at the promotional $1.00 monthly renewal rate until approximately November 2021." *Id*. "Then, in or around November 2021, less than one full year after Ms. Renfrow's initial enrollment, Defendant began charging approximately $17 per month to Ms. Renfrow's Payment Method in connection with her NYT Subscription, a renewal rate 17 times higher than the initial rate she was charged upon initial enrollment in or around December 2020 and again every month for nearly a year after that." *Id*. "Ms. Renfrow was not aware of the increase in price to the $17 monthly renewal rate until she reviewed her bank statement in or around November 2021." *Id*.

"Promptly after learning of these subscription charges, Ms. Renfrow attempted to cancel her NYT Subscription." *Id*. "Specifically, in or around November 2021, Ms. Renfrow called Defendant's customer service line to notify Defendant that she did not authorize the monthly charges she incurred at the unexpected renewal rate of $17 per month, and to request cancellation of her NYT Subscription so as to avoid incurring any additional future charges." *Id*. "During that phone call, Defendant refused to issue any refund but confirmed that it would cancel Ms. Renfrow's NYT Subscription." *Id*. "However, to Ms. Renfrow's surprise, in December 2021, Defendant again automatically renewed Ms. Renfrow's NYT Subscription and charged her Payment Method another $17 for the subsequent month." *Id*. "[D]espite being told by Defendant that it would cancel her NYT Subscription in November 2021, the subscription was not cancelled." *Id*. "Then, in or around December 2021, Ms. Renfrow attempted to cancel again by phone, but was told she could not do so." *Id*. "Ultimately, Ms. Renfrow's cancellation attempts were unsuccessful, and she was unable to terminate her subscription due to Defendant's confusing and time-consuming cancellation policy, the most crucial aspects of which were

missing or obscured from the Checkout Page and Acknowledgment Email." *Id*.  "As a result,

Ms. Renfrow remains enrolled in, and continues to receive monthly renewal charges for, her

NYT Subscription to this day, despite the fact that she does not want to remain subscribed or pay

further renewal fees." *Id*.

## III.    LEGAL STANDARD

Under Rule 12(b)(6), a party may move to dismiss a complaint for "failure to state a

claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  A motion to dismiss for

failure to state a claim may only be granted when there is no cognizable legal theory to support

the claim or when the complaint lacks sufficient factual allegations to state a facially plausible

claim for relief.  *See Edwards on behalf of J.E. v. Yamhill Cnty.*, 2021 WL 7540367, at *4 (D.

Or. Sept. 7, 2021), *report and recommendation adopted*, 2022 WL 819449 (D. Or. Mar. 17,

2022) (citing *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1014 (9th

Cir. 2013)).  On the other hand, a complaint will survive a Rule 12(b)(6) motion so long as it

articulates "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.

Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible on its face if the factual allegations in

the complaint allow a court to reasonably infer the defendant's liability based on the alleged

conduct.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In evaluating the sufficiency of a

complaint's factual allegations, a court must accept all material facts alleged in the complaint as

true and construe them in the light most favorable to the nonmoving party.  *See Wilson v.

Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012).

## IV.    ARGUMENT

### A.    Plaintiffs' UTPA Claims Are Not Time-Barred

First, Defendant argues that "the face of the Amended Complaint shows Plaintiffs' UTPA

claims are time-barred." MTD at 16. That is meritless. "'A claim may be dismissed under Rule 12(b)(6) on the ground that it is barred by the applicable statute of limitations <u>only</u> when the running of the statute is apparent on the face of the complaint.'" *Brooks v. BC Custom Constr., Inc.*, 2019 WL 3763769, at *19 (D. Or. May 21, 2019), *report and recommendation adopted*, 2019 WL 3502907 (D. Or. Aug. 1, 2019) (emphasis added) (quoting *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010)). Thus, a "'complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim.'" *Id.* (quoting *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1206 (9th Cir. 1995)). Here, as explained below, both Plaintiffs' claims are timely.

    i.    <u>**Defendant's Unlawful Acts And Practices In Violation Of The ARL Were Not Readily Apparent To Plaintiffs At The Point Of Sale**</u>

Plaintiffs' UTPA claims are subject to a one-year statute of limitations. *See* ORS 646.638(6). According to Defendant, the "statute of limitations for a UTPA claim begins to accrue at the time of a purportedly deficient disclosure." MTD at 18. Thus, Defendant contends that Plaintiffs' UTPA claims are untimely because Plaintiffs were exposed to its deficient disclosures at the time of their initial enrollments in the NYT Subscriptions, *see id.*, which occurred more than one year before Plaintiffs' original complaint in this matter was filed on July 1, 2022. *See* ECF No. 1. That is wrong.

ORS 646.638(6) states in no uncertain terms that UTPA claims "must be commenced within one year after the <u>discovery</u> of the <u>unlawful method, act, or practice</u>," ORS 646.638(6) (emphasis added), *not* the date of its commission. Indeed, under the discovery rule, "mere suspicion cannot trigger the statute of limitations." *Russell v. Ray Klein, Inc.*, 2021 WL 1895238, at *2 (D. Or. May 10, 2021). Rather, "the UTPA statute of limitations begins to run

when the plaintiff *knows or should have known* of the allegedly unlawful conduct," *Rollins v. Wink Labs, Inc.,* 2021 WL 1976082, at *4 n.4 (D. Or. Feb. 22, 2021) (emphasis added), whatever form that conduct may take. As Defendant notes, *see* MTD at 15, courts "employ[] a two-step process to determine whether a plaintiff 'should have known' of a claim: 'First, it must appear that plaintiff had sufficient knowledge to excite attention and put a party upon his guard or call for an inquiry. Second[,] if plaintiff had such knowledge, it must also appear that a reasonably diligent inquiry would disclose the fraud'" (the "*McCulloch* Accrual Test"). *Brooks*, 2019 WL 3763769, at *19 (quoting *McCulloch v. Price Waterhouse LLP*, 157 Or. App. 237, 248 (1998)).

There are multiple ways to violate the ARL. Here, Plaintiffs allege that Defendant violated the UTPA based on each of the three prohibitions set forth under ORS 646A.295(1) of the ARL, *see* FAC ¶¶ 3, 5, 41-51; *see also id*. ¶ 81 ("Each of [Defendant's unlawful] acts and practices constitute[] an independent violation of the ARL, and thus an independent violation of the Section 646.608(1) of the UTPA."). As explained below, with respect to each of these independent claims, the first prong of the test was not satisfied for Plaintiffs MacQuaid and Renfrow—and their UTPA claims could not have begun to accrue—until, *at the earliest*, July 31, 2021, and November 2021, respectively. Plaintiffs' original complaint in this matter was filed on July 1, 2022, less than one year later. *See* ECF No. 1. Thus, their UTPA claims are timely.

### a.    *Defendant's Unlawful Charges (ORS 646A.295(1)(b))*

First, both Plaintiffs allege that "[a]t all relevant times, Defendant failed to comply with the ARL … [in that] Defendant charged Plaintiffs' and Class members' Payment Methods without first obtaining their affirmative consent to the agreement containing the automatic renewal offer terms, in violation of ORS 646A.295(1)(b)." FAC ¶ 42; *see also id*. ¶¶ 8-9. Thus, even if Defendant is correct that the "deficient disclosure" triggers accrual of their claims with

respect to their ARL-based UTPA claims based on violations of ORS 646A.295(1)(a) and (c), that is definitely not the particular "unlawful conduct" proscribed by ORS 646A.295(1)(b). Rather, the ARL announced in plain terms that the "[c]harge" is the unlawful act that gives rise to liability under ORS 646A.295(1)(b). As a result, Plaintiffs' ORS 646A.295(1)(b)-based UTPA claims are timely as long as the unlawful charge at issue, or Plaintiffs' discovery of it, occurred within the last twelve months. And here, Plaintiffs allege exactly that.

Specifically, Plaintiff MacQuaid alleges that her first renewal charge occurred on July 31, 2021.[1] *See id.* ¶ 8 ("[O]n Saturday, July 31, 2021, … Defendant automatically renewed Ms. MacQuaid's NYT Subscription and charged Ms. MacQuaid's Payment Method approximately $200, which is a rate more than double the rate charged to her Payment Method upon initial enrollment in or around August 2020."). She discovered the unexpected charge later that same day. *See id.* ¶ 8 n.6. Thus, Plaintiff MacQuaid met the first prong of the test of accrual under Oregon's discovery rule – that she had sufficient knowledge to call for a diligent inquiry – upon her discovery, on July 31, 2021, of the unlawful renewal charge from that day. Accordingly, her ORS 646A.295(1)(b) claims could not have begun to accrue any sooner than July 31, 2021.

As for Plaintiff Renfrow, the first unlawful renewal charge that gave rise to her UTPA claim based on violations of ORS 646A.295(1)(b) was posted to her account in or around November 2021, when "Defendant began charging approximately $17 per month to Ms.

---

[1] Defendant's liability under ORS 646A.295(1)(b) is triggered by the renewal charge Plaintiff MacQuaid incurred in November 2021, and *not* the initial subscription charge she incurred upon enrollment in August 2020. That is because, as a result of Defendant's failure to place Plaintiff MacQuaid on notice, at the time of enrollment or subsequent thereto, of the applicable automatic renewal offer terms by obtaining her affirmative consent to such terms in compliance with the ARL, Plaintiff MacQuaid believed she was purchasing a fixed membership for access to the benefits of the NYT Subscription and that the membership would automatically terminate at the end of the one-year period. *See* FAC ¶ 8. Thus, although Plaintiff MacQuaid expected to incur a one-time charge at enrollment in 2020, she was surprised and upset by the renewal charge she incurred in November 2021. *See id.*

Page 10 - RESPONSE TO MOTIONS TO DISMISS AND STRIKE

Renfrow's Payment Method in connection with her NYT Subscription, a renewal rate 17 times higher than the initial rate she was charged upon initial enrollment in or around December 2020 and again every month for nearly a year after that." FAC ¶ 9. Plaintiff Renfrow discovered the unexpected charge shortly thereafter, "in or around November 2021." *Id*. ("Ms. Renfrow was not aware of the increase in price to the $17 monthly renewal rate until she reviewed her bank statement in or around November 2021.").[2] Thus, with respect to Plaintiff Renfrow, the first prong of the test of accrual under Oregon's discovery rule was met upon her discovery, in or around November 2021, of the unlawful renewal charge from that same month. Accordingly, her ORS 646A.295(1)(b) claims could not have begun to accrue sooner than November 2021.

In sum, accrual of Plaintiff MacQuaid's and Plaintiff Renfrow's ORS 646A.295(1)(b)-based UTPA claims began no earlier than July 31, 2021, and November 2021, respectively. Since the original complaint in this action was filed on July 1, 2022, and the one-year statute of limitations period on both Plaintiffs' ORS 646A.295(1)(b)-based claims began to run less that twelve months prior to that date, there is no question that their claims are timely.

### b.    *Defendant's Deficient Disclosures (ORS 646A.295(1)(a), (1)(c))*

Plaintiffs also assert UTPA claims based on Defendant's violations of ORS 646A.295(1)(a) and (1)(c) of the ARL, which require that businesses in Defendant's position make various disclosures on the Checkout Page before a consumer purchases an NYT Subscription and again in the post-purchase Acknowledgment Email, respectively. With respect

---

[2] Defendant argues that Plaintiff "Renfrow has had inquiry notice that she was enrolled in an automatic renewal program since at least January 2021," MTD at 20, when she first began incurring recurring, monthly subscription charges. However, prior to that January 2021, Plaintiff Renfrow's promotional NYT Subscription had been consistently automatically renewed at the discounted rate of approximately $1.00 per month, and **she had no expectation that the recurring rate she had been charged prior to November 2021 was a "discounted" rate or that the rate would automatically change during the life of her subscription without further notice to her**. *See* FAC ¶ 9.

Page 11 - RESPONSE TO MOTIONS TO DISMISS AND STRIKE

to these claims, Defendant is correct that the unlawful conduct at issue is Defendant's omissions and otherwise deficient disclosures. However, even so, the statute of limitations on UTPA claims does *not* "begin[] to accrue at the time of a purportedly deficient disclosure," as Defendant baldly asserts. MTD at 18; *see also id*. at 16 ("Each of these alleged wrongs occurred at the point of sale or immediately following it."). Rather, accrual is triggered by Plaintiffs' *discovery* that Defendant's disclosures on the Checkout Page and the Acknowledgment Email were deficient. *See* ORS 646.638(6); *see also Russell*, 2021 WL 1895238, at *2. As explained above, Plaintiffs did not suspect that there was any deficiency with Defendant's disclosures until they incurred unexpected automatic renewal charges on July 31, 2021 (for Plaintiff MacQuaid) and in November 2021 (for Plaintiff Renfrow).

<strong>i.      Defendant's Argument That Deficient Disclosures Trigger<br>Accrual Of Plaintiffs' ARL-Based UTPA Claims Defies<br>Common Sense And Legislative Intent</strong>

With respect to accrual of Plaintiffs' UTPA claims, Defendant insists that the key question is "whether Plaintiffs' could have 'discovered' [NYT's] misstatements or omissions when they purchased their subscriptions or shortly thereafter." MTD at 16. That is wrong.

First, Defendant's perspective on application of Oregon's discovery rule to Plaintiffs' ARL claims defies commons sense. The statutory language of the ARL confirms that "[i]t is the intent of the Legislative Assembly to <u>end the practice of ongoing charging</u> of consumer credit or debit cards or third party payment accounts without the consumers' explicit consent for ongoing shipments of a product or ongoing deliveries of service." ORS 646A.292 (statement of legislative intent) (emphasis added); *see also* FAC ¶ 27 (same). The statute attempts to do so by imposing particularized disclosure, notice, and consent requirements on businesses offering automatic renewal programs. *See id*. This makes sense, given that, when a corporation fails to

disclose its policies, practices, and procedures concerning billing, cancellation, and other

practical policy matters, consumers are "at a tremendous informational disadvantage that

impedes the opportunity to discover a claim" for deceptive practices. *Gaston v. Parsons*, 318 Or.

247, 250–62 (1994).[3]

Moreover, Plaintiffs allege that **this action is, at its core, an "illegal charge" case** (or

"prohibited transaction" case). *See, e.g.*, FAC ¶¶ 2, 5, 42, 47, 53-55, 82-83, 86, 88. "In an

illegal charge case such as this one," an ascertainable loss occurs where a plaintiff is charged

money in a transaction rendered illegal by a defendant's failure to disclose legally required

information. *Scharfstein v. BP W. Coast Prod.*, LLC, 292 Or. App. 69, 89 (2018), *rev. den.*, 363

Or. 815. **As a result, in such cases, the statutory period on UTPA claims is, predictably,**

**triggered by the illegal charge and not the deficient disclosure that preceded it**.

*Scharfstein* is instructive. In that case, the plaintiffs alleged that the defendants, a gas

station chain, "engaged 'in a prohibited transaction by charging gasoline purchase debit fees

without first properly disclosing the fees as required by [an attorney general rule]' and in

violation of [the UTPA under] ORS 646.608(1)(u)." *Id.* at 88 (quoting complaint). Thus, the

court held that because the plaintiffs "'paid fees that defendants were not legally entitled to

collect[,]' … plaintiff's theory of ascertainable loss was that BP illegally charged class members

an unlawful 35-cent debit card fee and, therefore, [that] '[p]laintiff and the class [we]re entitled

---

[3] *See also Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022) ("Website users are entitled to assume that important provisions—such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print. Because 'online providers have complete control over the design of their websites,' **the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers**.") (internal citations omitted) (emphasis added); *Sanders v. Francis*, 277 Or. 593, 598-99 (1977) ("[W]hen the representation takes the form of a 'failure to disclose' …, as in this case, it would be artificial to require a pleading that plaintiff had 'relied' on that non-disclosure.").

to recover statutory damages of $200 per class member.'" *Id*.[4]  *Scharfstein* involved an unlawful

surgcharge, but its holding is equally applicable to UTPA claims based on omissions that

"'involves a matter about which the party [omitting the information] is legally requires to inform

the other.'"  *Id*. at 89 (quoting *Tri-West Const. v. Hernandez*, 43 Or. App. 961, 972 (Or. App.

1979), *rev. den.*, 288 Or. 667 (Or. 1980)).  Thus, where, as here, a defendant has "failed to

disclose … legally required information and assessed [a charge] in violation of the UTPA[, the

defendant] illegally charged its customers, … thereby causing the ascertainable loss." *Id*. at 90.[5]

As in *Scharfstein*, the gravamen of this case is that Defendant violated the UTPA when it

assessed and collected unauthorized fees from Plaintiffs' Payment Methods, in violation of the

ARL.  *See* FAC ¶ 53-55, 82, 86, 88.

Defendant also argues that "[h]ad Plaintiffs chose to inquire here, … additional

information about their subscription was readily available on [NYT's] website," and also that "a

Google search would have revealed the[ complaints regarding NYT's subscription practices] – as

well as the then-pending *Moses* Action."  MTD at 18.  But, prior to discovery of their

unauthorized renewal charges incurred in 2021, Plaintiffs had no reason to suspect Defendant's

unlawful conduct—either in the form of its deficient disclosures or the unlawful charges yet to

occur—and the law does not impose any obligation on Plaintiffs to engage in a free-wheeling

inquiry for legal violations before they have gained sufficient knowledge to suspect such

---

[4] *See also id*. at 89 ("The UTPA prohibits businesses from charging customers other types of fees when they are not disclosed in the particular way that the law requires. … If those businesses were to violate any of the terms under which they may assess those fees, the assessment would result in an illegal charge.") (some citations omitted).

[5] Although Defendant cites *Scharfstein* as support of its argument that Plaintiffs' claims are time-barred, *see* MTD at 18, *Scharfstein* did not deal with any challenge to the plaintiff's UTPA claims pursuant to the one-year statute of limitations, nor was there any suggestions by the defendant that the plaintiff's claims were untimely in any regard.  Further, as noted herein *Scharfstein* supports Plaintiffs' argument here that the charge, and not the deficient disclosure, at issue under the prohibited transaction theory of liability that Plaintiffs assert in this case.

Page 14 - RESPONSE TO MOTIONS TO DISMISS AND STRIKE

unlawful conduct.  *See, e.g.*, *Sanders v. Francis*, 277 Or. 593, 598-99 (1977).  Stated otherwise, without "sufficient knowledge" to put Plaintiffs on guard or call for an inquiry as to the lawfulness of Defendant's conduct (per step one of the *McCulloch* test), they had no obligation to conduct a "reasonably diligent inquiry" (and thus never reach step two of the *McCulloch* test). *McCulloch*, 157 Or. App. at 248.[6]

Finally, Defendant contends that, "[t]o the extent any information was not directly stated on the [Checkout P]age, the Checkout Page provides hyperlinks sufficient to draw the attention of an objective subscriber to additional information."  MTD at 17 (citation omitted).  Not so.  As the Ninth Circuit recently held, "[u]nless the website operator can show that a consumer has actual knowledge of the agreement, an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022) (citations omitted).

Here, Plaintiffs plainly allege that they did not have *actual* knowledge of the terms that were either omitted from or obscured on the Checkout Page or buried in the webpages hyperlinked thereto, *see, e.g.*, FAC ¶¶ 8 & n.6, 9, 43, 46, and Defendant does not suggest otherwise.  Moreover, as discussed below, Plaintiffs dispute Defendant's contention that the hyperlinks were sufficiently conspicuous to give them on constructive notice of the terms

---

[6] *See, e.g.*, *Martell v. Gen. Motors LLC*, 492 F. Supp. 3d 1131, 1145 (D. Or. 2020) ("At this stage of the litigation, the Court does not find that the only conclusion that a reasonable jury could reach is that Plaintiff knew or should have known before August 31, 2016 about GM's alleged conduct under the UTPA.  Accordingly, Defendant's motion to dismiss this claim as untimely is denied."); *T. R. v. Boy Scouts of America*, 344 Or. 282, 296-97 (2008) ("[W]e cannot conclude, as a matter of law, that an inquiry would have revealed facts indicating that [defendant] may have caused plaintiff harm.") (citation omitted); *see also Doe v. American Red Cross*, 322 Or 502, 514 (1996).

disclosed on the hyperlinked webpages, *see infra*, and they plainly allege that Defendant failed to

obtain their affirmative consent to the agreements as the ARL requires.  *See* FAC ¶¶ 8-9, 47; *see*

*also, e.g.*, *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 469-70, 480 (2021), *reh'g denied*

(Jan. 18, 2022), *review denied* (Apr. 13, 2022) (applying the California ARL and noting that "a

conspicuous 'terms of use' hyperlink may not be enough to alert a reasonably prudent [i]nternet

consumer to click the hyperlink"); *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir.

2014) ("Were there any evidence in the record that Nguyen had actual notice of the Terms of

Use or was required to affirmatively acknowledge the Terms of Use before completing his online

purchase, the outcome of this case might be different.").

Thus, all of Plaintiffs' ARL-based UTPA claims are timely.

### B.    Plaintiffs Plausibly Allege ARL Violations

Pursuant to the ARL under ORS 646A.295(1), Defendant was required to disclose, in a

"clear and conspicuous" manner, the following automatic renewal offer terms:  "(1) [t]hat the

subscription or purchasing agreement will continue until the consumer cancels;" "(2) [t]he

description of the cancellation policy that applies to the offer;" "(3) [t]he recurring charges that

will be charged to the consumer's [Payment Method] … as part of the automatic renewal … plan

or arrangement, and, if the amount of the charge will change, the amount to which the charge

will change, if known;" "(4) [t]he length of the automatic renewal term or that the service is

continuous, unless the length of the term is chosen by the consumer;" and "(5) [t]he minimum

purchase obligation, if any."  ORS 646A.293(5) ("'Offer terms' means the following clear and

conspicuous disclosures ….").

As a preliminary matter, Defendant argues that Plaintiffs do not "alleg[e] whether [the

examples of disclosures they cite] are identical to what the Plaintiffs here saw and received."

MTD at 21. Defendant is wrong. The FAC specifically states that the enrollment process for the

NYT Subscriptions, including the appearance and disclosures of the Checkout Page shown at

Paragraph 40, has remained "substantially the same" at all relevant times herein, *id*. ¶ 39, in that

the same ARL violations featured in the June 2022 exemplar were also present in the versions

that Plaintiffs viewed in 2020, *see id*. ¶¶ 8-9, 42. Furthermore, the FAC describes in detail the

particular ARL violations that affected Plaintiffs at the time of their enrollment in 2020, *see id*.

¶¶ 8-9, 42-51, and the same deficiencies are also present in the June 2022 exemplar. *See also id*.

¶ 58 ("The facts giving rise to Plaintiffs' claims are materially the same as the Class they seek to

represent."). As courts applying identical provisions of California's ARL have held, "[t]hese

allegations are enough to survive the pleading stage." *McKee v. Audible, Inc.*, 2018 WL

11263238, at *19 (C.D. Cal. Mar. 12, 2018); *Price v. Synapse Group, Inc.*, 2017 WL 3131700,

*6 n.1 (S.D. Cal. July 24, 2017); *Kissel v. Code 42 Software, Inc.*, 2016 WL 7647691, at *8

(C.D. Cal. Apr. 14, 2016) (same).[7]

---

[7] Although not binding on this Court, case law concerning California's ARL is persuasive as to the meaning of the substantially identical provisions of Oregon's ARL. Indeed, California's ARL – which was enacted in 2010, one year prior to the enactment of Oregon's ARL in 2011 – features the identical language as Oregon's ARL with respect to legislative intent. *Compare* ORS 646A.292 *with* Cal. Bus. & Prof. Code § 17600 (statement of legislative intent). Additionally, the requirements and prohibitions of the operative provisions of Oregon's ARL are substantively the same as the California version. *Compare* ORS 646A.295(1)-(2) *with* Cal. Bus. & Prof. Code § 17602(a)-(b); *compare also* ORS 646A.295(5) *with* Cal. Bus. & Prof. Code § 17603 (unconditional gift provision). *See also* FAC ¶ 57 (discussing same). Moreover, apart from *Merritt v. Yavone, LLC*, 2015 WL 9256682, at *2 (D. Or. Nov. 5, 2015), *report and recommendation adopted*, 2015 WL 9165898 (D. Or. Dec. 15, 2015), in which the court denied the defendant's motion to dismiss UTPA claims based on violations of ORS 646A.295, no Oregon court has issued a decision concerning Oregon's ARL since its 2011 enactment. **Thus, given the identical policy underpinnings of the California and Oregon ARLs and their substantively identical requirements and prohibitions, as well as the relative lack of decisions (binding or otherwise) applying Oregon's version, interpretations of the California version are of high value in discerning the legislative intent and meaning of identical provisions of the Oregon ARL.** *See, e.g.*, *State v. Rodriguez-Barrera*, 213 Or. App. 56, 68 (2007) ("The rulings of courts in other jurisdictions concerning the meaning of other statutes, of course, are not binding on us. But we find persuasive the reasoning of the majority of the courts that have reviewed the issue, particularly their understanding of the apparent intention of Congress in amending the federal statute[.] … Oregon's legislature adopted the equivalent amendment, and the same reasoning seems to us to apply.") (emphasis added).

<strong>i.    <u>Plaintiffs Plausibly Allege ARL Violations In Pre-<br>Purchase Checkout Page</u></strong>

Next, Defendant argues that "Plaintiffs' claim under ORS 646A.295(1)(a) fails as a matter of law because [Defendant] did just what that section requires: provide the Automatic Renewal Terms in a "clear and conspicuous" manner.  MTD at 22.  Not so.  As discussed below, Plaintiffs plausibly allege that Defendant's pre-purchase disclosures do not comply with the ARL's requirements.  *See* FAC ¶¶ 8-9, 41-46.

<strong>a.    <em>Defendant's Disclosures Are Neither Clear And Conspicuous<br>Nor Are They Presented In Close Visual Proximity To The<br>Request For Consent</em></strong>

As Defendant's brief demonstrates, the parties dispute whether Defendant's automatic renewal disclosures are in fact (1) "clear and conspicuous" and (2) whether they are in fact presented in visual proximity to the request for consent.  *See* MTD at 22-23; *cf.* FAC ¶¶ 42-46. Both of these questions depend on the same issue: whether a *reasonable consumer* would be misled by the substance or form of Defendant's disclosures.  This is typically a question of fact for the jury.  As the Ninth Circuit has explained, "whether a business practice is deceptive will usually be a question of fact not appropriate for decision on [a motion to dismiss]." *Williams v. Gerber Products*, 552 F.3d 934, 938-39 (9th Cir. 2008).  And here, Plaintiffs allege that any relevant "automatic renewal offer terms" appearing on the Checkout Page were insufficient to satisfy the ARL based on ambiguous phrasing, font size, font type, text color, and placement on the Checkout Page.  *See* FAC ¶¶ 40, 42-46.

Further, Plaintiffs allege precisely where Defendant *should have* made the required disclosures on the Checkout Page.  *See* FAC ¶ 39 ("For the purposes of the ARL and this Complaint, the 'relevant portion of the Checkout Page' refers to the text of that portion of the Checkout Page that appears 'in visual proximity … to the request for consent to the offer' (ORS

646A.295(1)(a)), which in this case pertains to the latter block of text located immediately above the final black 'Purchase Subscription' button that customers must press in order to complete the checkout process."); *see also id.* ¶ 40.  Thus, Plaintiffs allege that, under the ARL, the required terms must appear on the Checkout Page, and more precisely they must appear in the block of text immediately above the "Purchase Subscription" button on that page.  *Id.*  However, according to Plaintiffs, "the relevant portion of the Checkout Page for the NYT Subscription does not adequately disclose the recurring amount to be charged to the subscriber's Payment Method each billing period, *see* ORS 646A.293(5)(c)."  *Id.* ¶ 45.  In other words, Plaintiffs allege that these "disclosures" were "presented in such a way that [they] could be, and [were], easily overlooked," thereby rendering them effectively useless.  *Id.* ¶ 45.

"Taking Plaintiff's allegations as true and drawing all reasonable inferences in his favor, as the Court must at this stage, the Court [should not] conclude as a matter of law that the alleged failure to disclose … would not deceive a reasonable consumer."  *Hall v. Marriott Int'l, Inc.*, 2020 WL 4727069 (S.D. Cal. Aug. 14, 2020).  Thus, Plaintiffs' allegations are sufficient at this stage.  *See, e.g.*, *Price*, 2017 WL 3131700, at *6; *Lopez v. Stages of Beauty, LLC*, 307 F. Supp. 3d 1058, 1071–72 (S.D. Cal. 2018) (denying motion to dismiss consumer protection claim based on ARL violations where automatic renewal disclosures were not necessarily clear and conspicuous).

  **b.**  ***Defendant Failed To Fully Disclose Its Cancellation Policy On The Pre-Purchase Checkout Page***

Next, Defendant contends that the Checkout Page complies with the disclosure requirement related to their cancellation policy under ORS 646A.293(5)(b) and ORS 646A.295(1)(a) by informing consumers that they can "notify [NYT] of [their] intent to cancel at any time by <u>contacting Customer Care</u>" and that "[c]ancellations take effect at the end of [the

consumer's] current billing period." *See* MTD at 23.  That is meritless.

Plaintiffs allege that the Checkout Page for the NYT Subscriptions fails to identify several crucial aspects of Defendant's cancellation policy in the requisite manner.  For instance, Plaintiffs allege that the Checkout Page: "contains no explanation of *how* to cancel" (FAC ¶ 43 & n.38; *see also id*. ¶ 8 & n.6; *id*. ¶ 9); "does not specify how long before the end of [the subscription] period cancellation must be affected, or precisely by when the consumer must request cancellation in order to avoid being charged for the subsequent billing period" (*id*. ¶ 43); "fails to mention that cancellation or modification of one's NYT Subscription via phone call to Defendant's Customer Care line may not be permitted 'in the case of certain promotions,'" that "'[t]o cancel and avoid being charged[ in connection with a promotional NYT Subscription offer], [the consumer] must notify [Defendant] before the promotion ends[,]'" or, paradoxically, that '[c]ertain promotions may not permit cancellation during the promotional period'" (*id*. ¶ 43); and "fails to adequately explain that consumers who cancel in the beginning or middle of a given billing cycle 'will not receive a [partial or full] refund for the current billing cycle[,]' even if the consumer does not want to have or use the benefits of the NYT Subscription until the end of that billing cycle" (*id*.).  Each of these terms relates to cancellation, and each is therefore a material component of Defendant's cancellation policy.  *See* FAC ¶ 43 ("These undisclosed terms constitute material aspects of Defendant's cancellation policy.").  Plaintiffs therefore allege that "Defendant failed, and continues to fail," to present a complete 'description of the cancellation policy that applies to the offer.'"  *Id*. (citing ORS 646A.295(1)(a), ORS 646A.293(5)(b)).

Defendant nevertheless challenges Plaintiffs' allegations with respect to its omissions of each of the required disclosures listed above.  For instance, while Defendant concedes that the Checkout Page fails to disclose the above-discussed cancellation term concerning cancellation in

the case of promotional offers, *see* MTD at 23-24, it attempts to justify these omissions on the basis that "the ARL only requires disclosure of the Cancellation Policy 'that applies to the offer' – not every possible policy that might apply." MTD at 24. However, this was not a policy that "might" have applied to Plaintiff Renfrow and similarly situated consumers that enrolled in a promotional NYT Subscription. *See* FAC ¶ 9. It definitively applied, and this was set in stone at the time of her enrollment. Thus, disclosure of this term to Plaintiff Renfrow and other promotional subscribers was required. Yet, as alleged, the Checkout Page that Plaintiff Renfrow viewed in or around December 2020, like the June 2022 exemplar featured at Paragraph 40 of the FAC, failed to disclose this policy. *See id.*

Next, with respect to the omitted refund policy (*i.e.*, the consequences of cancellation), Defendant argues that the Checkout Page sufficiently "indicate[s] that refunds are unavailable by stating that cancellations 'take effect at the end of your current billing period' (so there is nothing to refund)." MTD at 23. But that is not a "clear" or complete statement of Defendant's refund policy because it does not sufficiently communicate that refunds are unavailable for unused subscriptions benefits or partial billing periods.

Finally, Defendant argues that the Checkout Page adequately describes how and when to cancel, *see* MTD at 23, by stating that the consumer "can cancel at any time by <u>contacting Customer Care</u>," FAC ¶¶ 40, 43 (underlining denotes hyperlink), and by including a hyperlink to a separate webpage that provides detail regarding "how to do just that." MTD at 23. Similarly, Defendant argues that these missing aspects of "the Cancellation Policy [are] a part of the Terms of Sale to which Plaintiffs affirmatively agreed when they purchased their subscriptions." MTD at 24 (citation omitted). According to Defendant, "[t]his document, which is incorporated into the parties' contract, includes [NYT's] Cancellation Policy. By providing links to that policy

during the subscription process and notifying subscribers that they were agreeing to its terms, [NYT] sufficiently described its cancellation policy as required." *Id*. (internal citation omitted).

That argument fails for two reasons.  First, contrary to the statement of the Checkout Page, Plaintiffs allege that a subscriber to the NYT Subscriptions cannot actually "cancel at any time" as the Checkout Pages promises.  "[I]n reality cancellation by phone is only possible for subscribers in the U.S. during NYT's customer service hours of operation," FAC ¶ 8 n.6, which are "7 a.m. to 10 p.m. E.T. Monday to Friday, and 7 a.m. to 3 p.m. E.T. on weekends and holidays." *Id*. ¶ 43 n.38.  Additionally, Plaintiffs were "unaware that cancellation is also available via Defendant's 'chat' facility because, contrary to the ARL, this aspect of NYT's cancellation policy was not adequately disclosed on the pre-purchase Checkout Page or in the post-purchase Acknowledgment Email." *Id*. ¶ 8 n.6.  "In any case, 'most of the time and days, their chat facility is unavailable due to excessive chat from customers[.]'" *Id*.  Thus, "NYT's claim that consumers can cancel their subscriptions 'at any time' is demonstrably false." *Id*.[8] Moreover, none of this material information concerning cancellation via phone call and chat is disclosed on the Checkout Page, despite the fact that, "prior to checkout, Defendant was obligated by law to place consumers on notice of these aspects of Defendant's cancellation policy in accordance with the ARL." *Id*. ¶ 43.

Second, although the "Terms of Sale" hyperlink on the Checkout Page may, as Defendant suggests, lead to additional information regarding the applicable cancellation policy, the terms buried in the Terms of Sale webpage are not disclosed "in visual proximity[] … to the request for

---

[8] It goes without saying that the cancellation policy must be disclosed *accurately* and *truthfully*.  The disclosure of a false cancellation policy is no disclosure at all.  Thus, Defendant cannot be said to have complied with the ARL by disclosing a false cancellation policy to the consumers.  *See, e.g.*, *Dutcher v. Google LLC*, No. 20CV366905, 2021 WL 628347, at *4 (Cal. Super. Jan. 27, 2021) ("As urged by Plaintiff, the Complaint alleges that subscribers could not actually cancel anytime, and the Court cannot ignore these allegations or resolve the parties' factual dispute on demurrer.).

consent to the offer," as the ARL requires.  ORS 646A.295(1)(a).  Reference to these omitted

aspects of Defendant's "cancellation policy" set forth on other pages of the NYT Website and/or

App is <u>not</u> tantamount to disclosure of it on the Checkout Page.  As another court recently

explained, mere inclusion of hyperlinks on the Checkout Page cannot satisfy the ARL's pre-

purchase disclosure requirements:

> Defendant primarily relies on purported disclosures contained in a terms
> and conditions agreement related to Beyond +.  Specifically, it argues the
> required terms were accessible through a hyperlink that was a few
> centimeters from the request for consent.  **But the terms themselves—not**
> **the access point to them—need to be in visual proximity to the**
> **request**.  Cal. Bus. & Prof. Code § 17602.  <u>The required terms do not</u>
> <u>appear on the webpage that contains the request for consent</u>. … **Given the**
> **terms appear nowhere near the request for consent**, <u>Plaintiff has</u>
> <u>plausibly alleged Defendant did not comply with section 17602(a)(1)</u>.

*Turnier v. Bed Bath & Beyond Inc.*, 517 F. Supp. 3d 1132, 1139-40 (S.D. Cal. 2021) (some

internal citations and internal footnote omitted; emphasis added).  "Notably, the practice that led

to ARL was the inclusion of autorenewal terms in fine print."  Id. at 1140 n.6 (citation omitted).

As the *Turnier* court pointed out, "[t]he use of a hyperlink to the terms presents a similar

practice."  *Id*.  Thus, that the ARL's disclosure requirements cannot be satisfied through

incorporation by reference to terms disclosed in another webpage or location, beyond the

Checkout Page, comports with a plain reading of the ARL, as well as legislative intent.

 The Ninth Circuit already rejected substantially the same arguments Defendant advances

here in 2018, based on violations of identical provisions of California's ARL, Cal. Bus. & Prof.

Code §§ 17602, *et seq*.  *See Johnson v. Pluralsight, LLC*, 728 F. App'x 674, 677 (9th Cir. 2018)

("[Plaintiff's] complaint alleges that [defendant] <u>violated the ARL by charging him without first</u>

<u>providing information on how to cancel the subscription</u>.  The record also indicates that

consumers signing up for trial subscriptions were not specifically given instructions on how to

cancel before payment. … [Plaintiff's] allegations that [defendant] 'failed to ... allow Plaintiff and Class Members to cancel before payment,' are sufficient to support an inference that [the] products were allegedly unconditional gifts because the company failed to procure [plaintiff's] 'affirmative consent as described in Section 17602.") (internal citations omitted and emphasis added).  Following the Ninth Circuit's lead in *Johnson*, another court similarly explained:

> The webpage does not include information instructing the subscriber that they must call th[e listed] phone number at least one day prior to the date the next monthly delivery ships.  <u>Accordingly, Plaintiff sufficiently alleges that Defendant's "description of the cancellation policy that applies to the offer" is incomplete</u>, and therefore, <u>it is plausible that the incomplete cancellation policy violates the ARL</u>.

*Lopez*, 307 F. Supp. 3d at 1071–72 (emphasis added and citation omitted).

As *Turnier*, *Johnson*, and *Lopez* make clear, the fact that the ARL does not prescribe any specific cancellation policy is of no moment.  Nor does it matter that the terms are disclosed in webpages hyperlinked to the Checkout Page.  What matters here is that Defendant's cancellation policy is buried in separate webpages linked on the Checkout Page, instead of actually disclosed to consumers *on the Checkout Page* itself, as the ARL requires.  *See* ORS 646A.295(1)(a); ORS 646A.293(5)(b).  Instead of making those mandatory disclosures, Defendant decided to omit material terms related to cancellation from the Checkout Page in favor of hiding them elsewhere on its website.  *See* FAC ¶¶ 43-44.  Thus, as in *Johnson*, *Lopez*, and *Turnier*, Plaintiffs here have sufficiently alleged that Defendant's "description of the cancellation policy that applies to the offer" is incomplete in violation of the ARL (and, thus, the UTPA).  *Id*.[9]

---

[9] Defendant cites *Hall v. Time, Inc.*, 2020 WL 2303088, *4 (C.D. Cal. Mar. 13, 2020), *aff'd*, 857 F. App'x 385 (9th Cir.), in support of its argument for dismissal of Plaintiffs' UTPA claims based on failure to disclose the full cancellation policy *on the pre-purchase Checkout Page, in violation of ORS 646A.295(1)(a)*.  *See* MTD at 23-24.  However, the relevant holding in *Hall* concerned the cancellation policy disclosure of *post-purchase Acknowledgment Email,* which was alleged to have violated Cal. Bus. & Prof. Code § 17602(a)(3)—the California ARL's equivalent of ORS 646A.295(1)(c).  *See Hall*, 2020

ii.    **Defendant's Internet Agreement Does Not Confer Affirmative Consent**

"'The purpose of the ARL is to protect consumers from unwittingly consenting to automatic renewals or subscription orders.'" *Lopez*, 307 F. Supp. 3d at 1071 (quoting *Price*, 2017 WL 3131700, at *5). To achieve this, the ARL requires, among other things, that Defendant "obtain[] the consumer's ***affirmative consent*** to the agreement containing the automatic renewal offer terms or continuous offer terms," and it makes it "unlawful to … [c]harge the consumer's credit or debit card or payment account with a third party for an automatic renewal or continuous service without first" doing so. ORS 646A.295(1)(b). This requirement "must be met prior to the completion of the initial order for the automatic renewal or continuous service." ORS 646A.295(4). As Plaintiffs allege, Defendant did not satisfy this requirement. *See* FAC ¶ 41; *see also id*. ¶ 47.

Predictably, Defendant asserts that Plaintiffs are wrong because: (1) the ARL does not require a separate checkbox for the automatic renewal, *see* MTD at 26; and (2) NYT obtains a consumer's consent by having the consumer click the "Purchase Subscription" button at the bottom of the Checkout Page for the NYT Subscriptions, *see id*. at 26. That is nonsense.

<u>First</u>, Defendant disputes this requirement to obtain affirmative consent, instead arguing that it has done so because "the Checkout Page[] … states immediately above the 'Purchase Subscription' button that 'By subscribing, you agree to the Automatic Renewal Terms on this

---

WL 2303088, at *5. The *Hall* court did *not* consider the sufficiency of the defendant's pre-purchase cancellation policy disclosures, as is necessary here. *See generally id*. Moreover, with respect to the alleged the Acknowledgement Email omissions, the "trial court held the plaintiff failed to state a claim under … the ARL, **but the information Plaintiff[s] contend[] is lacking here—the date by which he was required to cancel—was specifically provided in *Hall*, within the single postcard acknowledgement**." *Dutcher*, 2021 WL 628347, at *4 n.2 (emphasis added) (citing *Hall*). Thus, far from compelling dismissal, *Hall* actually "supports" Plaintiffs' theory of ARL liability under ORS 646A.295(1)(c). *See id*.

page, our Terms of Sale and Terms of Service,'" and "the 'Automatic Renewal Terms' are located directly above this statement[ with hyperlinks to] both the Terms of Sale and Terms of Service [webpages.]"  MTD at 26; *id*. at 27 ("Plaintiffs' act of purchasing a subscription after having the opportunity to view the Automatic Renewal Terms and the Terms of Sale was independently sufficient to indicate consent.").  But Defendant does not distinguish between ordinary consent, as is required for the formation of a contract under common law principals, and the statutory "*affirmative* consent" required by the Oregon Legislature pursuant to the ARL.

Defendant's interpretation is problematic because it "would render the legislature's inclusion of the word '[affirmative]' in [ORS 646A.295(1)(a)] meaningless surplusage[.]"  *State ex rel. Rosenblum v. Living Essentials, LLC* [hereinafter "*Living Essentials*"], 313 Or. App. 176, 210, *review allowed*, 368 Or. 787 (2021) (citation omitted).  "As a general rule, we [] assume that the legislature did not intend any portion of its enactments to be meaningless surplusage." *State v. Clemente-Perez*, 357 Or. 745, 755 (2015) (citation omitted); *see also* ORS 174.010 ("General rule for construction of statutes") (instructing courts to construe statutes so as to "give effect to all" provisions, and "not to insert what has been omitted, or to omit what has been inserted").  Indeed, the legislature's use of the phrase "affirmative consent" in ORS 646A.295(1)(a) indicates that ordinary "consent" is insufficient to satisfy the ARL.  "To conclude otherwise would render the legislature's inclusion of the word '[affirmative]' in [ORS 646A.295(1)(a)] meaningless surplusage[.]"  *Living Essentials*, 313 Or. App. at 210 (citation omitted).  This Court should not adopt Defendant's erroneous interpretation.

Further, in muddying the distinction, Defendant also conflates two wholly distinct requirements under the ARL, namely: (1) the requirement that Defendant provide consumers with ***notice*** of the automatic renewal terms *vis-a-vis* clear and conspicuous disclosures; and (2)

the requirement that Defendant obtain consumers' affirmative ***consent*** to the agreement containing the automatic renewal terms.  At best, the presence of the requisite disclosures in the space immediately above the "Purchase Subscription" button, without more, could only serve to place a consumer on ***notice*** of those disclosures, but it would not serve to obtain the consumer's ***consent*** to those terms (affirmative or otherwise).

Second, what Defendant describes is nothing but a "browsewrap" agreement—or, at best, a "[h]ybrid internet agreement[, ] sometimes referred to as 'hybridwrap' or "sign-in-wrap" agreement[.]"  *Lundbom v. Schwan's Home Service*, 2020 WL 2736419, at *4 (D. Or. May 26, 2020).  A browsewrap agreement is one where the "consumer assents to the Terms & Conditions simply by using the website or purchasing a subscription, without visiting the Terms & Conditions page or even acknowledging that use of the website constitutes assent to the Terms & Conditions."  *Lopez v. Terra's Kitchen, LLC* ("*Terra's Kitchen*"), 331 F. Supp. 3d 1092, 1099 (S.D. Cal. 2018).  "The defining feature … is that the user can continue to use the website or its services without visiting the page hosting the browsewrap agreement or even knowing that such a webpage exists."  *Nguyen*, 763 F.3d at 1175-76.  Similarly, hybridwrap agreements "'prompt the user to manifest assent to particular terms by engaging in some dual-purpose action, such as creating an account' or making a purchase," but, as with browsewrap agreements, the user is not required or prompted to actually visit the webpage hosting the terms to which the consumer is required to assent.  *Lundbom*, 2020 WL 2736419, at *4 (citation omitted).[10]

---

[10] In contrast, "'[c]lickwrap' agreements are contracts formed on the internet, 'in which website users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use[.]'" *Hopkins v. Genesis FS Card Servs., Inc.*, 2020 WL 466636, at *1 n.2 (D. Or. Jan. 9, 2020), *report and recommendation adopted*, 2020 WL 437544 (D. Or. Jan. 28, 2020) (citing *Nguyen*, 763 F.3d at 1175-76). In other words, clickwrap agreements "require a user to affirmatively click a box on the website acknowledging awareness of, and agreement to, the terms of service before he or she is allowed to proceed with further utilization of the website." *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 397 (E.D.N.Y. 2015); *accord Lundbom*, 2020 WL 2736419, at *4.

Page 27 - RESPONSE TO MOTIONS TO DISMISS AND STRIKE

In the context of the ARL, browsewrap or hybridwrap agreements like the one at issue here are insufficient to confer affirmative consent.  That is because, as consent decrees obtained through ARL enforcement actions in California demonstrate, affirmative consent is obtained:

> [T]hrough a check-box, signature, express consent button, or other substantially similar mechanism that [consumers] must affirmatively select to give their consent.  This mechanism cannot relate to consent for anything other than the AUTOMATIC RENEWAL OFFER TERMS (such as final payment or completion of the transaction).

*People v. Guthy-Renker LLC*, No. 19-cv-341980, at *5 (Cal. Super. Ct. Feb. 1, 2019); *see also People v. eHarmony, Inc.*, No. 17-cv-03314, at *4 (Cal. Super. Ct. Jan. 8, 2018); *People v. Beachbody, LLC*, No. 55029222, at *5 (Cal. Super. Ct. Aug. 24, 2017).  Also, *Turnier* recently rejected the same argument Defendant makes here.  *See* 517 F. Supp. 3d at 1139-40.

Defendant's inclusion of hyperlinks to its "Terms of Sale" and "Cancellation and Refund Policy" likewise undercut any finding of affirmative consent here.  That is because "where a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on – without more – is insufficient to give rise to notice."  *Terra's Kitchen*, 331 F. Supp. 3d at 1100 (internal quotations omitted).  Moreover, "[t]hat a consumer could have come across the required information somewhere else on [Defendant's] website does not mean that [Plaintiff] has not suffered a concrete injury when a health studio fails to include the mandatory disclosures in the actual agreement."  *Cavka v. SoulCycle Inc.*, 2017 WL 2906034, *4 (C.D. Cal. 2017); *Nguyen,* 763 F.3d at 1179 ("[C]onsumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound.").  As such, the proximity or conspicuousness of the "Terms of Sale" and "Cancellation and Refund Policy"

hyperlinks cannot save Defendant.[11]

Defendant's citations do not compel a different conclusion.  First, Defendant cites *Lundbom*, 2020 WL 2736419, at *6, for the proposition that "policies available via hyperlink are incorporated into the parties' agreement where a plaintiff agrees to them by clicking a 'Complete Registration' button."  MTD at 25.  However, that is not what *Lundbom* holds.  Rather, the court determined that the plaintiff provided authorization "when she clicked the 'Complete Registration' button with the **check-box** corresponding to phone communications checked."  *Id*. at *8 (emphasis added).  Thus, the internet agreement at issue in *Lundbom* involved exactly what Plaintiffs allege is missing here:[12] "a 'checkbox' next to the automatic renewal offer terms or other similar mechanism to complete the checkout process."  FAC ¶ 47.[13]

---

[11] Regardless, even if the Checkout Page here did contain a "checkbox" or similar device requiring affirmative consent (it does not), that would be insufficient to constitute affirmative consent to terms that appear on a separate page. *See, e.g., Terra's Kitchen*, 331 F. Supp. 3d at 1099 ("Defendant points to no language on its webpages indicating that by clicking a button on its webpage, the consumer is indicating that he or she has read and agrees to the Terms & Conditions."); *cf.* FAC ¶ 40.

[12] Moreover, *Lundbom* did not involve application of the ARL.  Other courts have held in ARL cases that "the transactional context is an important factor to consider and is key to determining the expectations of a typical consumer."  *Sellers*, 73 Cal. App. 5th at 481; *id.* at 480 ("[A] textual notice of the existence of contractual terms that limit the consumer's ability to address ARL violations should, in our view, be at least as conspicuous as the notice required by the statute in the first instance.  At a minimum, … the statutory requirements of the ARL, and its stated intent to protect consumers from unwittingly being entered into automatically recurring memberships, must be considered as part of the overall transactional context."); *B.D. v. Blizzard Ent., Inc.*, 76 Cal. App. 5th 931, 948 (2022) ("[T]he *Sellers* court found that in the context of a transaction governed by the ARL, the sign-in wrap notices 'were not sufficiently conspicuous to bind' the plaintiffs because the notices were 'significantly less conspicuous than the statutory notice requirements governing [the plaintiffs'] underlying [ARL] claims.'") (citations omitted).

[13] Defendant's citation to *Rutter v. Apple Inc.*, 2022 WL 1443336, *6 (N.D. Cal. May 6, 2022), is similarly unavailing.  *See* MTD at 24-25.  In holding that the defendant had adequately disclosed to consumers the "description of the cancellation policy that applies to the offer" by linking to its Terms and Conditions, the *Rutter* court explained that "the Amended Complaint acknowledges" that "the iCloud Terms and Conditions … are provided to each user before they subscribe to iCloud," and that it "fails to plausibly explain why or how iCloud users who chose to upgrade their storage did not consent to this agreement[.]"  2022 WL 1443336, at *5.  By contrast, in this case, the FAC does not indicate that the terms embedded in the webpages hyperlinked to the Checkout Page were ever provided to Plaintiffs before they subscribed to the NYT Subscriptions—in fact, Plaintiffs allege the exact opposite.  *See* FAC ¶ 43.  Further, the FAC extensively details why and how Plaintiffs did not consent or agree to the terms of the hyperlinked webpages.  *See id.* ¶¶ 8-9, 42-53.  Thus, *Rutter* is inapposite.

### iii.    Defendant's Acknowledgment Email Failed To Comply With The ARL

Defendant argues that the post-checkout Acknowledgment Emails for the NYT Subscriptions complied with the ARL because, according to Defendant, "Plaintiffs allege nothing about what was in the Acknowledgement Emails that were sent *to them*."  MTD at 28 (italics in original).  "Instead," Defendant contends, "they include a screenshot of an 'example' email from 2020, and then assert that the email is deficient – without alleging whether their emails were identical, or even substantially similar."  *Id*. at 28-29.  Thus, Defendant argues that Plaintiffs fail to meet the heightened pleading standards under Rule 9(b).  *See id*.  That argument fails for the same reasons discussed with respect to Defendant's Checkout Page above, *supra*.[14] Moreover, since Plaintiffs allege that they initially enrolled in the NYT Subscriptions in 2020, the Acknowledgment Email shown at Paragraph 49 of the FAC, which is dated 2020, was sent in use by Defendant close in time to the dates of Plaintiffs' enrollments and thus is fairly representative of what Plaintiffs saw when they enrolled and received their Acknowledgment Emails at that time.  Furthermore, as alleged, the Acknowledgment Email that Defendant sent to Plaintiff has featured the same ARL violations at all relevant times to this litigation.  *See id*. ¶ 39. As with the exemplar Checkout Page of the FAC, these allegations are sufficient to satisfy the Rule 9(b) pleading standards.

Defendant also argues that "Plaintiffs' allegations of inadequate 'acknowledgement' are deficient because they presuppose that the Acknowledgement Email is the only way in which [NYT] could comply with ORS 646A.295(1)(c)(2)."  MTD at 29.  But it is irrelevant whether

---

[14] Namely, the FAC describes in detail the particular ARL violations of the Acknowledgment Email that affected Plaintiffs, *see* FAC ¶¶ 8-9, 48-51, and the same deficiencies are also present in the 2020 exemplar provided, *see id*. ¶ 40.  *See also id*. ¶ 58 ("The facts giving rise to Plaintiffs' claims are materially the same as the Class they seek to represent.").

ORS 646A.295(1)(c) can be satisfied with anything other than an acknowledgment, because in this case, nothing else did. As discussed above, the Checkout Page failed to provide the same "offer terms" that the ARL also requires be adequately disclosed in the Acknowledgment Email. And even if it did adequately disclose such terms (it did not), the Checkout Page is still incapable of satisfying ORS 646A.295(1)(c) because, as Defendant implicitly concedes, the Checkout Page is not a document that is "'capable of being retained by the consumer.'" MTD at 29 (quoting ORS 646A.295(1)(c)). Further, Defendant cites *Rutter*, 2022 WL 1443336, at *7, as support for its argument that the webpages hyperlinked to the Checkout Page satisfy this requirement, but *Rutter* is inapposite for the reasons discussed above. *See supra* at p. 29, n.13.

In short, what matters here is that Defendant's complete cancellation policy and other required disclosures are buried in separate webpages linked in the Acknowledgment Email. *See* FAC ¶ 52. That is a direct violation of the ARL's requirement that such information be disclosed to consumers *in the acknowledgment email* itself. *See* ORS 646A.295(1)(c). Instead of actually making these mandatory disclosures in the acknowledgment email, Defendant chose to place the mandatory disclosures on separate pages of its website, which Defendant then incorporated by inconspicuous reference in the Acknowledgment Emails. *See* FAC ¶¶ 48-50**.** Simply put, that is not allowed by the plain text of the ARL. *See Dutcher v. Google LLC*, No. 20CV366905, 2021 WL 628347, at *4 (Cal. Super. Jan. 27, 2021) ("Plaintiff plausibly alleges that Defendants violated the ARL's requirement to 'disclose in the acknowledgment how to cancel[.] … <u>While Defendants accuse Plaintiff of 'invent[ing] a rule that the disclosures must be contained within one acknowledgement email,' this interpretation is consistent with the plain language of the statute, and Defendants provide no authority supporting a contrary interpretation</u>.") (emphasis added) (internal citations and footnote omitted) (citing Bus. & Prof.

Code § 17602(a)(3), which is the California ARL's equivalent of ORS 646A.295(1)(c)).

### C.    Plaintiffs State A Claim For Unjust Enrichment

Next, Defendant argues that Plaintiffs' unjust enrichment claim should be dismissed for four reasons.  *See* MTD at 30-33.  Each of Defendant's arguments fails.

First, Defendant argues that "a claim for unjust enrichment is a state common law claim—yet Plaintiffs fail to identify which state's law of unjust enrichment they are invoking. … Given Plaintiffs' failure to identify a source of law, their unjust enrichment claim must be dismissed."  MTD at 30-31.  But, as explained below in the context of Plaintiffs' nationwide class action claims for unjust enrichment, that argument is premature prior to discovery.  *See, e.g.*, *In re Clorox Consumer Litigation*, 894 F. Supp. 2d 1224, 1237 (N.D. Cal. 2012).  Thus, Defendant's challenge should be addressed at class certification with a developed record.

Second, based on *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020), Defendant next argues that unjust enrichment is not available when an adequate legal remedy exists.  *See* MTD at 31.  However, Defendant overlooks a large swath of case law demonstrating that Plaintiffs may plead alternative legal theories, including unjust enrichment, under Federal Rule of Civil Procedure 8(d).  *See, e.g.*, *Nacarino v. Chobani, LLC*, 2022 WL 344966, at *10 (N.D. Cal.  Feb. 4, 2022); *Brown v. Natures Path Foods, Inc.*, 2022 WL 717816, at *6 (N.D. Cal. Mar. 10, 2022).  Here, Plaintiffs' equitable and damages claims may co-exist at the pleading stage based on their request for injunctive relief.  Indeed, injunctive relief is appropriate because Defendant's violations are continuing, *see* FAC ¶¶ 69, 80, 88, and because reasonable consumers rely on their omissions and misstatements during the sign-up process, *id.* ¶¶ 56, 87.[15]  Thus,

---

[15] For instance, due to Defendant's inadequate disclosures, Plaintiff Renfrow "remains enrolled in, and continues to receive monthly renewal charges for, her NYT Subscription to this day, despite the fact that she does not want to remain subscribed or pay further renewal fees."  *Id.* ¶ 9 ("As a direct result of

without corrective action, more reasonable consumers, including Plaintiff Renfrow, will inevitably be injured by Defendant's continuing violations. *See id*. ¶ 69. Accordingly, the FAC establishes that injunctive relief is necessary to ensure that Plaintiffs and Class Members can reasonably rely on the truth and comprehensiveness of Defendant's disclosures in the future. *See Kay v. Copper Cane, LLC*, 549 F. Supp. 3d 1014, 1026 (N.D. Cal. 2021). An injunction requiring NYT to truthfully and fully disclose applicable offer terms in compliance with the ARL would provide this assurance. Monetary damages would not.

Third, Defendant argues that a claim for unjust enrichment is only permitted where no enforceable contract exists," and, according to Defendant, Plaintiffs plead that an enforceable contract exists here because they "allege that they entered into subscription agreements with [NYT]." MTD at 31. That is not necessarily true. As Defendant's motion concedes, the FAC "does dispute the contours of these agreements by alleging that they contained material omissions," *id*., yet Defendant fails to recognize the significance of this allegation. If, as alleged, Plaintiffs did *not* have notice of the omitted or obscured offer terms discussed herein, then any contract Plaintiffs formed with Defendant would not include those terms due to a lack of mutual assent. Thus, Defendant would not be permitted to withdraw the funds from Plaintiffs' Payment Methods in the amounts or at the times that it did, or at all, under any enforceable contract that may exist. Without a contractual right to withdraw recurring charges from Plaintiffs' Payment Methods, the fact that they did so would be "unjust" within the meaning of unjust enrichment.[16]

---

Defendant's violations of the ARL, Ms. Renfrow … continues to suffer, economic injury.").

[16] Moreover, "all goods, wares, merchandise, and/or products sent to Plaintiffs and the Class in violation of the statute are deemed," by operation of law, "to be 'unconditional gift[s] to the consumer who may use or dispose of them in any manner the consumer sees fit without[.]'" FAC ¶ 55 (citing ORS 646A.295(5)); *see also id*. ¶ 84. As such, Plaintiffs allege that, when Defendant withdrew money from Plaintiffs' Payment Methods, they were taking money from Plaintiffs for goods they already unconditionally owned, and for which they had no obligation to pay (and Defendant had no right to

Fourth, Defendant insists that "there is nothing 'unjust' about [NYT] keeping the money that Plaintiffs paid for their subscriptions, given the disclosures available on the Checkout Page and the fact that there is no dispute [NYT] provided Plaintiffs with the services it promised." MTD at 32.  Wrong again.  Here, Plaintiffs allege that Defendant was unjustly enriched when it collected and retained the monies Plaintiffs paid for the NYT Subscriptions, even though the goods and benefits for which they unwittingly paid were, by operation of law, unconditional gifts to Plaintiffs, for which Defendant had no legal right or authority to charge a single dollar.  *See* FAC ¶¶ 1-9, 55, 84, 96; *see also* ORS 646A.295(5) (unconditional gift provision).  Thus, Plaintiffs allege "that it would be unjust to allow [Defendant] to retain the benefit" of Plaintiffs' money, as is required to state a claim for unjust enrichment under Oregon law.  *Unigestion Holdings, S.A. v. UPM Tech., Inc.*, 580 F. Supp. 3d 932, 954 (D. Or. 2022) (citation omitted).

### D.    Plaintiffs' Nationwide Class Allegations Should Not Be Struck

Finally, Defendant seeks to strike Plaintiffs' nationwide claims for unjust enrichment based on the argument that such claims cannot be certified because there is a conflict of laws on material issues between the laws of the various states in which the named Plaintiffs and putative Class Members reside.  *See* MTD at 33.  But that argument is premature at this stage.  *See Mattson v. New Penn Fin., LLC*, 2018 WL 6735088, at *2 (D. Or. Nov. 6, 2018), *report and recommendation adopted*, 2019 WL 123870 (D. Or. Jan. 4, 2019) ("Courts in this circuit repeatedly have denied motions to strike class allegations prior to discovery as premature.") (collecting cases).  Indeed, "[d]ismissing class allegations at the pleading stage is rare because

---

charge).  *See id.* ¶ 96.  Arguably, this would render Plaintiffs' contract null and void for, *inter alia*, lack of consideration.  Thus, Plaintiffs plausibly allege that "Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs … purchases of the NYT Subscriptions."  *Id.*; *see also L.Q. Dev., Oreg. v. Mallory*, 98 Or. App. 121, 125 (1989) ("The court did not err when it ordered defendant to make restitution.  Even though the parties may not have made an enforceable contract, if one of them has been unjustly enriched at the other's expense, the former has a 'quasi-contractual' duty to make restitution.").

'the parties have not yet engaged in discovery and the shape of a class action is often driven by the facts of a particular case.'" *Id*. at *2 (citations omitted).

Moreover, "motions to strike class allegations are generally disfavored because 'a motion for class certification is a more appropriate vehicle' for testing the validity of class claims." *Ott v. Mortg. Invs. Corp. of Ohio*, 65 F. Supp. 3d 1046, 1062 (D. Or. 2014) (citation omitted). Indeed, the primary Ninth Circuit decision Defendant cites as support of its argument on this point, *Mazza v. American Honda Motor Co., Inc.*, 666 F.3d 581, 591 (9th Cir. 2012), addressed whether a claim should be certified for a nationwide class *at the class certification stage*, after the parties had an opportunity to conduct discovery. *See id*. at 594. The same result should hold here because "such a fact-heavy inquiry should occur during the class certification stage, after discovery." *Clancy v. The Bromley Tea Co.*, 308 F.R.D. 564, 572  (N.D. Cal. 2013).[17]  The motion to strike must therefore be denied as premature.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Defendant's motion to dismiss in its entirety.  Alternatively, if the motion is granted in any respect, Plaintiffs should be given leave to amend.  *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

---

[17] *See also In re Clorox*, 894 F. Supp. 2d at 1237 ("Since the parties have yet to develop a factual record, it is unclear whether applying different state consumer protection statutes could have a material impact on the viability of plaintiffs claims"); *Forcellati v. Hyland's, Inc.*, 876 F. Supp. 2d 1155, 1159 (C.D. Cal. 2012) ("[I]t would be premature to speculate about whether the difference in various states' consumer protection laws are material in this case."); *Barber v. Johnson & Johnson Co.*, 2017 WL 2903255, at *9 (C.D. Cal. Apr. 4, 2017) ("Although Defendants identify several differences between the warranty laws of the various states, the Court concludes that deciding which of these differences are material to class certification is premature where there has been no discovery and Defendants have not yet filed an answer to the FAC.") (internal citation omitted); *In re Seagate Tech. LLC Litig.*, 2017 WL 3670779, at *4-5 (N.D. Cal. Aug. 25, 2017) (after a lengthy analysis of *Mazza*, deciding not to strike nationwide unjust enrichment claim at the pleading stage: "Even assuming … that the circumstances of this case could support early resolution of the choice of law and nationwide class questions that Seagate raises, these are not the sort of issues that the Court would resolve on its own motion, for a number of reasons.").

Dated: October 14, 2022                Respectfully submitted,

                                       **MARKOWITZ HERBOLD PC**

                                       By:      *s/ Jermaine F. Brown*
                                                Stanton R. Gallegos, OSB #160091
                                                StantonGallegos@MarkowitzHerbold.com
                                                Jermaine F. Brown, OSB #073415
                                                JermaineBrown@MarkowitzHerbold.com
                                                *Attorneys for Plaintiffs and the*
                                                *Putative Class*

                                       **BURSOR & FISHER, P.A.**

                                       Neal J. Deckant *
                                       ndeckant@bursor.com
                                       Julia K. Venditti *
                                       jvenditti@bursor.com
                                       1990 North California Boulevard, Suite 940
                                       Walnut Creek, CA  94596
                                       Telephone:  (925) 300-4455

                                       Philip L. Fraietta *
                                       pfraietta@bursor.com
                                       Frederick J. Klorczyk III *
                                       fklorczyk@bursor.com
                                       888 Seventh Avenue
                                       New York, NY  10019
                                       Telephone:  (646) 837-7150

                                       *\* Pro Hac Vice Application Forthcoming*
                                       *Attorneys for Plaintiffs and the Putative Class*